UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

Chloe Coscarelli, CC Hospitality Holdings LLC, and Chef Chloe LLC,

              Plaintiffs,

    -against-

Bain Double Impact Fund LP, BCIP Double Impact Associates, L.P. , Kitchen Fund, L.P., KF-Chloe LLC, Greg Golkin, Collab + Consumer Fund I, L.P., Lion/BC LLC, and Qoot International UK Limited

              Defendants.

------------------------------------ X

CASE NO.  1:21-cv-4159

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      This case is about a circle of greed. The defendants include some of the largest private equity firms in the world with over $130 billion in assets under their management. They teamed up with ESquared Hospitality and James Haber—notorious for his own tax schemes—to profit off celebrity chef Chloe Coscarelli's name. As detailed throughout this Complaint, they prioritized their own financial self-interest over what was right and lawful. They used their power and money to take advantage of a young, talented, and successful female entrepreneur.

2.      Chloe Coscarelli has earned the reputation as America's favorite vegan chef. After winning Food Network's Cupcake Wars and becoming a best-selling cookbook author, Chloe founded "by Chloe"—a first-of-its-kind fast-casual vegan restaurant chain. "by Chloe" featured Chloe's name precisely because her name is so valuable. And Chloe knew this value, which is why she ensured her name was protected. For instance, Chloe negotiated and agreed to license rights to her name that were conditional on, and limited by, terms and conditions that her original business partner, ESquared Hospitality, and the by Chloe company had to honor.

1

3.      Yet ESquared Hospitality—and its CEO James Haber—had other plans. Haber intended to "milk" Chloe's name "til we can't!" To execute this scheme, ESquared Hospitality purported to repurchase Chloe's 50% membership interest in the by Chloe company for zero dollars. At this time, ESquared Hospitality valued the company at $75 million. ESquared Hospitality and Haber then invited private equity investors, like Bain Capital and Kitchen Fund, to join their efforts to milk Chloe's name. And they accepted.

4.      The Investor Defendants (defined below) ultimately contributed over $30 million for that purpose. The valuation of fast-casual restaurant companies is generally driven by the number of locations: the more stores, the higher the valuation. Thus, the Investor Defendants intended and induced a rapid expansion of "by Chloe" stores. They sought to maximize their internal rate of return by exploiting what the company referred to as its "crown jewel asset"—the trademark featuring Chloe's name.

5.      But no one had any authority to misappropriate and infringe Chloe's name in this manner. In fact, Chloe terminated the company's license to her name back in March 2018. And the by Chloe company has violated the terms and conditions of the agreements with Chloe and her entity, Chef Chloe. The Investor Defendants simply did not care. They continued to misuse and misappropriate Chloe's name. Indeed, even after the Honorable Faith S. Hochberg (Ret.) declared that Chloe's business entity—Chef Chloe—remained a 50% owner in the by Chloe company, the Investor Defendants still refused to recognize her ownership and continued to misappropriate her name unlawfully. The Investor Defendants exploited Chloe's name to maximize their own financial interest while also denying Chloe the opportunity to benefit from the company she created and that bore her name.

6.     The Investor Defendants' immense financial resources do not place them above the law. Chloe and her affiliated entities bring this complaint for vicarious trademark infringement, civil conspiracy, and unjust enrichment to hold them accountable for their unlawful misconduct.

## PARTIES

7.     Plaintiff Chloe Coscarelli (Chloe) is an individual and resident of California.

8.     Plaintiff Chef Chloe LLC (Chef Chloe) is a California Limited Liability Company wholly owned by Chloe.

9.     Plaintiff CC Hospitality Holdings LLC (CC Hospitality) is a California Limited Liability Company wholly owned by Chloe.

10.     Defendant Bain Capital Double Impact Fund, L.P.  (BC Double Impact Fund) is a Limited Partnership with its principal place of business at 200 Clarendon Street, Boston, MA 02116.

11.     Defendant BCIP Double Impact Associates, L.P. is a Limited Partnership with its principal place of business at 200 Clarendon Street, Boston, MA 02116. Bain Capital Defendants refers to Bain Capital Double Impact Fund and BCIP Double Impact Associates collectively.

12.     Defendant Kitchen Fund, L.P. is a Limited Partnership with its principal place of business at 500 Park Avenue, 4th Floor, New York, NY 10022.

13.     Defendant KF-Chloe LLC is a limited liability company with its principal place of business at 500 Park Avenue, 4th Floor, New York, NY 10022.

14.     Defendant Gregory Golkin is an individual and a resident of New York. Kitchen Fund Defendants refers to Kitchen Fund, KF-Chloe, and Golkin collectively.

15.     Defendant Collab + Consumer Fund I, L.P. is a Delaware limited partnership formed on September 29, 2016 with its principal place of business at 347 Bowery, 2nd Floor, New York, NY 10003.

16.     Defendant Lion/BC LLC is a Limited Liability Company with its principal place of business a 21 Grosvenor Place, London SW1X 7HF, UK.

17.     Defendant Qoot International UK Limited is a foreign legal entity with its principal place of business at 276 Vauxhall Bridge Road, 3rd Floor, London SW1V 1BB, UK.

18.     As used throughout this Complaint, "the Investor Defendants" shall refer collectively to the Bain defendants; the Kitchen Fund defendants; Collab + Consumer defendant; Lion/BC defendant; and Qoot International defendant.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over the Investor Defendants because they all have conducted business in New York, which give rise to the causes of action in this Complaint.

20.     This Court has federal subject matter jurisdiction under 15 U.S.C. §§1121, 1125, and 28 U.S.C. §1331 for violating the federal trademark laws of the United States.

21.     This Court has pendent and supplemental jurisdiction under 28 U.S.C. §1367 for related state law claims.

22.     Venue is proper under 28 U.S.C. §1391(b)(2).

## BACKGROUND

**Chloe**

23.     Chloe has earned the recognition as America's favorite vegan chef. After graduating from UC-Berkley, she attended culinary school at the prestigious Natural Gourmet Institute in New York City and received a plant based nutrition degree from Cornell University.

At age 22, Chloe appeared on—and won—Food Network's hit television competition, Cupcake Wars.

24.     After Cupcake Wars, mainstream America started to appreciate Chloe and her talent. The New York Times published its first feature article about Chloe and her success as a vegan chef. Chloe published three best-selling cookbooks with Simon & Schuster: Chloe's Kitchen, Chloe's Vegan Italian Kitchen, and Chloe's Vegan Desserts. And Woman's World magazine featured Chloe on its cover and in a high-profile article.

25.     Chloe also hosted the first ever sold out vegan dinner at the South Beach Wine & Food Festival. She collaborated with "Top Chef" Tom Colicchio for a vegan pop-up restaurant called Supernatural. And she cooked the first vegan dinner hosted at the James Beard House.

26.     National and culinary media have showcased Chloe's success. The New York Times, Zagat, and Forbes have each profiled Chloe in their "30 under 30" series. Chloe makes frequent appearances on the Today Show, among other national television networks and shows.

27.     Chloe owns common law trademark rights in her name "Chloe" and variations of Chloe's name. Since 2010, for instance, Chloe has been using "Chloe" and "Chef Chloe" in commerce. "Chloe" and "Chef Chloe" have been a source identifier for cookbooks, recipes, cooking shows, retail products, special events, catering, and vegan food and beverages.

28.     Chloe, through CC Hospitality Holdings LLC, owns the registered trademark for "Chef Chloe" for "Providing a website featuring information in the field of recipes and cooking" (Reg. No. 5269199).

**ESquared Hospitality, Haber, and Wasser**

29.     James Haber maintains a labyrinth of corporate entities for his and his children's benefit, including various entities that utilize the "ESquared Hospitality" brand.

30.     Haber has a history of sharp business practices that are relevant here. *See*

*Humboldt Shelby Holding Corp. & Subsidiaries v. Comm'r of Internal Revenue,* 606 F. App'x 20

(2d Cir. 2015) (affirming penalties for Haber artificially creating $75,000,000 in tax losses,

holding that Haber's transactions amounted to a "sham," "devoid of economic substance");

*Ironbridge Corp. v. C.I.R.,* 528 F. App'x 43, 44 (2d Cir. 2013) (affirming two separate U.S. Tax

Court decisions charging Haber's company Ironbridge Corp. "with a total of $44,075,776.80 in

unpaid taxes and related penalties"). For example, through his firm Diversified Group, Inc.

("DGI"), Haber devised and promoted tax shelters that the IRS found to be illegal and fined

Haber and DGI $25 million as a result. *See, e.g., Haber v. United States,* 823 F.3d 746 (2d Cir.

2016). Haber has repeatedly invoked his Fifth Amendment right against self-incrimination to

avoid testifying on the subject. *See, e.g. AD Inv. 2000 Fund LLC v. IRS,* T.C. Memo. 2015-223,

2015 WL 7423367, at *14 (U.S. Tax. Ct. Nov. 19, 2015); *Ironbridge Corp. v. IRS,* 528 Fed.

App'x 43, 45 (2d Cir. 2013). The Second Circuit has rejected his objection to the IRS'

investigation into whether he has hidden assets in his wife's accounts. *Haber,* 823 F.3d 746.

31.     Haber entered the restaurant business shortly after his tax shelters ended. Haber

created a hospitality company under the "ESquared Hospitality" brand that originally became

best known for its "BLT" line of steakhouses and restaurants. Like his dealings with Chloe,

Haber also tried to cheat and force out the celebrity chef who created the BLT brand. Haber even

bragged about forcing the chef out: "A celebrity chef is not necessary for the life thereafter . . .

They are useful for establishing a brand, but you're almost better off when they leave, since their

egos don't get in the way."

32.     Also around the time Haber shuttered his tax shelters, Haber created a series of

trusts for the benefit of his children, including his daughter Samantha Wasser. These trusts

ultimately owned the corporate entities operating under the ESquared Hospitality brand. Wasser also joined ESquared Hospitality as its Creative Director in 2012. At that time, she had no experience in the restaurant industry: not in restaurant design; not in culinary development; and not in operations. She had no relevant education either, like an MBA or degree in interior design. Before she worked with Chloe, every restaurant she worked on at ESquared Hospitality failed.

**The Founding of the By Chloe Restaurants**

33.    Based on Chloe's growing fame, she pursued her dream of opening her own restaurant in 2013. By age 26, Chloe had conceived of a fast-casual vegan restaurant concept. In January 2014, Chloe pitched her concept to the CEO of ESquared Hospitality—a hospitality company based in New York City, New York.

34.    Chef Chloe and ESquared Hospitality established CCSW LLC to launch Chloe's concept for fast-casual vegan restaurants. Chef Chloe and ESquared Hospitality as members each had a 50% membership interest in CCSW. CCSW was otherwise a manager-managed LLC.

35.    The managers of CCSW named the restaurant brand "by Chloe." Indeed, Paperwhite—an elite branding firm hired by ESquared Hospitality—emphasized the need to capitalize on Chloe's name based on her "existing notoriety in the food industry to further establish her presence without needing to compete with smaller and potential future brands."

36.    But Chloe knew the value of her name too. Thus, Chloe only authorized limited and conditional rights to use her name and likeness. She bargained for and negotiated two relevant agreements: a Name, Face, Likeness License Agreement (NFL Agreement), and the CCSW Operating Agreement (Operating Agreement).

37.    Chloe licensed to CCSW her "full and formal name, nickname or variations of her name ("Name")," among other likeness rights. The NFL Agreement also provides that CCSW

would pay Chloe a 1% royalty on CCSW's gross sales if any of her NFL rights were used and Chloe no longer enjoyed a membership interest. And the NFL Agreement allowed Chloe to terminate the license if CCSW challenged, objected to, or interfered with Chloe's trademark registration of any of her NFL Rights. These terms and conditions of the NFL Agreement were essential for Chloe's willingness to enter into the agreement.

38.     At the same time Chloe entered into the NFL Agreement, Chef Chloe entered into the Operating Agreement. The Operating Agreement expressly limits any rights CCSW would have in the "by Chloe" trademark because those rights were "subject to the terms and conditions of this Operating Agreement and the NFL License Agreement." Put another way, CCSW's rights in the By Chloe trademark were conditional on the remaining terms and conditions in the two agreements. For instance, like the NFL Agreement, the Operating Agreement included terms and conditions for CCSW not to oppose, challenge, or interfere with Chloe's trademark rights other than the By Chloe trademark. The Operating Agreement also included terms and conditions that prohibited CCSW from selling retail products with the By Chloe trademark. These terms and conditions of the Operating Agreement were essential for Chef Chloe's willingness to enter into the agreement.

39.     In July 2015, CCSW opened its first "By Chloe" restaurant on Bleecker Street in the West Village of New York City. It was a smash success with a crowd of Chloe's fans gathered around the block on opening day and rave press reviews. Based on one location alone, Haber valued CCSW at $25 million.

40.     The popularity of by Chloe continued to sky rocket. As the number of locations grew, for example, by Chloe has been called the "vegan McDonalds" and the "vegan Shake Shack."

41.     The by Chloe company relied on Chloe's extensive fame and name recognition in past trademark disputes. For instance, the company represented that Chloe "almost immediately became well known as 'Chef Chloe' or just 'Chloe.'" The company likewise touted Chloe's extensive and widespread recognition through her media appearances, including through her winning appearance on Cupcakes Wars, the feature article about Chloe in the New York Times, and her "popular and critically acclaimed" cookbooks. Put simply, Chloe's "enviable reputation" was established long before 2012, as the company "could fill up pages with evidence of [Chloe's] acclaim, fame and celebrity and public recognition." Thus, the value and fame associated with Chloe's name predated "by Chloe" by years—as admitted by the company.

42.     But as the success of by Chloe increased, Chloe's business relationship with ESquared Hospitality's CEO, James Haber, and his daughter, Samantha Wasser, deteriorated. Haber maintained an inappropriate and unprofessional work environment. And his overall greed led to a scheme to repurchase Chef Chloe's 50% membership interest in CCSW for zero dollars. Indeed, this was all part of Haber's plot to "milk" Chloe's name "till we can't!"

43.     As Haber schemed to "milk" Chloe's name, Chef Chloe and ESquared Hospitality were litigating various disputes in an arbitration proceeding. On March 21, 2017, the arbitrator released her final award. The following day, CCSW purported to repurchase Chef Chloe's 50% membership interests for zero dollars. ESquared Hospitality valued CCSW at $75 million at this time. Yet the attempted repurchase was ineffective for many reasons, including that an ESquared Hospitality Liquidity Event took place that prevented any repurchase right from ever arising. Even so, ESquared Hospitality continued to deny Chef Chloe its valuable membership interest in CCSW.

**The Investment in By Chloe**

44.     ESquared Hospitality and Haber then sought to maximize their profit from Chef Chloe's 50% membership interest that they unlawfully seized. For instance, the day after the unlawful seizure, ESquared Hospitality emailed Bain Capital about "a potential investment in By CHLOE."

45.     ESquared Hospitality, Bain, and the other private equity firms named as defendants, negotiated a multi-million dollar investment over the next several months. They conducted these negotiations even though Chloe's counsel provided ESquared Hospitality and CCSW detailed reasons why the seizure of Chef Chloe's membership interest was ineffective and unlawful, and Chloe informed representatives for two investors—Greg Golkin of Kitchen Fund and Warren Valdmanis of Bain—that she would enforce her rights and bring claims against ESquared Hospitality and CCSW. ESquared Hospitality and the investors proceeded with the investment without regard to Chloe and her rights.

**The Investor Defendants**

46.     Bain Capital is one of the world's leading private multi-asset alternative investment firms with over $100 billion in assets under management. Bain Double Impact Fund is one of Bain Capital's investment funds. Bain Double Impact Fund is not a passive investor. Rather, it under takes "active partnerships," "active ownership," and "active management" of companies—like CCSW, later called BCHG—that it invests in.

47.     Kitchen Fund is a venture capital company focused on the food industry. Like Bain Double Impact Fund, Kitchen Fund touts its active participation in companies that it invests in, like through its "application of knowledge"—or its "arsenal of intelligence"—across many

various subject matters. Kitchen Fund touts Sweetgreen as "Kitchen Fund's first official unicorn (eclipsing a billion-dollar valuation in late 2018)."

48.     Collaborative Fund is a venture capital company that oversees four funds and $300 million. Collab + Consumer Fund I, L.P. is one of its funds.

49.     Lion Capital is a private equity company that focuses investments in consumer brands. It has raised over $6 billion across four funds.

50.     Qoot Co. is a hospitality management and investment company. Qoot International UK Limited is one of its subsidiary entities used to invest funds.

**The Creation of BCHG Inc.**

51.     ESquared Hospitality led several efforts to create new corporate entities to induce an investment from the Investor Group. First, ESquared Hospitality purported to amend the Operating Agreement to change the name from CCSW LLC to BC Hospitality Group LLC (BCHG LLC). Like the attempted repurchase of Chef Chloe's membership interests, this too was unlawful and ineffective. Second, ESquared Hospitality purported to contribute 100% of BCHG LLC to a new entity BC Hospitality Group Inc. (BCHG Inc.). BCHG Inc. was then used as a means to consummate an investment with the Investor Defendants.

52.     The Investor Defendants consummated its multi-million dollar investment in January 2018. At the initial closing, the Investor Defendants collectively invested over $18 million dollars and received over 2.2 million shares of preferred stock. The chart below sets forth specific contributions:

SCHEDULE OF PURCHASERS – INITIAL CLOSING

| Name and Address | Shares of Series A Preferred Stock | Aggregate Purchase Price |
|---|---|---|
| Bain Capital Double Impact Fund, LP 200 Clarendon Street Boston, MA 02116 Attention: Warren Valdmanis | 1,197,448 | $9,974,741.84 |
| BCIP Double Impact Associates, L.P. 200 Clarendon Street Boston, MA 02116 Attention: Warren Valdmanis | 127,261 | $1,060,084.13 |
| Kitchen Fund, LP 500 Park Avenue, 4th Floor New York, New York 10022 Attention: Greg Golkin | 183,885 | $1,531,762.05 |
| KF-Chloe, LLC 500 Park Avenue, 4th Floor New York, New York 10022 Attention: Greg Golkin | 246,406 | $2,052,561.98 |
| Qoot International UK Limited c/o TGP International 276 Vauxhall Bridge Road, 3rd Floor London SW1V 1BB Attention: Simon Wright | 220,662 | $1,838,114.46 |
| Lion/BC LLC 21 Grosvenor Place London SW1X 7HF Attention: Sherif Guirgis | 257,439 | $2,144,466.87 |
| Collab+Consumer I, L.P. 347 Bowery, 2nd Floor New York, New York 10003 Attention: Craig Shapiro | 47,810 | $398,257.30 |
| TOTALS | 2,280,911 | $18,999,988.63 |

53.    The Board of Directors for BCHG Inc. comprised five directors following the investment: Warren Valdmanis of Bain; Todd Cook of Bain; Greg Golkin of Kitchen Fund; James Haber of ESquared Hospitality; and Samantha Wasser of ESquared Hospitality. Bain negotiated and required that it would maintain two of the five board seats—"control-like rights"—as part of its investment. Kitchen Fund negotiated for one of the five board seats as well.

54.    BCHG LLC and BCHG Inc. did not operate as distinct corporate entities. In fact, the CEO of BCHG Inc. testified under oath that "no distinction" exists in the daily operation of

12

the two entities. Thus, "BCHG" will refer hereafter refer to the entities collectively unless specified otherwise.

**Chloe Terminated the NFL Agreement in March 2018**

55.     Not content with just trying to steal Chef Chloe's 50% membership interest, ESquared Hospitality and CCSW, doing business as BCHG, continued to harass Chloe and try to prevent her from competitive professional endeavors.

56.     For example, Chloe, through one of her corporate entities (CC Hospitality) filed trademark applications for "Chef Chloe" and "Chloe's Delicious," as Chloe was entitled to under the Operating Agreement and NFL Agreement. Yet BCHG opposed those applications at the Trademark Office, in breach of the terms and conditions of the Operating Agreement and NFL Agreement.

57.     Chloe terminated the NFL Agreement on March 16, 2018. As such, and because CCSW doing business as BCHG violated the terms and conditions of the Operating Agreement and NFL Agreement, BCHG had no rights to use the "by Chloe" trademark at least as of this date.

58.     Shortly after termination, Chloe and her corporate entities, Chef Chloe and CC Hospitality, sued BCHG and ESquared Hospitality, asserting claims for trademark infringement, federal unfair competition, and breach of contract, among other claims. This complaint received significant press attention. As a result, the Defendants had actual or constructive notice of the complaint and detailed allegations within it, including that Chloe had terminated the NFL Agreement in March 2018.

13

**The Investor Defendants' Additional Investment**

59.     The Investor Defendants still continued to invest millions of dollars in BCHG. In January 2019, for instance, the Investor Defendants contributed over $12 million for over 1.4 million shares of preferred stock.

60.     The Investor Defendants' financial contributions to BCHG—over $30 million in total—was used to expand the number of "by Chloe" restaurant locations. Valuations for fast-casual restaurants in general, and BCHG specifically, depend on the number of locations: the greater number of locations, the higher the valuation. For instance, following the Investor Defendants' additional investment in 2019, BCHG announced that it intended to open up to 50 "by Chloe" restaurants by 2023. Thus, the Investor Defendants intended to expand the number of "by Chloe" locations to maximize a return on their investment. They did not care that BCHG had no right to misleadingly associate their stores with Chloe, and that Chloe objected to their expansion. Rather, the Investor Defendants continued to induce BCHG to exploit Chloe's name to increase the valuation of their purported ownership interests in BCHG.

**The Investor Defendants Continued to Deny Chloe her Rights**

61.     While the Investor Defendants trampled Chloe's rights in their boardrooms, Chloe sought to enforce her rights in the courtroom. As part of her lawsuit in 2018, for instance, Chloe also started an arbitration to declare ESquared Hospitality's purported repurchase of Chef Chloe's ownership ineffective and unlawful; to enjoin BCHG from selling retail products; and to declare the original CCSW operating agreement effective.

62.     Complex civil litigation is time and resource intensive. For years, therefore, the parties litigated and prepared their claims and defenses in district court and arbitration. In the arbitration, Judge Hochberg presided over a comprehensive final hearing during the week of

December 9, 2019, and later over a post-hearing argument. On May 13, 2020, Judge Hochberg

issued an 87-page Partial Final Award declaring Chef Chloe a 50% owner in CCSW; enjoining

CCSW/BCHG from selling retail products; and declaring the original operating agreement to

remain effective. Ex. 1 at Appendix A. Judge Hochberg later awarded Chef Chloe over $2.2

million in attorneys' fees and costs, which the Honorable Jesse M. Furman confirmed as to

ESquared Hospitality. *Id.*; *see also Chloe v. ESquared Hospitality,* 2021 WL 293163 (S.D.N.Y.

Jan. 28, 2021).

63.    Yet the Defendants have treated these decisions as no more than ink blots.

64.    Even after Judge Hochberg declared that Chef Chloe was rightfully a 50%

member of CCSW, and that BCHG Inc. owned the remaining 50% (not 100%), BCHG, and in

turn the Investor Defendants, refused to comply with this "binding" award and continued to use

Chloe's name and misleadingly associate the "by Chloe" restaurants with Chloe.

65.    BCHG also continued to prioritize their personal interests, and those of the

Investor Defendants, over Chef Chloe's interests. For instance, they chose not pursue all

available opportunities for capital contributions to help address temporary challenges associated

with the Covid-19 pandemic. In one instance, Defendant Golkin declined to pursue a potential

capital opportunity because, according to Defendant Golkin, the timing was not right due to

pending legal issues, as Judge Hochberg had shortly before declared Chef Chloe to be a 50%

owner of BCHG. Several months later BCHG filed for Chapter 11 bankruptcy, even though it

had relatively little debt. For instance, BCHG disclosed less than $25,000 of secured debt and

less than $3 million of unsecured debt at the time of filing. BCHG, a company valued by some of

the most sophisticated investors in the world to exceed $60 million pre-pandemic, needed

comparatively little capital to continue on and avoid bankruptcy. Yet Defendant Golkin led

efforts to maximize the financial interests of the Investor Defendants to Chef Chloe's detriment.

**Count I**

**TRADEMARK INFRINGEMENT**

**(VICARIOUS LIABILITY)**

**(By Chloe and CC Hospitality against the Bain and Kitchen Fund Defendants)**

66.     Chloe and CC Hospitality incorporate each paragraph above here.

67.     CC Hospitality owns the registered trademark for the mark "CHEF CHLOE"

(Reg. No. 5269199).

68.     Chloe owns common law trademark rights in her name "Chloe" and variations of

Chloe's name.

69.     At least as of March 17, 2018, CCSW, doing business as BCHG, infringed the

Chef Chloe trademark and Chloe's common law trademark rights in her name "Chloe" and

variations of Chloe's name through its use of "By Chloe" in restaurants and variations of "By

Chloe," like www.eatbychloe.com among others acts of infringement. For instance, BCHG

owned, operated, and controlled the website domain www.bychefchloe.com and the associated

Instagram and Twitter accounts @bychefchloe. When a user typed the name bychefchloe.com

into a web browser the user was redirected to the by Chloe Website at www.eatbychloe.com,

which is the website maintained by BCHG purporting to be a "by Chloe" restaurant chain. When

a user accessed the @bychefchloe account on Instagram, the user was instructed "PLEASE

FOLLOW @EATBYCHLOE // ACCOUNT NO LONGER ACTIVE," referring the user to the

@eatbychloe Instagram account maintained by BCHG. Thus, BCHG's use of "By Chloe,"

www.bychefchloe.com, www.eatbychloe.com, and social media accounts @bychefchloe and

@eatbychloe were acts of trademark infringement of CC Hosptiality's trademark rights in Chef Chloe and Chloe's common law trademark rights in "Chloe" and variations of her name.

70. The Bain and Kitchen Fund Defendants are liable for this trademark infringement as joint tortfeasors. Under the doctrine of vicarious infringement, any person or entity that has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities is liable for trademark infringement even if that entity has no knowledge of the direct infringement. Put differently, every entity or person who actively partakes in, lends aid to, or ratifies and adopts infringing acts is liable equally with the entity performing the acts of direct infringement. Actual or apparent partnerships with direct infringers, or entities that exercise joint ownership or control over the acts of infringement, are also liable as joint tortfeasors.

**The Bain Defendants**

71. The Bain Defendants meet the standard for joint tortfeasors. The Bain Defendants are not mere investors. Rather, the Bain Defendants promote their "active ownership" and "active partnership" with companies in their portfolio. As part of this "active partnership," the Bain Defendants provide "value-added approach, experienced team and broad platform expertise helps provide the resources and capabilities that these companies need to thrive." The Bain Defendants "are active owners. We partner with each of our portfolio companies to design initiatives that maximize impact potential, and we drive implementation of these initiatives during our ownership period. [The Bain Defendants] works with company leadership to develop a strategic blueprint that identifies a clear set of objectives and initiatives to achieve full impact and commercial potential." The Bain Defendants even tout their development of "exceptional partnerships." Indeed, the Bain Defendants' active involvement with their partner companies is what leads to "exceptional partnerships": "We believe active management is critical for

maximizing financial and impact outcomes." The Bain Defendants' active partnership includes "a broad range of business activities, including strategic blueprinting, budgeting, M&A, leadership recruiting and assessment, and impact initiatives and tracking."

72.     BCHG, doing business under the "by Chloe" brand, is in the portfolio of the Bain Defendants' "partner companies." The Bain Defendants "partnered with by CHLOE in January 2018."

73.     Through their active partnership, the Bain Defendants have an actual or apparent partnership with BCHG. The Bain Defendants also had a right and ability to supervise BCHG's infringing acts. Through its investment, the Bain Defendants obtained "control-like rights" through two of five board seats in BCHG. Also through its multi-million dollar investment, the Bain Defendants had a significant financial stake in BCHG and stood to gain from the infringing acts.

**The Kitchen Fund Defendants**

74.     The Kitchen Fund Defendants meet the standard for joint tortfeasors. Like the Bain Defendants, the Kitchen Fund Defendants are not mere investors. Rather, the Kitchen Fund Defendants promote the "know-how" they provide. In fact, they recognize that while capital is important, the Kitchen Fund Defendants' "most valuable resource is our expertise." The expertise that the Kitchen Fund Defendants offers its partner companies includes: team building for the next phase of growth; budgeting, forecasting, and financial analysis; new market / geography and site selection; franchise network development; tech stack evaluation; labor optimization; branding and marketing strategy; and ESG initiatives. Thus, like the Bain Defendants, the Kitchen Fund Defendants promote an active partnership with companies they work with. For example, one of Kitchen Fund Defendants' partner companies (similar to BCHG)

described Kitchen Fund's contributions as a "true partner in our business. The team seamlessly switches hats between high level thought leaders and in-the-weeds operators. More than just capital, they bring a wealth of knowledge and expertise that they deploy enthusiastically." Kitchen Fund provided this same type of active partnership to BCHG.

75.     BCHG, doing business under the "by Chloe" brand, is in the portfolio of the Kitchen Fund Defendants' partner companies. For instance, the Kitchen Fund Defendants include the following quote from BCHG's former-CEO on their website: "We were in the fortunate situation to have a wide range of interested investors for by CHLOE. However, Kitchen Fund was the obvious choice for us given the combination of their financial and strategic value. Their experience has provided a wealth of information at every step of the way." Again, the Kitchen Fund Defendants provided hands-on, active assistance to help direct and partner with BCHG.

76.     Through their active partnership, the Kitchen Fund Defendants have an actual or apparent partnership with BCHG. The Kitchen Fund Defendants also have a right and ability to supervise BCHG's infringing acts. Through its investment, the Kitchen Fund Defendants obtained one of five board seats in BCHG. Also through its multi-million dollar investment, the Kitchen Fund Defendants had a significant financial stake in BCHG and stood to gain from the infringing acts.

77.     The Bain and Kitchen Fund Defendants' active partnership also actively partook in, lent aid to, and ratified and adopted BCHG's infringing acts. For instance, the Bain and Kitchen Fund Defendants actively supported and encouraged the expansion of by Chloe stores after March 16, 2018, provided that this Complaint makes no allegation of infringement for the "Interim Period" as defined in the Covenant Not to Sue Agreement dated March 15, 2021.

78.    The Bain and Kitchen Fund Defendants also knew or should have known that BCHG's actions infringed CC Hospitality and Chloe's trademark rights. In addition to actual notice of trademark infringement from Chloe's and CC Hospitality's litigation in 2018, the Bain and Kitchen Fund Defendants directed BCHG to harass Chloe and her business entities to prevent her from using "Chloe" in the title of any professional restaurant endeavors. For instance, BCHG—as directed by the Bain and Kitchen Fund Defendants—authorized BCHG's counsel to threaten Chloe with trademark infringement allegations for her entities' use of "Chef Chloe and the Vegan Café" and a popup in what they argued was named "Supernatural Chloe x Tom." BCHG's counsel specifically focused on the utilization of "the word 'CHLOE'" as the basis for the threatened legal action for trademark and unfair competition. That BCHG did not have any rights in the "by Chloe" trademark at this time, along with Chloe's and CC Hospitality's superior trademark rights (which the company had even acknowledged in writing), exemplifies their intentional, active, and bad-faith infringement of Chloe and CC Hospitality's rights—all of which the Bain and Kitchen Fund Defendants were involved in through their active work and participation on the BCHG board.

79.    The Bain and Kitchen Fund Defendants' vicarious liability as joint tortfeasors for BCHG's trademark infringement has caused damage to Chloe and CC Hospitality.

80.    The Bain and Kitchen Fund Defendants' conduct was intentional, willful, wanton, and malicious. CC Hospitality is entitled to BCHG's profits for its infringement, and no less than a reasonable royalty. And because the Bain and Kitchen Fund Defendants' conduct was willful, CC Hospitality is entitled to treble damages. CC Hospitality is also entitled to the costs of the action, an award of attorneys' fees, and pre-judgment interest.

81.     Chloe has also been harmed and damaged by the Bain and Kitchen Fund Defendants' vicarious infringement of her common law trademark rights. And because the Bain and Kitchen Fund Defendants' conduct has been intentional, willful, wanton, and malicious, Chloe is entitled to punitive damages. Chloe is also entitled to damages in an amount to be determined at trial, along with her costs of this action, attorneys' fees, and prejudgment interest.

## Count II

## TRADEMARK INFRINGEMENT (CONTRIBUTORY INFRINGEMENT)

### (By Chloe and CC Hospitality against the Investor Defendants)

82.     Chloe and CC Hospitality incorporate each paragraph above here.

83.     BCHG directly infringed CC Hospitality's and Chloe's trademark rights as alleged above.

84.     Each of the Investor Defendants is liable for contributory trademark infringement. Contributory trademark infringement occurs when an entity or person "knowingly supplied the ammunition" that allowed the wrongful user to complete the infringement.

85.     Each of the Investor Defendants supplied "the ammunition" through significant capital contributions that was intended to expand the number of stores under the "By Chloe" name, which constituted direct trademark infringement. Collectively, the Investor Defendants provided over $30 million to BCHG that was used to continue and expand BCHG's trademark infringement of CC Hospitality's and Chloe's trademark rights. Put differently, the Investor Defendants controlled and directed the expansion of by Chloe restaurants, and in turn, direct infringement of CC Hospitality's and Chloe's trademarks through their investment.

86.     The Investor Defendants knew or should have known that their contributions materially contributed to infringement of CC Hospitality's and Chloe's trademark rights. For

instance, Chloe terminated the NFL Agreement on March 17, 2018. And Chloe and CC Hospitality sued BCHG for trademark infringement and trademark cancellation in April, 2018— and refiled a complaint in June 2018. Thus, the Investor Defendants were on notice of BCHG's trademark infringement and unauthorized use of the "By Chloe" mark. Yet the Investor Defendants still chose to supply over $12 million to BCHG in January 2019 to continue and expand BCHG's infringement of CC Hospitality and Chloe's trademarks for their own self-interest and financial gain.

87.     The Investor Defendants knowingly contributed to BCHG's infringement. Their contributory infringement has caused damage to Chloe and CC Hospitality, provided that this Complaint makes no allegation of infringement for the "Interim Period" as defined in the Covenant Not to Sue Agreement dated March 15, 2021.

88.     The Investor Defendants conduct was intentional, willful, wanton, and malicious. CC Hospitality is entitled to BCHG's profits for its infringement, and no less than a reasonable royalty. And because the Investor Defendants' conduct was willful, CC Hospitality is entitled to treble damages. CC Hospitality is also entitled to the costs of the action, an award of attorneys' fees, and pre-judgment interest.

89.     Chloe has also been harmed and damaged by the Investor Defendants' vicarious infringement of her common law trademark rights. And because the Investor Defendants' conduct has been intentional, willful, wanton, and malicious, Chloe is entitled to punitive damages. Chloe is also entitled to damages in an amount to be determined at trial, along with her costs of this action, attorneys' fees, and prejudgment interest.

**Count III**

**FEDERAL UNFAIR COMPETITION**

**(VICARIOUS LIABILITY AND CONTRIBUTORY INFRINGEMENT)**

**(By Chloe against the Investor Defendants)**

90.     Chloe incorporates each paragraph above here.

91.     Section 1125 of the Lanham Act prohibits the false designation of origin and false

descriptions in connection with any goods or services.

> (1)Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

92.     BCHG has violated this section by operating restaurants, websites, and social

media accounts under the "by Chloe" brand that misleadingly suggest an affiliation, connection,

and association with Chloe, even after BCHG removed Chloe from any involvement with the

company and even after Chloe terminated the NFL Agreement in March 2018. Thus, BCHG's

actions were likely to cause confusion, mistake, and deceive others as to an affiliation,

connection, or association between "by Chloe" and Chloe.

93.     The Bain and Kitchen Fund Defendants are joint tortfeasors in BCHG's false

designation violations for the same acts and involvement alleged above in Count I. For instance,

the Bain and Kitchen Fund Defendants have supervised the false designation violations and maintained a direct financial interest from the false designation violations, provided that this Complaint makes no allegation of any violation during the "Interim Period" as defined in the Covenant Not to Sue Agreement dated March 15, 2021.

94.    Each of the Investor Defendants is liable for contributory infringement in BCHG's false designation violations for the same reasons alleged above in Count II. For instance, the Investor Defendants knowingly induced BCHG to continue and expand its false designation violations through the expansion of "by Chloe" stores through financial contributions for that purpose, provided that this Complaint makes no allegation of violation during the "Interim Period" as defined in the Covenant Not to Sue Agreement dated March 15, 2021.

95.    Chloe is entitled to BCHG's profits flowing from its violations, and no less than a reasonable royalty. And because the Investor Defendants' conduct was willful and intentional, Chloe is entitled to treble damages. Chloe is also entitled to the costs of the action, an award of attorneys' fees, and pre-judgment interest.

## Count IV

## CIVIL CONSPIRACY

### (By CC Hospitality and Chloe against all the Investor Defendants)

96.    CC Hospitality and Chloe incorporates each paragraph above here.

97.    As alleged above, BCHG directly infringed CC Hospitality's Chef Chloe trademark; BCHG directly infringed Chloe's common law trademark rights to Chloe and variations of her name; and BCHG violated the Lanham Act's prohibition against false

designations of origin and false descriptions. Each of these acts is an independent tort for this cause of action for civil conspiracy.

98.    The Investor Defendants conspired with BCHG to commit each of these independent torts.

99.    The Investor Defendants had an agreement with BCHG to expand the number of By Chloe stores and continue website and social media use of "by Chloe," even after BCHG removed Chloe from any involvement with the company and even after Chloe terminated the NFL Agreement in March 2018.

100.    Each of the Investor Defendants committed an intentional and overt act in furtherance of the agreement. For instance, the Investor Defendants contributed over $12 million in January 2019 in furtherance of the plan to expand the number of stores using the "by Chloe" name, provided that this Complaint makes no allegation of violation during the "Interim Period" as defined in the Covenant Not to Sue Agreement dated March 15, 2021.

101.    CC Hospitality and Chloe have been damaged as a result of this conspiracy. CC Hospitality and Chloe are entitled to all profits flowing from the conspiracy, and no less than a reasonable royalty. And because the Investor Defendants' conduct was willful and intentional, CC Hospitality and Chloe are entitled to punitive damages. CC Hospitality and Chloe are also entitled to the costs of the action, an award of attorneys' fees, and pre-judgment interest.

### Count V

### UNJUST ENRICHMENT

### (By Chloe and Chef Chloe against the Investor Defendants)

102.    Chef Chloe and Chloe incorporate each paragraph above here.

103.    The Investor Defendants were enriched at Chef Chloe's and Chloe's expense.

104.    When Chloe founded "by Chloe," she knew the value of her name and her talents. She and her company, Chef Chloe, therefore, bargained for (1) Chef Chloe's 50% ownership in CCSW LLC, and (2) a 1% royalty to Chloe for any use of her NFL Rights if Chef Chloe no longer owned any interest in CCSW LLC. Chef Chloe and Chloe also conditioned any rights to use the "By Chloe" trademark on the terms and conditions of the Operating Agreement and NFL Agreement. Put differently, Chef Chloe and Chloe never agreed that anyone or any entity could use her name, including the "by Chloe" trademark, while (1) Chef Chloe was not a member of CCSW, (2) Chloe was not receiving a 1% royalty, and (3) CCSW breached the terms and conditions of the Operating Agreement and NFL Agreement.

105.    The "by Chloe" trademark and brand has always been the most valuable asset of the company—or, as the company itself put it, the "crown jewel asset."

106.    The Investor Defendants unjustly received the benefit of Chloe's name, including through the By Chloe trademark, website, and social media, when the company had no right to do so. For instance, when the Investor Defendants agreed to invest in BCHG Inc., and thus purport to own 100% of CCSW LLC, doing business as BCHG LLC, (1) Chef Chloe was wrongfully denied its 50% membership interest in CCSW, (2) CCSW did not pay Chloe a 1% royalty, and (3) CCSW breached the terms and conditions of the Operating Agreement and NFL Agreement, including by opposing trademark applications in violation of both agreements. And as alleged above, BCHG—through the Investor Defendants' inducement and support—continued to use the "by Chloe" trademark—and the good will of Chloe's name that goes with it—even after Chloe terminated the NFL Agreement. The Defendants should be required to provide restitution to Chloe for this unauthorized use of her name.

107.    Indeed, the Investor Defendants increased the value of their ownership in BCHG through the improper use of Chloe's name in violation of the corporate documents that established the company in the first place. And the Investor Defendants did so when they knew or should have known that they were cheating Chloe out of her rights. Following their investment in 2018, for instance, the Investor Defendants increased the value of their ownership in BCHG through the unlawful use of Chloe's name. Indeed, they wanted the value to continue to grow before they planned to cash out.

108.    And as the Investor Defendants increased the value of their interest in BCHG, Chef Chloe and Chloe were also denied their opportunity to obtain fair value of Chef Chloe's 50% ownership. For background, the number of stores generally drives valuations for fast-casual restaurants. Back when only one By Chloe location existed, CCSW was valued at $25 million alone. In 2017, the company was valued at $75 million. And when BCHG planned to open up to 50 locations by 2023, valuations of the company projected at $223 million. Thus, Chef Chloe's 50% interest in CCSW, doing business as BCHG, was worth between $43.2 million and $63.1 million in 2019. Alternatively, even BCHG valued Chef Chloe's interest at $7.9 million in a litigation-driven opinion to devalue Chef Chloe's ownership, representing an absolute floor of the value of Chef Chloe's interests as of December 2019. Yet Chef Chloe never had the opportunity to monetize the value of her ownership interest at various points of time when a market existed for her equity because BCHG had improperly seized her ownership and the Investor Defendants reaped the benefit of Chef Chloe's ownership interests instead while exploiting Chloe's name. The Investor Defendants should pay Chef Chloe restitution for the benefit they received in derogation of Chef Chloe's rights.

109.    Even with the effects of the Covid-19 pandemic on the restaurant industry, BCHG has amassed—and thus the Investor Defendants indirectly enjoy—over $54 million in carry forward net losses. Private equity companies and sophisticated investors are notorious for monetizing carry forward net losses—among other tax schemes—to their ultimate financial benefit. Thus, even now, the Investor Defendants remain unjustly enriched at Chef Chloe's and Chloe's expense.

110.    BCHG—as directed by the board of directors, and specifically Defendant Golkin—also did not pursue all available efforts to infuse the company with capital to ameliorate the temporary effects of the pandemic. The reason for this direction was to prioritize the financial interests of the Investor Defendants over Chef Chloe's rights and interests as a 50% owner of CCSW LLC and to avoid the $2.2 million attorney fee award by Judge Hochberg.

111.    Under these circumstances, equity and good conscience requires the Investor Defendants to provide restitution to Chef Chloe and Chloe in an amount to be proven at trial.

## PRAYER FOR RELIEF

Chloe, CC Hospitality, and Chef Chloe requests the following relief:

a.    A finding that the Bain and Kitchen Fund Defendants vicariously infringed CC Hospitality's and Chloe's trademark rights; an award of compensatory, treble, and punitive damages; an award of attorney's fees and costs; and an award of prejudgment interest.

b.    A finding that the Investor Defendants contributorily infringed CC Hospitality's and Chloe's trademark rights; an award of compensatory, treble, and punitive damages; an award of attorney's fees and costs; and an award of prejudgment interest.

c.    A finding that the Investor Defendants violated Section 1125 of the Lanham Act; an award of compensatory and treble damages; an award of attorney's fees and costs; and an award of prejudgment interest.

d.    A finding that the Investor Defendants are liable for civil conspiracy; an award of compensatory, treble, and punitive damages; an award of attorneys' fees and costs; and an award of prejudgment interest.

e.    A finding that the Investor Defendants have been unjustly enriched at Chloe's and Chef Chloe's expense; an award of damages to Chloe and Chef Chloe; an award of attorneys' fees and costs; and an award of prejudgment interest.

f.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues subject to trial by jury.

Dated: May 10, 2021                 Respectfully submitted,


                                    By: /s/ Ronald J. Schutz
                                    _____
                                        **ROBINS KAPLAN LLP**
                                        Ronald J. Schutz Bar No. (4871778)
                                        Carly A. Kessler Bar No. (5410212)
                                        399 Park Avenue
                                        Suite 3600
                                        New York, NY 10022
                                        212 980 7400

                                        Patrick M. Arenz MN Bar No. (0386537)
                                        (*pro hac vice* to be submitted)
                                        800 LaSalle Ave
                                        Suite 2800
                                        Minneapolis, MN 55402
                                        612 349 8591

                                        Attorneys for Plaintiffs Chloe Coscarelli, CC
                                        Hospitality Holdings LLC, and Chef Chloe LLC