# Exhibit 1

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
-----------------------------------------------------------------------x
CHEF CHLOE LLC,                                    :

                       Claimant,                      :

       -against -                            :

ESQUARED HOSPITALITY LLC and BC       :
HOSPITALITY GROUP LLC f/k/a CCSW LLC,

                                         :

                   Respondents.                :

                                       :
-----------------------------------------------------------------------x

Case No. 01-19-0000-7965

| **Claimant Counsel** | **Respondents Counsel** |
|---|---|
| Ronald J. Schutz | William L. Charron |
| Robins Kaplan LLP | Pryor Cashman LLP |
| 399 Park Avenue, Suite 3600 | 7 Times Square |
| New York, NY 10022 | New York, NY 10036-6569 |
| RSchutz@RobinsKaplan.com | wcharron@pryorcashman.com |
| | |
| Patrick M. Arenz | Matthew S. Barkan |
| Robins Kaplan LLP | Pryor Cashman LLP |
| 800 LaSalle Avenue, Suite 2800 | 7 Times Square |
| PArenz@RobinsKaplan.com | New York, NY 10036-6569 |
| Minneapolis, MN 55402 | mbarkan@pryorcashman.com |
| | |
| Frederick A. Braunstein | |
| Robins Kaplan LLP | |
| 399 Park Avenue, Suite 3600 | |
| New York, NY 10022 | |
| FBraunstein@RobinsKaplan.com | |
| | |
| Reena Jain | |
| Robins Kaplan LLP | |
| 399 Park Avenue, Suite 3600 | |
| New York, NY 10022 | |

**Complete Final Award**

Following a four-day full evidentiary hearing in New York from December 9-12, 2019, post-hearing briefing, and oral summation arguments on February 3, 2020, the Arbitrator issued the Partial Final Award on May 13, 2020.  The Partial Final Award is hereby incorporated herein, and attached as Appendix A.  The Partial Final Award granted Chef Chloe the primary remedy sought—reinstatement of her 50% Membership Interest in CCSW LLC ("CCSW")—as well as a permanent injunction against CCSW related to its use of certain IP on products or projects other than the "by Chloe" fast casual chain of restaurants, and such other equitable relief as stated expressly therein.  The Partial Final Award, and all Orders and Awards issued by the Arbitrator, are hereby incorporated by reference, in lieu of restating their terms.

When the Arbitrator issued the Partial Final Award on May 13, 2020, the Award stated that the parties had a 90-day period "to implement the Declaratory Judgments and equitable relief awarded herein."  (Partial Final Award at 88.)  Operating Agreement Section 20.6 states that "all legal remedies . . . as well as all equitable remedies . . . shall be available for any breach or threatened breach of any provision of this Agreement."  The Partial Final Award found that Respondents breached the Operating Agreement in multiple ways, as stated therein. Accordingly, the Partial Final Award stated that, in addition to the declaratory relief awarded in the Partial Final Award, the parties had the "right to seek such other relief as may be necessary and appropriate under Section 20.6 after that 90-day period has elapsed; such application, if any, shall be made not later than 90 days from the issuance of this Partial Final Award."  (*Id*. at 88-89.)  The Partial Final Award also stated that "[n]o party or transferee, successor or assign or any party, shall take any action in derogation of the Declaratory Judgments and equitable relief entered in this Award until there has been full compliance with this Award and the Arbitrator has

confirmed that no party will seek further relief under Operating Agreement Section 20.6." (*Id.* at 88.)

The Partial Final Award also awarded Claimant costs and attorneys' fees, as specified therein. On August 13, 2020, after receiving full briefing, the Arbitrator entered a second Partial Final Award, granting Claimant fees and costs, as more fully stated an explained therein, attached hereto and incorporated herein as Appendix B ("Second Partial Final Award"). The Arbitrator stated that, to the extent further fees and costs were incurred until completion of this Arbitration, Claimant would also be entitled to submit a supplemental fee petition.

On August 14, 2020, the Arbitrator issued an Interim Order, extending the 90-day period by 30 days and ordering the parties to work in good faith to develop an implementation plan in the event the Partial Final Award is confirmed by the District Court. The Interim Order is incorporated herein and attached hereto as Appendix C. The Interim Order also stated the Arbitrator would consider supplemental discovery requests after full briefing by the parties.

Pursuant to the Second Partial Final Award, on August 14, 2020, Chef Chloe submitted a Supplemental Fee Petition. After full briefing, on August 27, 2020, the Arbitrator issued an Interim Order regarding the objections raised by Respondents as to certain aspects of Chef Chloe's Supplemental Fee Petition. The Interim Order is attached hereto and incorporated herein as Appendix D. The Interim Order found that Chef Chloe was entitled to supplement fees, but that such fees could not include fees related to settlement activity. Claimant was therefore ordered Chef Chloe to re-submit the time entries related to the Supplemental Fee Application with such entries for settlement time charges removed. Chef Chloe submitted updated time entry information on August 27, 2020. Respondents stated that they had no objections to the manner in which Chef Chloe removed the settlement-related time entries on August 29, 2020.

## I.  Arbitral Jurisdiction to Issue the August 14, 2020 Interim Order

On August 18, 2020, Respondents wrote to the Arbitrator arguing that the August 14, 2020 Interim Order exceeds the scope of the Arbitrator's authority and is "legally invalid" because an unconfirmed arbitral award is not enforceable.  Respondents argued that "[t]he law is well-established that, 'once an arbitrator has made and published a final award, his authority is exhausted and he is *functus oficio* . . . and can do nothing more in regard to the subject matter of the arbitration.'"  (Aug. 18, 2020 Respondents Ltr. at 2 (quoting *Hill v. Wackenhut Servs. Int'l*, 971 F. Supp. 2d 5, 12 (D.D.C. 2013)).)

On August 21, 2020, Claimant submitted a letter responding to the factual and legal issues raised by Respondents as to the question of the Arbitrator's jurisdiction to issue the relief in the Interim Order.  Claimant argued that the Arbitrator retains jurisdiction over this matter because "the arbitration provision in the Operating Agreement reflects the parties' broad intent for your Honor to decide all issues 'unless otherwise mutually agreed to by the parties.'"  (Aug. 21, 2020 Claimant Ltr. at 1 (quoting Operating Agreement § 20.19(a)).)  Claimant also argued that "no matter what your Honor orders, the Respondents will not comply" and therefore that "the best option available to [Claimant] is to receive a supplemental fee and cost award as soon as possible and otherwise submit a final award for Judge Furman's expedited review."  (*Id.* at 2.)

There are two principles articulated in the authorities cited by Respondents regarding the Arbitrator's continued jurisdiction over this matter following issuance of the Partial Final Award: First, that once an arbitrator issues a *final* award, the arbitrator ceases to have jurisdiction.  *Hill*, 971 F. Supp. 2d at 12 (rejecting the arbitrator's reconsideration of an issue considered in a final

award that disposed of all arbitrable issues).  Second, that an arbitration award is "inchoate until enforced by judgment."  *Fotochrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975).[1]

Neither principle is even remotely violated in the Interim Order.  First, the award issued by the Arbitrator was *not* a final award, as in *Hill*, but was explicitly a Partial Final Award.  Partial Final Awards are the precise manner in which Arbitrators applying the AAA Rules (adopted by the parties to govern this case) make rulings on cases when there are certain remaining issues to be resolved thereafter.  (*See* AAA Commercial R-47(b).)  It is the mechanism that avoids an Arbitrator in such a situation from becoming *functus officio*.

Respondents were fully aware of that fact, and chose nonetheless to cite caselaw that is completely inapplicable to a Partial Final Award.  The 30-day period to develop an implementation plan was clearly contemplated as the relief provided for in the Partial Final Award, which ruled that the parties had a 90-day period "to implement the Declaratory Judgments and equitable relief awarded herein" and that the parties had the "right to seek such other relief as may be necessary and appropriate under Section 20.6 after that 90-day period has elapsed." (Partial Final Award. at 88-89.)  Under Section 20.6, the contract between the parties expressly permitted other and additional forms of relief, as the Partial Final Award ruled.

The Partial Final Award granted the parties 90 days to implement the relief therein.  At the time of the Partial Final Award, the Arbitrator could not have foreseen the extent to which the pandemic would affect the court systems and extend the time typically required for court action on arbitral awards.  Providing a time period to implement the relief  was deemed by the

---

[1] *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 385 (2d Cir. 1989) and *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992) stand for the proposition that an unconfirmed arbitration award does not have *res judicata* effect on future claims, an issue no one is arguing in this Arbitration.

Arbitrator to be necessary and appropriate due to the extensive argument by Respondents in post-Hearing briefing and summations about the complexities of reversing the transaction by which Chef Chloe's 50% Membership Interest was recaptured and then transferred to BCHG Inc. First, there are non-parties to this Arbitration who are nonetheless bound by the actions of Respondents because they are "transferees, successors and assigns" of Respondents; under Section 20.14 of the Operating Agreement, the parties agreed that their assignees and successors are bound to the same extent as the Respondents, as stated more fully in the Partial Final Award. Second, the Arbitrator noted that Respondents had argued in summation that it was "impossible" to unwind their seizure of Claimant's Membership Interest, even if it was wrongfully done. That argument required the Arbitrator to issue a remedy necessitated by Respondents' own rush to seize Claimant's Membership Interest before obtaining arbitral or judicial declaratory judgment that they were entitled to take that action. The Partial Final Award thus already addressed the question of how the declaratory judgments in the Award—namely, the reinstatement of Chef Chloe's Membership Interest—could be achieved.

Now, again, the Arbitrator is met with the same refrain repeating Respondents' post-hearing brief and oral summation: The Respondents' argument regarding the Arbitrator's jurisdiction to require an implementation plan is simply a re-hash of the same "impossibility" argument already considered, and rejected, in the Partial Final Award. In other words, no new issue is being raised by the Arbitrator, nor by Respondents, now. Rather, the question of implementation was contemplated by the issues argued before the Arbitrator and the relief specified in the Partial Final Award.

Most significantly, despite the rhetoric of Respondent's letter brief, the Interim Order clearly and unequivocally did not purport to require enforcement an unconfirmed award (which

would contravene the principle articulated in *Fotochrome*).  The Respondents also know that.

The Interim Order stated that:

> While the Partial Final Award *remains subject to confirmation/vacatur proceedings*, it is the Arbitrator's duty to ensure that the parties are fully ready to implement a plan to effectuate the declaratory relief awarded to the Claimant; and to ensure that the other orders within the Partial Final Award are complied with, which were, and are, intended to preserve the status quo so that the relief set forth in the Partial Final Award of this binding Arbitration can be effectuated in a just and speedy manner.

(Interim Order at 4; *see also id.* (implementation plan "to be enacted *immediately upon confirmation* of the Partial Final Award").)  The plan of implementation was clearly stated as a forward-looking plan for use in the event of confirmation, and not as an enforcement mechanism prior to confirmation.  Thus, Respondent's letter brief is deliberately beside the point:  the entire purpose of the Interim Order was to extend the time for planning, precisely because judicial confirmation has not yet occurred.

Nor does an implementation plan amount to monitoring compliance with a final award, as in *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987).  There, following confirmation proceedings of a final award, the district court remanded an arbitration back to the arbitrator solely for the purpose of monitoring compliance.  The Second Circuit rejected this remand "[b]ecause the parties did not submit issues of compliance to arbitration, and *because the issuance of a final award terminated the arbitrator's authority*."  (*Id.*).  Here, by contrast, there was no final order issued prior to the Interim Order.  The Arbitration was continuing; it had not been completed.  Only by the instant Complete Final Order is this Arbitration now being completed.

In sum, the authorities argued by Respondents do not establish that the Interim Order was legally invalid or exceeded the Arbitrator's jurisdiction.  Because it is now clear that Respondents will not comply with even an Order to plan for implementation of the remedy

ordered in the Partial Final Award, Chef Chloe seeks no further relief from this Arbitrator

beyond a supplemental fee award and a final award from the Arbitrator. The Arbitrator therefore

completes her work on this matter with this Complete Final Award.

## II. Final Fee Award

The Arbitrator addressed Respondents' objections to Chef Chloe's Supplemental Fee

Application in the August 27, 2020 Interim Order. The Arbitrator has reviewed Chef Chloe's

August 27, 2020 re-submitted time entries and costs and the Arbitrator finds that they are

reasonable and customary and in compliance with the directive to remove the fees attributable to

settlement discussions. For the reasons stated in the Second Partial Final Award, the Arbitrator

has found that a 1.25 multiplier is appropriate in the circumstances of this case. Accordingly, the

Arbitrator awards Chef Chloe an additional $167,456.88 in fees and costs of $28,313.

## III. Complete Final Award

This Complete Final Award, together with the declaratory judgments and equitable relief

in the Partial Final Award issued on May 13, 2020, incorporated herein by reference and

attached hereto as Appendix A; the Second Partial Final Award, awarding Chef Chloe fees in the

amount of $1,620,440.63 and costs in the amount of $449,628.09, issued on August 13, 2020,

incorporated herein by reference and attached hereto as Appendix B; the August 14, 2020

Interim Order extending the period to implement the Partial Final Award by 30 days, pending

confirmation proceedings, incorporated herein by reference and attached hereto as Appendix C;

and the August 27, 2020 Interim Order regarding Chef Chloe's Supplemental Fee Application,

incorporated herein by reference and attached hereto as Appendix D, collectively referred to here

as the Complete Final Award, constitutes a full and final determination of all claims,

counterclaims, and requests for relief submitted in this Arbitration.

In addition to the relief awarded to Claimant in the Partial Final Award, the total of the fees awarded to Claimant is $1,787,897.51, and costs awarded are $477,941.09, totaling $2,265,838.60. This Complete Final Award and its subparts may be executed in an original signature of the Arbitrator, and scanned to AAA for dissemination to the parties, and it shall constitute together one and the same instrument. The Complete Final Award will be enforceable to the full extent whether signed electronically or by hand or by a scan of a signature by hand.

So Ordered,                                          Dated: September 3, 2020

Hon. Faith S. Hochberg, Arbitrator

I, Hon. Faith S. Hochberg, so hereby affirm upon my oath as an Arbitrator, that I am the individual described herein and who executed this instrument, which is the COMPLETE FINAL AWARD.

9/3/2020
Date

Hon. Faith S. Hochberg

# APPENDIX A

## to

## FINAL AWARD:

**Partial Final Award,
Dated May 13, 2020**

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
------------------------------------------------------------------------x
CHEF CHLOE LLC,                                          :
                                                                              Case No. 01-19-0000-7965
                            Claimant,                    :

             -against -                                  :

ESQUARED HOSPITALITY LLC and BC                          :
HOSPITALITY GROUP LLC f/k/a CCSW LLC,
                                                         :
                            Respondents.                 :
                                                         :
------------------------------------------------------------------------x


**Claimant Counsel**                              **Respondents Counsel**

Ronald J. Schutz                                  William L. Charron[1]
Robins Kaplan LLP                                 Pryor Cashman LLP
399 Park Avenue, Suite 3600                       7 Times Square
New York, NY 10022                                New York, NY 10036-6569
RSchutz@RobinsKaplan.com                          wcharron@pryorcashman.com

Patrick M. Arenz                                  Matthew S. Barkan
Robins Kaplan LLP                                 Pryor Cashman LLP
800 LaSalle Avenue, Suite 2800                    7 Times Square
PArenz@RobinsKaplan.com                           New York, NY 10036-6569
Minneapolis, MN 55402                             mbarkan@pryorcashman.com

Frederick A. Braunstein
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022
FBraunstein@RobinsKaplan.com

Reena Jain
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022

---

[1] Mr. Charron entered his appearance on April 20, 2020, after the merits Hearing and summations. Mr. Charron replaced Philip Hoffman, Respondents' lead counsel, after Mr. Hoffman passed away in March.

RJain@RobinsKaplan.com

**PARTIAL FINAL AWARD**

The undersigned Arbitrator, having been duly appointed and qualified pursuant to the arbitration agreement contained in the Operating Agreement of CCSW LLC (a New York Limited Liability Company), and having been duly sworn and having duly heard the allegations and proofs of the parties does hereby issue this Partial Final AWARD ("Award") as follows:

## I.    THE PARTIES

**Claimant, Chef Chloe LLC**[2] ("Chef Chloe") is a California Limited Liability Company wholly owned by Chloe Coscarelli, a well-known vegan chef who has made television appearances, authored cookbooks and originated the concept for the "by Chloe" fast casual vegan restaurant chain that is the subject of this Arbitration.

**Respondent BC Hospitality Group LLC** (f/k/a CCSW LLC) ("BCHG LLC") is a limited liability company organized under the laws of New York.  BCHG LLC owns a number of "by Chloe" fast casual vegan restaurants.  BCHG LLC was originally named CCSW LLC, and Chef Chloe disputes the validity of the name change (discussed in Section V(C), *infra*).  For clarity, and because for the majority of the relevant time period, the entity was named CCSW LLC, this Award will refer to this Respondent as "CCSW" or "the Company."  When it was formed, CCSW was 50% owned by Chef Chloe and 50% owned by ESquared Hospitality LLC.

**Respondent ESquared Hospitality LLC** ("ESquared") is a limited liability company organized under the laws of Delaware.  ESquared was formed by James Haber, the Manager of ESquared's owner, BLT Restaurant Group LLC.  (J8 at 10.)

---

[2] Chef Chloe LLC is identified as "CC Entity" in the Operating Agreement.

2

ESquared purported to recapture Chef Chloe's 50% Membership Interest in CCSW on March 22, 2017—the validity of which is in dispute in this Arbitration. Following that purported recapture date, ESquared executed multiple actions purportedly on behalf of CCSW. Those actions are also in dispute in this Arbitration. Accordingly, when describing arguments made by the Respondents, this Award will collectively refer to "Respondents" or "ESquared."

## II.    PROCEDURAL BACKGROUND

Claimant's Demand for Arbitration ("Demand") in this matter is dated March 12, 2019. Respondents' Answer is dated March 27, 2019. Claimant Chef Chloe LLC's Amended Prayer for Relief ("Amended Prayer") is dated September 13, 2019.[3]

The primary relief sought in the Amended Prayer is for "finding and judgment that Chef Chloe LLC still owns 50% of the Membership Interests in [CCSW] LLC and restoring her rights as a Member retroactively to March 22, 2017." (Am. Prayer ¶ b.) If, in this Arbitration, Chef Chloe is deemed to still own any Membership Interest in CCSW, Chef Chloe also seeks finding and judgment that CCSW "violated the Operating Agreement by issuing or transferring Membership Interests in violation of the terms of the Operating Agreement," and that "the November 2014 Operating Agreement is still in effect and that any amendments to that Operating Agreement are illegal, ineffective and invalid." (*Id.* ¶¶ c, g.) Chef Chloe alternatively seeks an award of money damages in the amount of the value of the 50% Membership Interest. (*Id.* ¶¶ b, d.)

Additionally, Chef Chloe seeks a "permanent injunction barring Respondents from selling any packaged food or beverages using the name Chloe or any variation thereof including the mark 'by Chloe' or any images or photographs of Chloe." (*Id.* ¶ a.)

---

[3] During the merits Hearing, counsel for Chef Chloe stated that Paragraphs (e) and (f) in the Amended Prayer were withdrawn as requested relief. (Hr'g Tr. at 479:11-15.)

Finally, Chef Chloe seeks prejudgment interest on any damages award and attorneys' fees and costs.  (*Id.* ¶¶ h, i.)

ESquared seeks an award "[d]ismissing the Demand in its entirety and with prejudice," as well as "costs and disbursements incurred in connection with this arbitration, including reasonable attorneys' fees and reimbursement of any [and] all fees paid to the AAA, including for compensation of the Arbitrator."  (Answer at 46.)

This Tribunal has jurisdiction over this Arbitration pursuant to Section 20.19 of the Operating Agreement of CCSW LLC (J1, "Operating Agreement"), which provides that all claims or disputes arising between the parties shall be decided by binding Arbitration, absent mutual agreement between the parties otherwise.  (J1 § 20.19.)  The Section also provides that any "Arbitration under this Agreement shall take place in New York, New York under the authority of, and in accordance with, the expedited rules of the American Arbitration Association."  (*Id.*)  Further, the "decision of the arbitrator shall be binding upon the parties." (*Id.*)  The "administrative costs of this arbitration, and fees and expenses of any arbitrator, . . . shall be divided equally between the parties, subject to any re-allocation thereof contained in any arbitration award."  (*Id.*)  Section 20.19 provides that "[a]ll other legal fees, costs and expenses incurred in connection with any dispute under this Agreement shall be paid as determined/apportioned by the arbitrator."  (*Id.*)

Section 20.18 of the Operating Agreement provides that the Agreement "shall be governed by, and construed in accordance with, the laws of the State of New York."  (*Id.* § 20.18.)

Pursuant to the Preliminary Hearing and Scheduling Order # 1, "the Commercial rules of the AAA, along with the Federal Rules of Evidence, shall govern this Arbitration." (Preliminary Hearing and Scheduling Order # 1 at 1.)

A.    **The Arbitration Hearing**

By agreement during the Preliminary Hearing, the parties submitted simultaneous pre-hearing briefs prior to the Hearing. Both parties objected to certain exhibits identified on each other's exhibit lists; the Arbitrator ruled on such objections during the Hearing; neither the post-hearing briefs nor the summations raised any argument regarding the evidentiary rulings.

Two witnesses—James Haber and Samantha Wasser—were on both parties' witness lists; rather than call them twice, they were questioned using the adverse witness rules of the Federal Rules of Civil Procedure and Federal Rules of Evidence, by joint agreement of the parties.

The Hearing was held in New York, New York from December 9-12, 2019.[4] During the Hearing, the following witnesses testified as fact witnesses:

- Chloe Coscarelli
- James Haber
- Samantha Wasser

Both parties presented expert testimony, both as to issues of corporate governance and transactions, and as to economic damages. Claimant presented the following expert witnesses:

- Jeffrey Haas
- Michele Riley

Respondents presented the following expert witnesses:

- Lawrence Graev
- Neil Beaton

---

[4] The Hearing was originally scheduled to extend through December 13; however, due to weather and attorney travel, the Arbitrator and parties sat very late into the night on December 12 to conclude the Hearing one day early.

Because Respondents raised a new defense to Chef Chloe's primary remedy for the first time in this Arbitration during opening statements, the Arbitrator kept the evidentiary record open at the close of the merits Hearing to provide the Arbitrator the opportunity to review the evidence related to this new defense and, if needed, request for additional documents or testimony related thereto.

**B.    Post-Hearing Submissions and Argument**

After the Hearing, on December 20, 2019, ESquared informed the Arbitrator that it would like to call a witness from Bain Capital, a third party investor in BC Hospitality Group Inc. ("BCHG Inc."). BCHG Inc. is the purported 100% owner of Respondent CCSW LLC by virtue of a series of transactions, the validity of which Chef Chloe disputes in this Arbitration. The testimony would relate to "the various valuations performed by and the actual state of BCHG and the by Chloe restaurants," which, according to ESquared, would rebut testimony from Chef Chloe's damages expert. (Dec. 20, 2019 email from P. Hoffman to Arbitrator Hochberg.) Chef Chloe objected to this request. (Dec. 20, 2019 email from P. Arenz to Arbitrator Hochberg.)

The Arbitrator deferred the question of whether additional evidence would be necessary until after post-hearing briefs had been submitted and considered. (Order No. 2.) For the reasons stated in this Partial Final Award, the Arbitrator has concluded that no such additional evidence is necessary to rebut the Claimant's damages expert, and denies this request to adduce additional witness testimony at this time.

The parties submitted simultaneous post-hearing briefs on January 13, 2020, and replies on January 22, 2020.

The Arbitrator heard post-Hearing oral summations on February 3, 2020. Mr. Schutz argued on behalf of Claimant, and Mr. Hoffman argued on behalf of Respondents. Lead trial counsel for both parties performed their duties on behalf of their clients in an outstanding

manner, leaving no stone unturned.  Legal arguments were presented in a highly competent

manner, and counsels' courtesy to each other was clearly evident, despite the history of tension

between the parties.

## III.    FACTUAL BACKGROUND

### A.    Background on the "by Chloe" brand and formation of the Operating Agreement

This case arises out of the Operating Agreement of CCSW LLC entered into between

ESquared Hospitality and Chef Chloe, dated November 7, 2014.  (J1.)  The Operating

Agreement formed a joint venture between Ms. Coscarelli—a vegan chef who had gained fame

when she won a television competition, Cupcake Wars, with a vegan cupcake (C1; Hr'g Tr. at

182:23-184:5)—and James Haber—who for decades has owned and operated many restaurants

(*id.* at 485:7-11); Mr. Haber's daughter Samantha Wasser[5] was the CCSW Manager designated

by ESquared under the Operating Agreement (and her initials "SW", along with Ms. Coscarelli's

initials, were the basis for the name "CCSW").  Ms. Wasser was at the time a recent college

graduate with an interest in learning the restaurant business.  (*Id*. at 326:18-328:17.)

As a vegan chef, Ms. Coscarelli had conceived a "fast casual" vegan restaurant chain

concept and sought an experienced restaurant group to partner with to help develop that concept

into a viable business.  (*Id.* at 196:5-197:10.)  Ms. Coscarelli had an opportunity to meet with

Mr. Haber to discuss her concept.  After hearing her pitch, Mr. Haber suggested that Ms.

Coscarelli team up with Ms. Wasser "to work together and figure it out and I'll support it."  (*Id.*

at 500:22-501:5.)

---

[5] Prior to her marriage, Ms. Wasser was known as Samantha Haber, and has continued to sign certain documents with that name. She will be referred to as Ms. Wasser throughout this Award.

Ms. Coscarelli and Ms. Wasser both contributed to the development of the concept for the "by Chloe" restaurant.  Ms. Coscarelli's efforts included substantial work to develop and refine the recipes for the menu, including amending the recipes to work under various restaurant settings and challenges, such as a ventless kitchen.  She also worked on sourcing and pricing ingredients for a cost-effective menu, as well as appropriate kitchen equipment needed to execute the menu.  (*Id.* at 204:8-208:16, 214:18-4, 216:9-218:22.)  Ms. Wasser worked on the restaurant design, as well as working with front of the house staff for the restaurant to be set up and run properly.  She worked with an outside branding team to create a unique look and feel for the restaurant, in particular to attract customers to a vegan restaurant, and built a social media presence.  (*Id.* at 530:4-14, 885:24-887:14.)

During this process, a key decision was whether the restaurant name should include the name of Ms. Coscarelli.  Ms. Wasser, after consulting with a branding company, Paperwhite, was of the opinion that capitalizing on Ms. Coscarelli's public persona as a vegan chef would be helpful for the brand, whereas Mr. Haber had concerns about linking the brand with a specific chef.  Specifically, Mr. Haber recalled a negative experience he had in a similar scenario with a chef for a new line of restaurants built around the persona of that chef, Laurent Tourondel, and bearing that chef's initials as its name:  the BLT line of restaurants, which stood for Bistro Laurent Tourondel.  After creating the line of restaurants with Chef Tourondel, Mr. Haber had a falling-out with him that led to the exit of that chef, who, under the relevant business agreement, owned the IP to the restaurants' name.  (*Id.* at 202:15-24; 335:16-336:19; 507:14-510:10.)  Mr. Haber testified that, given his past experience, if the restaurant name were to include Ms. Coscarelli's name, it was important that the Operating Agreement be clear that the Company owned the restaurant name.  (*Id.* at 510:11-14.)

8

The initial draft of the CCSW operating agreement was prepared by counsel for ESquared, Brad Muro of the firm Danziger, Danziger and Muro, LLP on March 24, 2014. (C43; C44; Hr'g Tr. at 200:21-23.) While the Operating Agreement was being negotiated, Ms. Coscarelli was represented by Josh Saviano at the firm of Morrison Cohen LLP. (*See id.*; Hr'g Tr. at 264:514.) The final Operating Agreement was executed on November 7, 2014. (J1.)

**B.**    **Relevant provisions of the Operating Agreement**

*Members*: The Members of CCSW are ESquared and Chef Chloe. (J1 at 1.) At the time of execution of the Operating Agreement, each Member owned a 50% Membership Interest in the Company (meaning "all of the Economic Interest in the Company held by such Member and such Member's rights to vote and participate in the management of the Company, and to receive allocations of Net Profits, Net Losses and Distributions"). (*Id.* at 8, Ex. A.)

*Service Member*: Chef Chloe was the sole original Service Member under the Operating Agreement. (*Id.* § 19.1.) The duties of the Service Member include development of the Concept and recipes for the "by Chloe" restaurants, as well as consultation on other aspects of the restaurants, such as décor, publicity and location selection. (*Id.* § 19.2.)

*Management*: The Operating Agreement states that CCSW is a manager-managed LLC. (*Id.* § 7.1(b) ("the Managers shall have sole, full and complete charge of all operations in the Company and the management of the Company's business").) Its original appointed Managers were Ms. Coscarelli and Ms. Wasser. (*Id.* § 7.3.) The Operating Agreement explicitly states that the Members of the LLC (Chef Chloe LLC and ESquared) are *not* permitted to act on behalf of the Company. (*Id.* §§ 7.1(a), 7.2.)

*The By Chloe Mark*: Because the restaurants were to be named "by Chloe", it was important to Mr. Haber that the Company owned the trademark to that name (as it included the first name of Ms. Coscarelli). (Hr'g Tr. at 507:14-510:10.) The "By Chloe Mark" is a trademark

included in the definition of "Company IP."  (J1 §§ 1.1, 4.3, 4.4(a) ("The Company Shall own all

right title and interest in and to the By Chloe Mark, including the right to register the By Chloe

Mark with the U.S. Patent & Trademark Office, subject to the terms and conditions of this

Operating Agreement and the NFL License Agreement.").)[6]

The Operating Agreement states that the "Concept" of the business is "fast casual vegan

restaurants."  (*Id.* § 4.1.)  Section 4.1 states the process by which any additional "Approved

Projects" utilizing the By Chloe Mark or the NFL Rights could be authorized at Chef Chloe's

discretion.  (*Id.*)

***"Major Decisions" requiring Chef Chloe's consent***:  There are certain "Major

Decisions" that require Chef Chloe's consent "so long as [Chef Chloe] owns any of the

outstanding Membership Interests."  (*Id.* § 7.4.)  These include:

- "issuing any additional Membership Interest or admitting any new Member to the Company,"

- "changing the Concept from 'fast casual' vegan," and

- "altering or waiving any provision of or otherwise amending any provision of this Agreement, other than amending the agreement as permitted in the proviso of Section 20.1."

(*Id.*)[7]

---

[6] The Name, Face and Likeness Agreement was signed the same day as the Operating Agreement and relates to variations on Ms. Coscarelli's "Name," as well as certain "Rights of Publicity," defined as, "versions of her image, signature, voice, likeness and other elements or attributes of her persona, identity, or personality"; together the Name and Rights of Publicity constituted the "NFL Rights." (J2 ("NFL Agreement").)  The NFL Agreement has a state or federal court jurisdiction provision and is therefore not before this Tribunal, except to the extent that the Operating Agreement itself references the NFL Agreement in its terms.  The Arbitrator will consider the terms of the NFL Agreement only to the extent that they are incorporated into a pertinent provision of the Operating Agreement, or as argued by counsel in connection with such counsel's interpretation of the Operating Agreement.

[7] Section 20.1 provides several administrative amendments that could be made without the consent of Chef Chloe; those amendments are not relevant to the facts of this case.  (*Id.* § 20.1.)

***Repurchase Right***:  The Company has, under certain circumstances, a right to repurchase the Membership Interest of a terminated Service Member (the "Repurchase Right"):

> [U]pon a termination of the Service Member (i) by the Company for Cause before March 7, 2023, (ii) upon resignation of the Service Member other than for Good Reason before March 7, 2023 or (iii) in connection with a Termination Event . . . The Company shall then have an option, but not an obligation, to purchase all and not less than all of the Membership Interests of the Terminated Service Member.

(*Id.* § 19.5(a).)  If the Repurchase Right were exercised using the procedures set forth in Section 19.6, it would result in "Membership Interest Recapture."  (*Id.* §§ 19.4, 19.6.)

The Operating Agreement states that the Repurchase Right is automatically extinguished under certain conditions.  For purposes of this Arbitration, the most central disputed issue is whether the provision that extinguishes the Repurchase Right after an "ESquared Hospitality Liquidity Event" applies here.  (*Id.* § 19.5(e)(ii).)  That provision states: "the Repurchase Right set forth herein, shall automatically terminate and be of no further force or [if] . . . (ii) there occurs an ESquared Hospitality Liquidity Event."  (*Id.*)

***ESquared Hospitality Liquidity Event*** is defined as:

> a sale, financing, public offering or other change of control transaction involving ESquared Hospitality (or its parent entity) and/or no less than a majority of the restaurants that ESquared Hospitality and its Affiliates have an ownership and/or management interest in.

(*Id.* § 1.1.)  The initial draft of the Operating Agreement prepared by counsel for ESquared shows that ESquared's counsel drafted this definition, which remained unchanged in the final agreement.  (*See* C44 at 5.)  The parties dispute the construction of this definition, which will be discussed at length below.[8]

---

[8] A different provision relates to an alternatively pled claim for relief.  The circumstances of the Service Member's termination would determine the payment she would be entitled to receive upon exercise of the Repurchase Right by the Company.  "[U]pon a termination by the Company for Cause . . . prior to March 7, 2019, the purchase price shall be equal to the positive value of

C.    **The transfer of ESquared Hospitality to the new entity, ESquared Holdings LLC**

Approximately a year after executing the CCSW Operating Agreement, James Haber and

Samantha Wasser executed certain other transactions on October 15, 2015.  This date is a key

date in this Arbitration, and counsel spent many hours of the Hearing presenting in both

argument and demonstrative exhibits what happened on that day.  On October 15, 2015, Mr.

Haber, acting on behalf of BLT Restaurant Group LLC, and Ms. Wasser, acting on behalf of

ESquared Holdings LLC, executed an LLC Membership Assignment.  This assignment

transferred 100% of BLT Restaurant Group's Membership Interest in ESquared Hospitality to

ESquared Holdings LLC.  (J19 (hereinafter defined for ease of reference as the "ESquared

Transfer").)

ESquared Holdings LLC was a newly created entity, formed on October 8, 2015; its first

operating agreement was entered into on October 15, 2015.  (*See* J11 at 1.)[9]  The LLC

Membership Assignment acknowledged that it was made in exchange for $250,000 in "good and

valuable consideration."  (J19.)  That consideration was paid by ESquared Holdings LLC to BLT

Restaurant Group, in exchange for its "right, title and interest in and to all of the transferor's

Membership Interest in ESquared Hospitality LLC . . . consisting of a 100% member interest,

---

such Member's Capital Account."  (*Id* § 19.5(b)(a).)  But if the repurchase was in connection
with a "Termination Event, the purchase price that the Company will pay for the Terminated
Service Member's Membership Interests shall be equal to the Fair Market Value of the
Membership Interests."  (*Id*. § 19.5(b).)  "Termination Event" is defined as a "Member's death,
insanity, adjudication of incompetency, Disability, or any event that, absent provisions to the
contrary in this Agreement or otherwise, would terminate the continued membership of such
Person in the Company or Service Member by operation of law."  (*Id*. § 1.1.)
[9] That same day, Ms. Wasser, the Manager of ESquared Holdings (J11 § 7.4(b)) appointed Mr.
Haber as CEO of ESquared Holdings.  (R29.)  Also on that day, Ms. Wasser, who effectively
controlled ESquared Hospitality (which was managed by its sole Member, ESquared Holdings)
appointed Mr. Haber as CEO of ESquared Hospitality.  (R30.)

and thereby all of the transferor's rights to participate in the management and affairs of the

Company [ESquared Hospitality]." (J19.)

> Mr. Haber testified that the purpose of the ESquared Transfer was as follows:
>
> [W]e knew eventually [outside investment] would lead to some sort of sale
> because investors want a return on their capital. So rather than leave it in the
> same structure for state tax purposes that we had set up previously with JL
> [Holdings], I wanted, after discussion with my tax counsel, to have it as a separate
> ownership so that when By Chloe sold, it went directly to my three children.

(*Id*. at 533:24-534:10.) To effectuate this desire of Mr. Haber, he retained tax counsel at the

Pryor Cashman firm, who created two new trusts, the Lily Haber Restaurant Trust and the Justin

Haber Restaurant Trust (named for two of Mr. Haber's three children). (*Id*. at 407:11-15,

1490:19-22, 1493:5-7; J17; J18.) Following the ESquared Transfer (which conveyed 100% of

ESquared Hospitality LLC to ESquared Holdings) ESquared Holdings was two-thirds owned by

these two newly created trusts, and one-third owned outright by Mr. Haber's oldest child,

Samantha Wasser. (J11, Ex. A.) Mr. Haber, in consultation with tax counsel, agreed to set the

consideration to be paid in exchange for ESquared Hospitality at $250,000, an amount that was

selected so that the consideration would "be respected for sale purposes." (*Id.* at 561:5-12.)

**D.** **The deterioration of the relationship between Chef Chloe and ESquared**

Disputes arose early between Mr. Haber and Ms. Coscarelli. Certain of those disputes

centered around her declination to approve the expansion of the By Chloe Mark's usage to

products beyond the vegan fast casual restaurant concept. Mr. Haber had hoped to "grow the

business wherever it would lead" and was frustrated by Ms. Coscarelli for being "extremely

resistant" to expanding the brand (as was her right under Section 4.1 of the Operating

Agreement). (*Id*. at 503:3-9.) Mr. Haber was also frustrated by Ms. Coscarelli's objection to

taking on outside investment, which Mr. Haber believed was necessary to grow the Company,

but which Chef Chloe, using her rights under the Operating Agreement, declined to approve. (*Id.* at 576:2-10.)

Indeed, Mr. Haber testified that he had told Ms. Coscarelli "often . . . in all of our meetings, I said I don't understand why [Ms. Coscarelli's lawyer] keeps on referring to the operating agreement.  The only times I've ever looked at an operating agreement is when I had a failed relationship, not a successful relationship."  (*Id.* at 503:15-22.)  In essence, Chef Chloe's exercise of her rights of approval under the terms of her contract with Respondents proved to be a thorn in James Haber's side.  They had a different view of the purpose of contract rights:  Chef Chloe acted under the belief that she was entitled to exercise her contract rights, and Mr. Haber felt that she should forego those rights of approval in order to have the relationship succeed. Suffice it to say, the parties' visions for the Company diverged almost immediately, despite producing a restaurant with early commercial and public success.  These disagreements made a long-term partnership virtually impossible.

As the relationship soured, ESquared invoked the Operating Agreement's arbitration clause in 2016, and presented its case in a prior arbitration that Ms. Coscarelli had breached the Operating Agreement in several respects.  Among the relief sought was a declaration of the Company's right to terminate Ms. Coscarelli as the Service Member, for cause.  On March 21, 2017, Arbitrator Erica Garay issued a Final Award in that arbitration, which declared that Ms. Coscarelli "is terminated for cause" as the Service Member of CCSW.  (C177 at 27.)  That arbitration finding was confirmed by a court, and is undisturbed here.  For avoidance of doubt, in this Arbitration Ms. Coscarelli is deemed to have been terminated as the Service Member for cause.  At issue here will be what rights she lost—and what rights she retained—after being

14

terminated in that manner.  All of these rights are governed by the Operating Agreement, and will be analyzed pursuant to its terms in the following sections of this Final Partial Award.

### E.    The Repurchase Letter

The next day after Arbitrator Garay's Final Award (C177), ESquared's litigation counsel at Pryor Cashman sent a letter purporting to exercise ESquared's Repurchase Right on March 22, 2017.  (C50 ("Repurchase Letter".)  The letter stated that CCSW was exercising its Repurchase Right, pursuant to Section 19.6 of the Operating Agreement, to recapture Chef Chloe's 50% Membership Interest.  (*Id.* at 1.)  The Repurchase Letter invoked Section 19.5(b), which stated that if Chef Chloe was terminated as a Service Member prior to March 7, 2019, "the purchase price that CCSW is to pay for Chloe LLC's Membership Interest 'shall be equal to the positive value of such Member's" Capital Account'"—which at the time was $0.  (*Id*. at 2.)  The Repurchase Letter also terminated Chef Chloe as a Manager.  (*Id.* at 1.)  The Repurchase Letter made no mention of the ESquared Transfer, which had occurred 11 months earlier.

### F.    Amendments to the CCSW Operating Agreement

After the purported Membership Interest Recapture of Chef Chloe's Membership Interest, CCSW executed two amendments to the Company's Operating Agreement without obtaining consent from Chef Chloe.

On the same day as the Repurchase Letter was sent, March 22, 2017, Samantha Wasser and James Haber (as CEO), acting on behalf of ESquared, immediately executed the first of two purported amendments to the CCSW Operating Agreement.  First, they changed the Operating Agreement's terms, by creating a new purported operating agreement entitled Amended and Restated Limited Liability Operating Agreement of CCSW LLC, dated March 22, 2017.  This purported new operating agreement granted Ms. Wasser a 1% Membership Interest in the Company.  (J14 § 2.1, Ex. A.)  This amendment (J14) also deleted, *inter alia*, the provisions of

the Operating Agreement that gave Chef Chloe the right to consent (or withhold consent) for

new projects using the By Chloe Mark or NFL Rights that went beyond the initial Concept for

CCSW (fast casual vegan restaurants); and it deleted Chef Chloe's right of consent to Major

Decisions under Section 7.4 of the Operating Agreement.  (*Compare* J1 §§ 4.1, 7.4 and J14.)  In

essence, after recapturing Chef Chloe's Membership Interest, the Claimant was then deemed by

Mr. Haber and Ms. Wasser to have forfeited her contractually defined rights under the Operating

Agreement by the act of deleting those rights in a new operating agreement.

On January 26, 2018, the Respondents changed the name of the Company, from CCSW

LLC, to BC Hospitality Group LLC, pursuant to another newly written operating agreement

called the BC Hospitality Group LLC Second Amended and Restated Operating Agreement.

(J15.)

### G.    BCHG Inc. and outside investors

After the purported Membership Interest Recapture of Chef Chloe's 50% Membership

Interest, Mr. Haber explored investment opportunities with the outside investors that Chef Chloe

had previously opposed.  (C72; C73; C74; Hr'g Tr. at 577:8-11, 578:15-580:10.)  Ultimately, a

consortium of investors led by Bain Capital invested $31 million in two tranches that closed in

January 2018 and January 2019.  (R35; C83; C84.)

To effectuate this transaction, ESquared incorporated a new entity, BCHG Inc., so that it

could issue shares in exchange for the investment.  (J16.)  Believing that ESquared and Ms.

Wasser together held 100% Membership Interest in the Company, they acted to transfer the

100% Membership Interest in CCSW to BCHG Inc. in exchange for 3 million shares of BCHG

Inc. common stock.[10]  (C53; R35.)  Thereafter, BCHG Inc. was purportedly the sole Member of CCSW.  (J15 at 001.)

They also decided to transact a deal so that Respondent ESquared would receive 600,240 preferred shares of BCHG Inc. as repayment of a $5 million loan Mr. Haber had made to CCSW (originated through JL Holdings LLC as a mortgage on Mr. Haber's home, through ESquared and into CCSW).  (R35; Hr'g Tr. at 446:9-19, 562:8-10.)  After the two investment closings, 3,722,687 preferred shares were issued to the outside investors, so that the ownership of BCHG Inc. became held in 7,322,927 shares (the original 3 million shares of common stock, plus a newly created class of 4,322,927 preferred shares, held by Respondent ESquared and the investor consortium).  (R35.)

The preferred shares issued to Respondent ESquared and the outside investors had certain highly valuable rights, including the preference in payment over the common shares.  (J16 § 2.) Thus, the original ownership of BCHG Inc. (3 million shares, with no superior preferred share class) was diluted to less than half of the total 7.3 million shares after the investment was closed, and the common stock was subordinate in rights to the newly created preferred share class.

---

[10] Because Ms. Wasser had purportedly been granted 1% of the Membership Interest in the Amended and Restated Limited Liability Operating Agreement of CCSW LLC, executed after the purported exercise of the Repurchase Right by the Company (J14), Ms. Wasser was granted 30,000 of the common shares, with ESquared receiving the remaining 2.97 million.  (R35.)

**Figure 1:  Summary of BCHG Inc. and CCSW LLC Ownership
After January 2019 Investment Closing**



### H.    Relevant entities

It is fair to say that James Haber likes to conduct his business and personal affairs using a web of many interconnected LLCs and corporate entities, as well as trusts.  Keeping their names, relationships, powers and authorities straight requires the analysis of a maze of oft-changing entities, ownerships, powers, authorizations and amendments in a litany of LLCs, corporate entities and trusts, each with intertwining personnel, Managers and Members.  Navigating this maze would be nearly impossible for an average lay person.  Indeed, even legal counsel were themselves challenged by the task.  The following list of entities is drawn from the documents and testimony at the Hearing (various figures reflecting the relationships and management of these entities will also be included for ease of reference):

**ESquared Hospitality** was a 50% Member in CCSW LLC, with Chef Chloe LLC owning the other 50% Membership Interest.  Mr. Haber testified that ESquared was created as a "trade name" when his restaurant group wanted to expand beyond the BLT brand, which was

associated with steak (antithetical to the vegan concept of "by Chloe").  (Hr'g Tr. at 435:10-16.)
ESquared, which had been formed prior to ESquared's relationship with Chef Chloe, was formed
as a member-managed LLC, meaning the owner/Member was also the Manager of ESquared.
(J8 § 6.2.)  Mr. Haber explained that this was done because "ESquared Hospitality . . . really had
no corporate activity whatsoever other than just being the trade name."  (Hr'g Tr. at 435:14-16.)
Prior to October 15, 2015, the sole Member and Manager of ESquared Hospitality was BLT
Restaurant Group LLC.

**BLT Restaurant Group LLC** ("BLT" or "BLT Restaurant Group") was itself a
manager-managed LLC (J9 § 7.1(a), (b).)  Its appointed Manager was James Haber, who had
100% of the Voting Percentage Interest.  (*Id.* § 7.4.)

**JL Holdings LLC** ("JL Holdings") had an 85% Membership Interest in BLT Restaurant
Group; the remaining 15% was owned by Keith Treyball.  (J9, Ex. A.)  JL Holdings was a
manager-managed LLC, and Mr. Haber was the designated Manager under the operating
agreement.  (J7 § 4.1.)

The **2002 Trusts** were created by Mr. Haber as irrevocable trusts, in which he could have
no ownership or managerial control.  These trusts held divided ownership of JL Holdings in
thirds, each one-third held by the 2002 Justin Haber Trust, 2002 Lily Haber Trust and 2002
Samantha Haber Trust (the "2002 Trusts").  (J4; J5; J6.)  The Trustee with sole authority to act
on behalf of each irrevocable trust was Fiduciary Management Services, Inc.  (*See, e.g.*, J4 at
002.)

So much happened on October 15, 2015 that it is most readily comprehensible in the
form of diagrams, that will be set out throughout this Partial Final Award, for the ease of
reference.

**Figure 2:  Ownership Structure of ESquared Hospitality Before October 15, 2015**



**ESquared Holdings LLC** ("ESquared Holdings") was created on October 8, 2015, and its operating agreement was executed on October 15, 2015.  (J11 at 1.)  This is the same date as the ESquared Transfer, discussed above, pursuant to which BLT Restaurant Group transferred its 100% Membership Interest in ESquared Hospitality to ESquared Holdings in exchange for $250,000 consideration.  (J19.)  ESquared Holdings was a manager-managed LLC, and its appointed Manager on October 15, 2015 was Ms. Wasser.  (J11 §§ 7.1(a), (b), 7.4(a).)

As discussed above, newly created irrevocable trusts on October 15, 2015, named the Lily Haber **Restaurant Trust** and the **Justin Haber Restaurant Trust,** and **Ms. Wasser personally**, each owned one-third of ESquared Holdings after the October 15, 2015 ESquared Transfer.  In this transaction, James Haber effectively transferred the ownership of his interest in ESquared Hospitality to the next generation: Ms. Wasser became the Grantor and Trustee of the Justin Haber Restaurant Trust and the Lily Haber Restaurant Trust (the "Restaurant Trusts"),

20

each of which held a one-third interest in ESquared Holdings.  (J17; J18.)  And Ms. Wasser was granted outright the remaining one-third of ESquared Holdings.  (J11 at 1, 37.)

**Figure 3:  Ownership Structure of ESquared Hospitality After October 15, 2015**



## IV.    ISSUES IN DISPUTE

Chef Chloe's claims and ESquared's defenses present several questions for the Arbitrator:

1.      Was Chef Chloe's right of consent under Section 4.1 of the Operating Agreement—which governs the process of approving CCSW's use of the By Chloe Mark on projects other than fast casual vegan restaurants (such as retail packaged foods)—extinguished when Chef Chloe was terminated as a Service Member?

2.      Was the purported Membership Interest Recapture of Chef Chloe's Membership Interest unauthorized and ineffective because the Repurchase Right held by CCSW had already been extinguished by an ESquared Hospitality Liquidity Event on October 15,

2015, upon the transfer of ESquared Hospitality from BLT Restaurant Group to ESquared Holdings?

3.      If the Repurchase Right was not extinguished, was the purported Membership Interest Recapture ineffective on the alternative grounds that (i) the Repurchase Letter misstated the proper entity that had the legal right to exercise the repurchase right, and misstated the correct entity on whose behalf the letter should have been sent, or (ii) the Repurchase Letter erred in compensating Chef Chloe only for the value of her capital account—$0—because in fact her termination was a Termination Event "by operation of law," entitling her to compensation in the amount of a fair market value for her Membership Interest?

4.      If the Repurchase Right was extinguished on or about October 15, 2015 and the purported Membership Interest Recapture of Chef Chloe's 50% Membership Interest was invalid, void and ineffective, were the purported amendments to the CCSW Operating Agreement, made thereafter without Chef Chloe's consent, null and void?

5.      If the Repurchase Right was extinguished on or about October 15, 2015, or was not properly exercised, and therefore the purported Membership Interest Recapture of Chef Chloe's 50% Membership Interest was invalidly done by CCSW, what is the proper remedy for such action by Respondents?

## V.      <u>ANALYSIS</u>

### A.      <u>Use of the By Chloe Mark</u>

Chef Chloe seeks a "permanent injunction barring Respondents from selling any packaged food or beverages using the name Chloe or any variation thereof including the mark 'by Chloe' or any images or photographs of Chloe."  (Am. Prayer ¶ a.)  The parties dispute whether, following Chef Chloe's termination as a Service Member, Chef Chloe lost her

contractual right to approve any expansion of the By Chloe Mark to new projects beyond use of the By Chloe Mark for fast casual vegan restaurants.[11]  ESquared argues that "there are no restrictions" under the Operating Agreement on CCSW's "use of the By Chloe Mark in any new manner, including retail goods."  (ESquared Pre-Hr'g Br. at 32.)  Chef Chloe argues that the Operating Agreement's terms did not strip her of these important rights upon her termination. (Chef Chloe Post-Hr'g Br. at 24.)

The Operating Agreement states that the "Company shall own all right, title and interest in and to the By Chloe Mark, including the right to register the By Chloe Mark with the U.S. Patent & Trademark Office, subject to the terms and conditions of this Operating Agreement and the NFL License Agreement."  (J1 § 4.4(a).)  The By Chloe Mark is included within "Company IP."  (*Id.* § 1.1.)

The parties agree that, prior to Chef Chloe's termination as Service Member, the Operating Agreement gave her control over whether to expand the use of the By Chloe Mark beyond fast casual restaurants.  Section 4.1 states that CCSW's Business is "restaurants utilizing the Concept [defined as "'fast casual' vegan restaurant"] . . . and Approved Projects."  An "Approved Project" is a defined term that means "any project related to the food and beverage industry that utilizes one or more of the NFL [name, face, likeness] Rights or the By Chloe Mark, *and which has been pre-approved in writing by CC Entity*."  (J1 §§ 1.1, 4.1 (emphasis added).)  The provision then details the procedure for obtaining such approvals.  Thus, to the extent the Company wants to use the By Chloe Mark on any project other than fast casual vegan

---

[11] Under Operating Agreement Section 4.1, the Company would have had an ongoing right to use the By Chloe Mark on other projects Ms. Coscarelli had previously approved prior to her separation from the company.  However, no such approvals were ever granted prior to Chef Chloe's termination as Service Member (or since).  (Hr'g Tr. at 235:6-235:15.)

restaurants, it must obtain Chef Chloe's consent to expand the trademark usage beyond the initial Concept.

The dispute presented to the Arbitrator is not about who owns the trademark; rather, it is about expansion of the *use* of the trademark beyond fast casual vegan restaurants. That usage limitation is clearly in the CCSW Operating Agreement, which defines Chef Chloe's right to withhold consent over the By Chloe Mark usage expansion. The only question presented to the Arbitrator is whether CCSW has the unlimited right to expand its usage of the By Chloe Mark without obtaining consent from Chef Chloe because Chef Chloe was terminated as a Service Member. That issue is governed by the terms of the Operating Agreement.

Section 19.3 is titled **"Separation from Service"**. It states what repercussions occur when a Service Member is terminated. Sub-section (b) states what rights are lost and what consequences "shall apply *with respect to the terminated Service Member*." (*Id.* § 19.3(b) (emphasis added).) The Terminated Service Member:

- "shall be treated as resigning as Manager,"

- "shall return all property to the Company,"

- "shall remain a Member of the company (unless they are repurchased)," and

- "shall no longer be eligible for further reimbursement of business expenses."

(J1 § 19.3(b).) Section 19.3(b) is the contract provision specifically stating the repercussions upon the terminated Service Member following Separation from Service. It is silent as to any other rights forfeited by the terminated Service Member. Similarly, there is no contract language in Section 4.1 that forfeits Chef Chloe's right to control CCSW's expanded usage of the By Chloe trademark if she is terminated as the Service Member.

Section 19.3 (c) is entitled "**Surviving Rights**," and states explicitly what rights are retained *by the Company* when the Service Member is terminated:

> [T]he Company's right to continue using . . . CC Entity Pre-Existing IP and the NFL Rights in . . . Approved Projects (including new Approved Projects approved as set forth in the NFL Agreement) shall survive any termination of [Chef Chloe LLC] as the Service Member and any Membership Interest Recapture.

(*Id.* § 19.3(c).)  The By Chloe Mark is Company IP, and is neither CC Entity Preexisting IP[12], nor an NFL Right.[13]  Therefore, Section 19.3 did not contain any expressed survival rights of the Company in expanded usage of the By Chloe Mark; the Company did not negotiate for and obtain the right to *expand the usage of that trademark*, beyond any projects that Chef Chloe has already approved prior to her termination as Service Member.

Section 19.3(b) has explicit provisions that state what Chef Chloe lost upon her termination as Service Member, and the trademark expansion pre-approval right under Section 4.1 is not listed among them.  Indeed, ESquared concedes that "there's nothing about that in the [Operating Agreement] one way or another."  (Hr'g Tr. at 1543:3-5.)  Thus, absent any language in Section 19.3(b) removing these trademark expansion pre-approval rights upon Chef Chloe's termination as Service Member, Section 4.1—the only section that defines the contours of that right—remains the operative provision regarding usage limitations of the trademark for new projects.

ESquared offers several creative arguments about why the Arbitrator should nonetheless find that the Section 4.1 approval right was extinguished upon Chef Chloe's termination as the Service Member.  ESquared places much significance on CCSW's ownership of the By Chloe

---

[12] "CC Entity Pre-Existing IP is defined as "any intellectual property rights that were developed by or on behalf of CC . . . and shall remain the property of CC."  (J1 § 1.1.)

[13] "NFL Rights" is defined as Ms. Coscarelli's name, "versions of her image, signature, voice, likeness and other elements or attributes of her persona, identity, or personality."  (NFL Agreement at 1.)

Mark.  (ESquared Pre- Hr'g Br. at 32, 33-34.)  However, this Arbitration dispute is not about *ownership*; rather, it is about expansion of trademark *usage* because the Company's ownership is, and always was, "subject to the terms and conditions of this Operating Agreement."  (J1 § 4.4(a).)  While Chef Chloe may not own the trademark, she retains the right to use other trademarks in the retail space that the Company wants the right to enter.  Thus, she is not competing with her own name in those other product areas.  This is not illogical at all, especially for a young chef just entering the business world, with decades of potential opportunities ahead of her.  She must abide by the deal that she made with the Company to continue to use her first name as the name of the fast casual vegan restaurant, but likewise the Company must abide by the terms of the deal that it struck with Chef Chloe not to expand the use the trademark beyond fast casual restaurants without getting her pre-approval.  It the Company wanted to terminate her as Service Member, it had that right, and it exercised that right.  But by doing so it chose the result that its trademark usage was frozen on its use as of that date of termination—*i.e.*, fast casual vegan restaurants.

Therefore, CCSW's ownership of the mark under the terms of the Operating Agreement does not answer the question of whether Chef Chloe retains her approval right of Section 4.1 following her termination.  It does not follow that CCSW's ownership of the mark entitled it to take any action it wished with the trademark, either before or after Chef Chloe's termination, absent a clear contract term that expunges the pre-approval right upon her termination as Service Member.

When asked where in the Operating Agreement ESquared contends Chef Chloe lost the approval right, ESquared stated only that it relies on the absence of language in Section 19.3(c) stating that this approval right is retained.  (*Id*. at 1522:6-9; ESquared Pre-Hr'g Br. at 34.)  This

26

argument is unpersuasive, and reads far too much into a non-provision. When a contract strips a right as a consequence of termination, it so states in express terms, as it does here in Section 19.3(b). To point this Arbitrator (or the Court) to a different section of the contract is facile: Section 19.3(c) does not recite Chef Chloe's lost rights; rather, it recites expressly CCSW's retained rights.

For Chef Chloe's contract rights to be stripped upon termination, the contractual terms must be explicit and clear on their face. There is such a contract term that states what rights Chef Chloe lost upon termination: Section 19.3(b). It does not effect such a forfeiture. ESquared's reading of Section 19.3(c) would expand the rights that ESquared bargained for when the contract was drafted. The CCSW Operating Agreement is the definitive contract in which the forfeiture of rights upon termination were to have been stated, and ESquared's contract drafting counsel did not obtain the right to expanded usage of that trademark as a penalty for termination of the Service Member.[14]

_____

[14] Even further afield, ESquared also attempts an even more creative source for stripping Chef Chloe of the right to approve the expanded usage of the By Chloe Mark by drawing inferences from NFL Agreement Section 10(c), which determines rights to Chef Chloe's name, image and other attributes. (*See* ESquared Pre-Hr'g Br. at 33; Hr'g Tr. at 1515:14-1516:21.) The Arbitrator notes that, except for those NFL Rights that were explicitly incorporated into the Operating Agreement (*e.g.*, in Section 4.1) the NFL Agreement is a contract that does not have an independent arbitration clause (J2 § 19), and therefore the Arbitrator rules only upon the rights expressly contained in the CCSW Operating Agreement.

ESquared urges that because the Operating Agreement and NFL Agreement were negotiated and signed at the same time, they should be read and interpreted together. (Hr'g Tr. at 1525:19-1526:2.) The Arbitrator has heard ESquared's imaginative argument that Section 10(c) of the NFL Agreement should be read to imply the forfeiture of a contract right in the Operating Agreement, and finds this argument a stretch too far in contract interpretation. The inferences that ESquared asks the Arbitrator to draw from NFL Agreement Section 10(c) are neither clear nor compelling as a basis upon which to strip Chef Chloe of her approval rights with respect to the By Chloe Mark, which the definitive contract at issue—the Operating Agreement—does not strip upon her termination.

ESquared is not presently using the By Chloe Mark on any retail product, but previously did sell retail products bearing the By Chloe Mark without Chef Chloe's consent, and asserts now that it has the unfettered right to do so if and when it wishes. (Hr'g Tr. at 253:11-25, 1543:10-19.) Thus, this issue is a ripe controversy and Claimant has properly pled a Claim for relief to prevent that from happening. During oral summations, the Arbitrator asked counsel for ESquared whether any contract provision, in ESquared's view, would limit it from hypothetically using the By Chloe Mark on grass-fed beef. ESquared's response was that, following Chef Chloe's termination, the Company "can put the 'By Chloe' mark on anything that they please." (*Id.* at 1522:13-15.) Though counsel repeatedly insisted that the company "*wouldn't*" use the mark on beef, it asserts that it has the right to do so under the Operating Agreement if it wished to do so. (*Id.* 1522:18-1523:13, 1526:15-19.)

The Arbitrator is persuaded by the testimony and demeanor of witnesses at the Hearing that the "by Chloe" name was selected for the restaurants specifically because of Chef Chloe's status as a known figure in the vegan world. (Hr'g Tr. at 202:15-24, 335:16-336:19, 507:14-510:10.) The name "by Chloe" was a name recommended by the branding consultant used by Ms. Wasser, based on a consensus that capitalizing on Ms. Coscarelli's name would help the brand. (*Id.* at 335:4-25; C22.) While the contract stated that the By Chloe Mark was to be owned by CCSW, Chef Chloe contributed her public recognition to the CCSW venture by allowing her name (and the trademark) to bear her name for the vegan fast casual restaurant brand. Mr. Haber and Ms. Wasser saw that Ms. Coscarelli's name added great value to the brand. After all, it was Mr. Haber who emailed his daughter Ms. Wasser: "We milk [Ms. Coscarelli's name] till we can't!" (C39.)

28

Chef Chloe and CCSW's respective trademark rights—as well as the pre-approval limits on the usage of those rights—were negotiated and agreed by competent counsel for both parties. The balancing evident in those contractual terms, considered in the light of the evidence adduced at the Hearing, makes logical sense. Upon termination as Service Member, Chef Chloe has lost her right to be involved in the running, menu selections, and restaurant design of the restaurants that will forever have her name above the doorway; but she still has the right to control any new, broader, or potentially insulting uses of the trademark that still bears her name, as she pursues her own future as a vegan chef.

It would be a far more absurd result to find that CCSW could use the By Chloe Mark for, for example, beef—a product antithetical to the vegan brand—than to find that Chef Chloe was not stripped from her ongoing right to approve any *expansion* of use of the trademark beyond the original Concept that was the basis for the Company's forming and the decision to include the By Chloe Mark as part of the Company IP. At the time the Operating Agreement was negotiated, Ms. Coscarelli was a burgeoning vegan chef with a long career ahead of her. She has already received recognition from major figures in the food world, such as the James Beard Foundation and Tom Colicchio. (Hr'g Tr. at 255:2-22.) While she risked losing the right to run the restaurant chain that bears her name, she did not risk the loss of her own right to control the unfettered expansion of the use of the trademark that was derived from her name. She has lost a great deal by being terminated from the restaurant that still bears her name in the vegan restaurant space, but she did not lose this important right to control the expansion of the trademark usage linked to her name.[15]

---

[15] Respondent ESquared also relies on dictum in an early decision by Judge Furman in the SDNY litigation, in which Judge Furman declined to preliminarily enjoin CCSW from selling

\*    \*    \*

In sum, the Arbitrator finds that Section 4.1 confers on Chef Chloe a right to consent to Approved Projects that exceed the original Concept of fast casual vegan restaurants, to the extent such projects "utilize[] one or more of the NFL Rights or the By Chloe Mark." (J1 § 4.1.) ESquared has identified no provision of the Operating Agreement that forfeited this pre-approval right when the Company terminated Chef Chloe. ESquared's litigation counsel have mustered the best arguments that outstanding and highly impressive litigators can devise, but the inferences ESquared wishes the Arbitrator to draw from other provisions in the Operating Agreement and the NFL Agreement are unpersuasive. And the alternative reading of the Operating Agreement now proffered by ESquared—that CCSW's ownership of the mark means it could do anything it wanted with it—even to sell beef if it so decided—surely cannot be the correct interpretation of the agreement. Therefore, Chef Chloe's pre-approval right under Section 4.1 survives her termination as Service Member.

---

retail goods bearing the By Chloe Mark. (*See e.g.*, ESquared Pre- Hr'g Br. at 34 (quoting *Coscarelli v. ESquared Hospitality LLC*, 364 F. Supp. 3d 207, 225 (S.DN.Y. 2019).) There, Judge Furman applied the time-honored criteria for application of a preliminary injunction before the merits of the issue had been heard by the Arbitrator. He concluded that an ambiguity in the contract diminished the requisite showing on one of the prongs needed in order to grant such extraordinary relief, before the merits of the parties' respective rights had been tried. Judge Furman stated that on "the current record, the Court cannot resolve whether the approval requirement still applies if Chef Chloe LLC is terminated as the Service Member." *Coscarelli*, 364 F. Supp. 3d at 225.

This Arbitrator has now had the opportunity for a full evidentiary trial on the merits on this question. For the reasons stated above—the Arbitrator finds that the Operating Agreement does not strip Chef Chloe of the approval right as to future expansion of the trademark usage as one of its penalties for termination as the Service Member. Therefore, the approval right for the expanded usage of the By Chloe Mark beyond fast casual vegan restaurants survives her termination. This interpretation is consistent with the persuasive testimony at the Hearing about the value placed on Chef Chloe's fame as a vegan chef, the intense contract negotiations, the explicit contract provisions that state what is forfeited upon such termination, and the totality of the evidence in the case.

The Arbitrator grants Chef Chloe's request to permanently enjoin CCSW from using the By Chloe Mark or the NFL Rights on any projects (including retail goods), other than vegan fast casual restaurants, without Chef Chloe's consent, pursuant to the terms of Operating Agreement Section 4.1.

**B.    The Effectiveness of the Repurchase of Chef Chloe's 50% Membership Interest**

Chef Chloe's second prayer for relief seeks declaratory judgment that Chef Chloe LLC retains the 50% Membership Interest in CCSW that it held prior to the purported Membership Interest Recapture on March 22, 2017.[16] (Am. Prayer ¶ b.) Chef Chloe's primary argument is that the Repurchase Right had already been extinguished more than a year earlier by the occurrence of an ESquared Hospitality Liquidity Event, and therefore did not exist on the date of the purported Membership Interest Recapture.

A central question in this Arbitration, and the issue about which most of the argument and evidence at the final Hearing was presented, is whether an ESquared Hospitality Liquidity Event occurred prior to March 22, 2017, so as to automatically extinguish the purported Repurchase Right before it was exercised. If such a Liquidity Event occurred, the Repurchase Right was vitiated, per section 19.5(e)(ii) of the Operating Agreement, and thus could not have properly been exercised on the date of the purported Membership Interest Recapture of Chef Chloe's 50% Membership Interest.

Chef Chloe argues that an ESquared Liquidity Event occurred on October 15, 2015, more than a year prior to the purported exercise of the Repurchase Right. Her contention is that the

---

[16] The Amended Prayer seeks, alternatively, an award of money damages in the amount of the value of the 50% Membership Interest in CCSW. With respect to the purported Membership Interest Recapture of her 50% Membership Interest in CCSW, Chef Chloe asserts that the primary remedy she seeks is the return of her 50% Membership Interest. Her alternative argument seeks an award of monetary damages pursuant to Section 20.6 of the Operating Agreement, upon a finding of breach by Respondents. (1635:8-1637:3.)

Liquidity Event occurred as a result of the ESquared Transfer, where 100% ownership of ESquared Hospitality was transferred from BLT Restaurant Group to ESquared Holdings in exchange for $250,000 paid by ESquared Holdings to BLT Restaurant Group.  (J19.)  Chef Chloe argues that the Repurchase Right was automatically terminated, and "was of no further force or effect" by this transaction, because the transaction constituted an ESquared Hospitality Liquidity Event.  (Chef Chloe Post-Hr'g Br. at 12 (citing J1 § 19.5.(e).)

On March 22, 2017, CCSW purported to recapture Chef Chloe's Membership Interest in reliance upon Section 19.5(a) of the Operating Agreement (*see* C50 at 1).  However, Section 19.5(e) limits the Repurchase Right granted in 19.5(a), as follows:

> [T]he Repurchase Right set forth herein *shall automatically terminate and be of no further force or effect* upon the occurrence of any of the following . . . (ii) there occurs an ESquared Hospitality Liquidity Event.

(*Id.* § 19.5(e)(ii) (emphasis added).)

An "ESquared Hospitality Liquidity Event" is defined as

> a sale, financing, public offering or other change of control transaction involving ESquared Hospitality (or its parent entity) and/or no less than a majority of the restaurants that ESquared Hospitality and its Affiliates have an ownership and/or management interest in.

(*Id.* § 1.1, "Liquidity Event".)

Chef Chloe argues that the ESquared Transfer was an ESquared Hospitality Liquidity Event, which automatically terminated the Repurchase Right on October 15, 2015.  Chef Chloe's argument rests upon two contentions:  Claimant argues first that the ESquared Transfer was a "sale", which alone satisfies the definition of Liquidity Event.  Claimant argues, in addition, that the ESquared Transfer *also* resulted in a change in control, which Chef Chloe argues is an alternative way to trigger the definition of ESquared Hospitality Liquidity Event.

ESquared argues that the ESquared Transfer, even if it was a sale, did not result in a change in control, and that any sale must also effect a change of control in order to constitute a Liquidity Event.  ESquared also argues that there was no change of control in the ESquared Transfer.

Both parties put on substantial evidence on these issues, and both presented expert witnesses who testified at length about this provision of the Operating Agreement.

### 1.  Analysis of Whether the ESquared Transfer Was a Sale

Direct ownership of ESquared clearly changed via the ESquared Transfer:  Prior to the ESquared Transfer, ESquared Hospitality was 100% owned by BLT Restaurant Group.  After the Transfer, ESquared Hospitality was 100% owned by ESquared Holdings.  (J19.)  These are legally distinct owners.  The following figure shows graphically the change in direct ownership.

**Figure 4:  Direct Ownership of ESquared Hospitality**



**Before October 15, 2015**



**After October 15, 2015**

Significant consideration was paid for the ESquared Transfer.  The assignment document that was signed to execute the ESquared Transfer states that the transfer was made for "good and

valuable consideration." (J19.) $250,000 is more than nominal consideration and more than

suffices to constitute a valid *quid pro quo*. Indeed, Mr. Haber testified that the amount to be paid

was arrived at "after consulting a tax attorney [because] we wanted to be respected for sale

purposes." (Hr'g Tr. at 561:5-10.)

Mr. Haber testified that the purpose of the ESquared Transfer was for his tax planning

purposes, anticipating an eventual sale of the "by Chloe" brand:

> [W]e knew eventually [outside investment] would lead to some sort of sale
> because investors want a return on their capital. So rather than leave it in
> the same structure for state tax purposes that we had set up previously with JL, I
> wanted, after discussion with my tax counsel, to have it as a separate ownership
> so that when By Chloe sold, it [*i.e.*, the sales proceeds] went directly to my three
> children.

(*Id*. at 533:24-534:10.) To this end, Mr. Haber requested that tax counsel divide ownership of

ESquared Holdings LLC—the new entity that became the owner of ESquared Hospitality—into

thirds: one-third was transferred into each of the newly created irrevocable Restaurant Trusts for

the benefit of his two younger children: the Justin Haber Restaurant Trust and the Lily Haber

Restaurant Trust. And one-third was granted in outright ownership to his oldest child, Samantha

Wasser. (J17; J18; J11.)

When this was done in 2015, there is no evidence presented in the record nor in the

testimony that Mr. Haber was concerned about anything other than rigorous tax planning to

move these potential profits (and the taxes thereon) to his children. There is absolutely nothing

wrong with tax planning, as long as the events structured to accomplish it are real, so that they

will be "respected" to achieve the tax planning goals, should there ever be a challenge to them by

taxing authorities. The definition of "Liquidity Event" was not mentioned by Mr. Haber in his

testimony as something that he told his tax counsel at Pryor Cashman about when the ESquared

Transfer was conceived and executed to obtain the tax benefits sought by Mr. Haber.

ESquared now constructs an argument to circumvent the "respected sale" created by tax

counsel.  It now argues that the ESquared Hospitality Liquidity Event definition only considers

the *indirect* ownership of ESquared to decide if there was really a sale.  ESquared argues that

before and after the ESquared Transfer, the beneficial owners of the trusts at the "top" of the

ownership structure were Mr. Haber's three children, and thus that no change in ownership

occurred.  (ESquared Post-Hr'g Br. at 6-7.)

This argument is flawed for multiple reasons:  First, ESquared advances no legal

authority whatsoever for the assertion that *indirect beneficial ownership* is the correct measure of

whether a change in ownership occurred.  This lack of any proffered caselaw is not the lack of

good research by Pryor Cashman in litigating this case.  Given the excellence of this law firm,

and the thoroughness with which its counsel have litigated this Arbitration, the Arbitrator is

confident that if such law existed, it would have been cited by Respondents.  The problem is not

a lack of research; the problem is that highly competent counsel found no law that supports this

argument, and thus provided none in their briefs to the Arbitrator.

Second, even if one were to consider, *arguendo*, the definition of ESquared Hospitality

Liquidity Event as applying solely ultimate beneficial ownership, rather than actual ownership of

the entities that changed hands, the argument still fails because the ultimate beneficial ownership

of ESquared Hospitality did in fact change significantly on the occurrence of the ESquared

Transfer.  Specifically, prior to October 15, 2015, ESquared Hospitality was indirectly owned by

the 2002 Lily Haber Trust, the 2002 Justin Haber Trust and the 2002 Samantha Haber Trust, in

thirds.  On October 15, 2015, after the ESquared Transfer, ultimate, indirect ownership changed

to two *different* newly created trusts plus one individual indirect owner: the Justin Haber Restaurant Trust; the Lily Haber Restaurant Trust; and, for the first time, Samantha Wasser received outright personal ownership rather than beneficial ownership in trust.

The following chart shows the change in indirect ownership:

**Figure 5:  Indirect Ownership of ESquared Hospitality**



The charts show a change and transfer to different indirect owners, and ESquared's argument utterly disregards the irrevocable trusts and individual identity and structures, which are legally highly significant. Even more important to the analysis, Ms. Wasser went from being a mere beneficiary of the 2002 Samantha Wasser Trust to substantial outright ownership in her own name, and Trustee of her siblings' newly created trusts. Distinct trusts are legal entities, with significant rights and responsibilities, as well as ownership.

In sum, the ESquared Transfer was a sale. It was set up by tax counsel to be a sale, and that sale happened on October 15, 2015, as planned by and for Mr. Haber.

### 2. Analysis of Whether the ESquared Liquidity Event Required a Change in Control for a Sale to Trigger the Clause

"ESquared Liquidity Event" is defined as follows: "a sale, financing, public offering or other change of control transaction involving ESquared Hospitality (or its parent entity) . . . ." (J1 § 1.1.) The parties dispute whether a sale, standing alone, could meet this definition or whether a Liquidity Event requires a sale that also results in a change of control.

Chef Chloe contends that a sale alone is sufficient to meet the definition of ESquared Hospitality Liquidity Event, arguing that the provision should be read as requiring a "(a) sale, (b) financing, (c) public offering or (d) other change of control transaction." (Chef Chloe Post-Hr'g Br. at 13.) Chef Chloe's position is that the Liquidity Event provision should not be construed as a change of control provision; to do so, Chef Chloe argues, would render meaningless or superfluous the language "sale, financing, public offering" if all that was required was a "change of control." (*Id.*)

ESquared asserts that, even if a sale did occur, a sale does not constitute a Liquidity Event unless it also effects a "change of control." ESquared places great weight and reliance solely on the word "other" in the Liquidity Event definition: it argues that the phrase "sale,

financing, public offering" means nothing, unless they also effect an "other change of control" transaction. The clause construction sought by ESquared is that any sale "must result in a change in control in order to constitute" a Liquidity Event. (ESquared Post-Hr'g Br. at 6; ESquared Post-Hr'g Reply at 2.) According to ESquared, "other change of control transaction" is a clause that modifies "sale, financing, public offering" so that only sales, financings or public offerings that *also* cause a change of control of the company are "Liquidity Events."

ESquared's corporate attorney drafted this clause. (*See* C43; C44 at 5.) Neither party sought to introduce extrinsic evidence of intent underlying the drafter's decision to name the term "ESquared Hospitality Liquidity Event" rather than "Change of Control Event," nor to explain why the language about sales and financings was included, if the only term with any meaning is "change of control". Change of control clauses are ubiquitous in corporate contracts, but ESquared's attorney chose not to use a standard clause in the CCSW Operating Agreement.

Litigation counsel for both sides did excellent work in presenting their respective positions. (The Arbitrator notes that the firm representing ESquared in this Arbitration was not the same firm whose corporate counsel who drafted the Operating Agreement.) Both Claimant and Respondents called expert witnesses on corporate governance and transactions to the witness stand.

Chef Chloe's corporate expert witness, Jeffrey Haas, testified that the title "Liquidity Event" means an event that produces *liquidity*, which the ESquared Transfer did, in the amount of $250,000. (Hr'g Tr. at 743:19-25, 744:25-745:4.)[17] Mr. Haas testified testified, in sum and substance, that the Liquidity Event provision is ambiguous, particularly the meaning of the word

---

[17] Here, we are not faced with a nominal consideration paid, which would have raised a question about whether it produced "Liquidity."

"other." However, based on the total language of the provision, including the title, "Liquidity Event," Mr. Haas opined that the provision is broader in scope than ESquared's proffered interpretation that only a change of control event could meet the definition. (Hr'g Tr. at 729:22-731:19.) Rather, Mr. Haas interprets the provision to include a sale that produces significant liquidity, regardless of whether it also causes a change of control, because "sale" is explicitly covered by the definition. (*Id.* at 731:12-19, 651:10-16.)

ESquared's expert witness on corporate transactions, Lawrence Graev, testified that in his opinion, the Liquidity Event provision is "clear and unambiguous that in order for there to be a liquidity event, as defined, there has to be a change of control" and that a sale, financing or public offering that did not also cause a change of control would not meet the definition. (*Id.* at 1330:13-24.) Mr. Graev nonetheless agreed with Mr. Haas that the definition could have been clearer, stating in his report that the definition "is not the most articulate definition I have seen in my legal business or teaching experiences." (R15 at 7.) When asked whether he had seen change of control provisions drafted as liquidity event clauses, Mr. Graev testified that, in his experience, these clauses exist, typically in the context of "preferred stocks or preferred units" to "describe that type of event that will result in the waterfall for distributions." (Hr'g Tr. at 1446:15-1448:15.) He testified that, in his opinion, the provision is "a change of control clause notwithstanding the fact that it talks about a liquidity event." (*Id.* at 1446:3-6.)

Viewing the evidence as a whole, the Arbitrator finds the Claimant's expert witness on this issue testified more persuasively than Mr. Graev. Mr. Graev, while an experienced practitioner, could not account for why a provision he believed unambiguously required a change of control in fact was titled Liquidity Event, and the examples provided for when such a provision would be included—preferred stock provisions related to triggering waterfall

distributions—have nothing to do with the relevant provisions in the Operating Agreement. In contrast, Mr. Haas's opinion was that a provision titled "*Liquidity* Event" should be tied to the occurrence of liquidity, such as a sale.

The Arbitrator is also not persuaded by Mr. Graev's opinion that the Liquidity Event provision is clear and unambiguous, particularly when he also testified that it was not written in an articulate manner, and contrasted it to the many change-of-control clauses he had seen in his years as a corporate attorney. The language drafted by ESquared's corporate draftsman (*see* C44 at 5; Hr'g Tr. at 200:21-23) was far from clear and unambiguous. Accordingly, any ambiguity will be construed against ESquared.[18]  *See BT Commercial Corp. v Blum*, 175 A.D.2d 43, 44 (1st Dept. 1991); *see also RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 712 (2d Cir. 2004).

ESquared's theory for why a change of control was required rests on nothing more than the word "other" in the Liquidity Event definition. But if a change of control was mandatory to trigger a Liquidity Event, then the ESquared attorney who drafted the term need not have included the words "sale, financing or public offering" and instead could have included a straightforward change of control clause. Such change of control clauses exist as standard clauses, as noted by ESquared's own expert. In short, ESquared's proffered contract construction argument renders most of the words of the definition, as well as its title, superfluous. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

---

[18] In rebuttal, ESquared did not call either its counsel or anyone else to testify as to the intent of this definition.

Having read the contract definition in its entirety, and having heard all of the fact and expert testimony in the case, the Arbitrator finds that the term "ESquared Hospitality Liquidity Event" is an event of sale, financing, or public offering that raises significant liquidity, or any change of control event that raises significant liquidity. The amount of consideration used for the ESquared Transfer was chosen for the explicit purpose of being "respected for sale purposes" as part of a series of tax planning transactions. Therefore, the ESquared sale was a sale that raised significant liquidity and was designed by Mr. Haber's tax counsel to be "respected" as a sale.

### 3. Analysis of Whether a Change of Control Occurred

However, the Arbitrator also considers whether the result would be different if it had adopted ESquared's construction of the "Liquidity Event" clause to require a change of control. Both parties adduced substantial testimony and argument on this issue, and both expert witnesses testified about it.

"Change of control" is not defined in the Operating Agreement. Both parties rely on Rule 405 of Regulation C promulgated under the Securities Act of 1933, which defines control as: "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. (Chef Chloe Post-Hr'g Br. at 16; ESquared Post-Hr'g Br. at 8, 11.)

A key distinction in the analysis of whether a change in control occurred during the ESquared Transfer is to first determine and understand the difference between a *member-managed* LLC and *manager-managed* LLC. As its name connotes, a "member-managed LLC" is one whose members—*i.e.,* owners—also act as managers of the LLC. (Hr'g Tr. at 622:5-8.) By contrast, a manager-managed LLC is managed by appointed managers. (*Id.* at 622:9-11.) A

key feature of the complex LLC ownership structure created by James Haber is that ESquared Hospitality—the entity that changed ownership on October 15, 2015—was *member-managed*. (J8 § 6.2; J10 § 7.1.)  Thus, when its owner changed as a result of the ESquared Transfer, its Manager also necessarily changed.

Specifically, prior to October 15, 2015:

**ESquared Hospitality** was *member*-managed.  It was thus managed by its 100% owner, BLT Restaurant Group.  (J8 § 6.2.)

**BLT Restaurant Group** was *manager*-managed.  James Haber was its designated Manager, and he held a 100% Voting Percentage Interest, under the BLT operating agreement. (J9 §§ 7.1(a), (b), 7.4.)  Because BLT Restaurant Group was the sole Member and Manager of ESquared Hospitality, BLT's Manager—Mr. Haber—indirectly managed ESquared Hospitality. (Hr'g Tr. at 635:14-636:18.)  James Haber therefore had direct control of BLT Restaurant Group, as well as indirect control of ESquared Hospitality prior to October 15, 2015.

BLT Restaurant Group had divided ownership:  JL Holdings 2002 LLC owned 85% of BLT Restaurant Group, and Keith Treyball (a third party) owned the remaining 15%.  (J9, Ex. A.)

**JL Holdings 2002 LLC** (the owner of 85% of BLT Restaurant Group), was *manager*-managed.  As with BLT Restaurant Group, the operating agreement for JL Holdings 2002 LLC appointed Mr. Haber the sole Manager.  (J7 § 4.1.)  Mr. Haber could be removed as Manager only if "adjudicated guilty of fraud, conversion or other criminal act detrimental to the Company" or if ordered removed by a court.  (*Id.* § 4.11.)  Therefore, Mr. Haber had direct control over JL Holdings LLC.

43

**The 2002 Trusts** owned the full Membership Interest in JL Holdings 2002 LLC.  (J7, Ex. A.)  James Haber put the ownership of JL Holdings into beneficial trusts for his children in 2002. The 2002 Justin Haber Trust, the 2002 Samantha Haber Trust and the 2002 Lily Haber Trust each owned one-third of JL Holdings in irrevocable trusts, managed by Fiduciary Management Services, Inc.  (J4; J5; J6.)  The Trustee had "sole discretion" to administer and manage the 2002 Trusts, which were irrevocable.  (*Id.* at 2, 17.)  Nonetheless, as the Manager of a manager-managed LLC, JL Holdings 2002 LLC, Mr. Haber held control of that entity.

<u>**Figure 6: Direct and Indirect Management of ESquared Hospitality**</u>
<u>**Before October 15, 2015**</u>



On October 15, 2015, James Haber, upon the advice of his tax counsel, executed the ESquared Transfer.  That transaction assigned 100% of the Membership Interest in ESquared Hospitality from its owner, BLT Restaurant Group, to ESquared Holdings.

<u>Therefore, on and after October 15, 2015</u>:

**ESquared Hospitality** remained *member*-managed.  But its new 100% owner was now ESquared Holdings.  Therefore, ESquared Hospitality became managed by its sole Member, ESquared Holdings.

**ESquared Holdings LLC,** however, was set up as a *manager*-managed LLC.  (J11 § 7.1.)  Pursuant to the ESquared Holdings operating agreement, Samantha Wasser was the appointed Manager and held a100% Voting Percentage Interest in ESquared Holdings.  (*Id.* § 7.4.)  ESquared Holdings became the sole Member and Manager of ESquared Hospitality.  Thus, Ms. Wasser directly controlled ESquared Holdings, as its Manager, and she also indirectly managed ESquared Hospitality, through her role as Manager of ESquared Holdings.  In sum, after October 15, 2015, Samantha Wasser was firmly in control of ESquared Hospitality.

**The Restaurant Trusts and Ms. Wasser:**  On October 15, 2015, ESquared Holdings LLC became two-thirds owned by two newly created irrevocable "Restaurant Trusts" for Justin and Lily Haber, that were managed by a different Trustee than the 2002 Trusts.  The Grantor and Trustee of these new Restaurant Trusts was Samantha Wasser.  (J17; J18.)  And she owned in her personal capacity the last one-third of ESquared Holdings.  (J11, Ex. A.)

Ms. Wasser therefore controlled the Restaurant Trusts in her role as Trustee of the irrevocable trusts for the benefit of her younger siblings, and controlled and owned one-third of ESquared Holdings directly in her personal capacity and in her capacity as Manager of ESquared Holdings.

**Figure 7:  Direct and Indirect Management of ESquared Hospitality
After October 15, 2015**



To sum up the effect of the ESquared Transfer on October 15, 2015:  Prior to the ESquared Transfer, management and both direct and indirect control of ESquared Hospitality was held by Mr. Haber at every level of the ownership structure.  After the ESquared Transfer, management and control became possessed by Ms. Wasser.  Ms. Wasser became the Manager of ESquared Holdings, which in turn was the Manager of ESquared Hospitality.  So Ms. Wasser directly controlled ESquared Holdings, and she also indirectly controlled the management of ESquared Hospitality.  Thus, direct control of ESquared Hospitality changed on October 15, 2015.

If one were to examine the "top" of the multi-layered LLC structure created by James Haber, it is also clear that indirect control changed on October 15, 2015.  Prior to that date,

indirect control of ESquared Hospitality was held by Fiduciary Management Services, Inc., as

Trustee of the 2002 Trusts for Justin, Lily and Samantha Haber, with "sole discretion" in

managing the irrevocable trusts.  On and after October 15, 2015, new trusts were created, granted

and controlled by Ms. Wasser, as Trustee of the Lily and Justin Haber Restaurant Trusts, and in

her role is direct owner of a 33.3% interest in ESquared Holdings, and her role as Manager of

ESquared Holdings, and her role as indirect Manager of ESquared Hospitality, which was

managed by ESquared Holdings.

**Figure 8:  Management Before and After October 15, 2015**



On its face, it the above chart shows that a change in control occurred by virtue of the

ESquared Transfer, both as to direct and indirect control.

ESquared advances several arguments why, notwithstanding the face of the transfer, it

urges a finding that no change in control occurred:

i.    **ESquared Argument: Haber and Wasser Held Common Control.**

First, ESquared argues that Mr. Haber and Ms. Wasser at all times shared *common* control, such that no change in control occurred. ESquared relies on certain documents that delegate certain management authority in making this argument.

Prior to the ESquared Transfer, when ESquared was owned and managed by BLT Restaurant Group, Ms. Wasser was appointed a Manager of BLT Restaurant Group and granted "the power and authority to bind the Company to the same extent that James Haber may bind the Company." (R28 (dated April 21, 2014).) According to ESquared, while Mr. Haber was the designated Manager in the BLT Restaurant Group operating agreement, Ms. Wasser's appointment as a Manager shows that she shared managerial responsibilities; thus, ESquared argues, they were in common control. (ESquared Post-Hr'g Br. at 8-9.)

On October 15, 2015, the date of the ESquared Transfer, Mr. Haber was appointed CEO of ESquared Holdings. (R29.) According to ESquared, while Ms. Wasser was the designated Manager of ESquared Holdings under the ESquared Holdings operating agreement (J11), control was shared with Mr. Haber by virtue of this appointment. Mr. Haber was also appointed CEO of ESquared Hospitality (which was member-managed, and thereby managed by ESquared Holdings, whose Manager was Ms. Wasser). (R30 (dated October 15, 2015).) ESquared argues that the ESquared Transfer merely continued the status quo, in which Mr. Haber and Ms. Wasser shared common control over that entity. (ESquared Post- Hr'g Br. at 9.)

This argument is not persuasive to demonstrate that Mr. Haber and Ms. Wasser held joint control of all of the entities at issue both before and after October 15, 2015. Although the delegations of authority in R28, R29 and R30 are noted, that authority was possessed only because the person with actual control exercised its discretion to make the delegations. A

delegation of authority is not equivalent to being the appointed Manager under the relevant operating agreements.  The delegations of authority to act could be rescinded at any time by the Manager with control pursuant to the LLC formation instruments; that person, who made such delegation, retains the power to rescind it.

Prior to October 15, 2015, the sole Member and Manager of ESquared Hospitality was BLT Restaurant Group.  At that time, James Haber was the appointed Manager of BLT Restaurant Group.  (J9 § 7.4(b).)  He was the sole person with the control to delegate, and rescind any delegation, of authority with respect to BLT Restaurant Group.  (*Id.* § 7.9.)  The BLT Restaurant Group operating agreement granted Mr. Haber, its Manager, 100% of the Voting Percentage Interest.  (*Id.* § 7.4(b).)  Further, the BLT operating agreement expressly stated that "*all actions or decisions* of the Managers shall be made *exclusively* by JH [James Haber]."  (*Id.* § 7.4(c) (emphasis added).)  While R28 appointed Ms. Wasser as a Manager with "the power and authority to bind the Company to the same extent that James Haber may bind the company," it did not grant her any Voting Percentage Interest; nor did it purport to amend the operating agreement's statement that all actions or decisions were to be made by the sole Manager who held 100% Voting Percentage Interest—*i.e.*, Mr. Haber.  Mr. Haber could at any time rescind the authority that he gave to Ms. Wasser, using his power under the BLT operating agreement.  That he did not do so does not mean that he did not have the control position to do so whenever he chose to exercise that control.

Chef Chloe's expert, Jeffrey Haas, testified persuasively that the delegation of authority reflected in R28 gave Ms. Wasser outward-facing authority to bind BLT, for example by signing an application or contract with a third party; but, importantly, it did *not* give her equal authority with Mr. Haber because he ultimately retained the authority to veto any action she wanted to

take, and/or could remove Ms. Wasser from her position as a Manager at his sole discretion. (Hr'g Tr. at 680:16-681:15.)  This outward facing authority is consistent with the authority granted in R28 to "bind the company."  R28 did not, however, alter Mr. Haber's "exclusive[]" power to make "all actions or decisions" for BLT Restaurant Group.  Therefore, the delegation evidenced in R28 does not establish "joint control" by Ms. Wasser and Mr. Haber prior to the October 15, 2015 ESquared Transfer.

The appointments of Mr. Haber as CEO of ESquared Hospitality and ESquared Holdings after the ESquared Transfer on October 15, 2015 follow a similar pattern, except that this time Ms. Wasser has control.

After October 15, 2015, ESquared Holdings became the sole Member and Manager of ESquared Hospitality.  In turn, as stated above, Ms. Wasser became, on that key date, the *sole Manager* of ESquared Holdings with a 100% Voting Percentage Interest in that entity.  (J11 § 7.4(b).)  In R29 (dated October 15, 2015), she appointed Mr. Haber as CEO of ESquared Holdings and delegated to him power to "contract debts or incur liabilities, to sign contracts or agreements . . . [and] to authorize the use of [certain] facsimile signatures . . . ."  (R29.) However, the ESquared Holdings operating agreement states that "[a]ny action or decision of the Managers shall require the consent of the then-current Manager(s) holding a majority of the Voting Percentage Interests"—*i.e.*, Ms. Wasser, who held 100% of the Voting Percentage Interest.  (J11 §§ 7.4(b)-(c); *see also* § 7.5(c) (stating that Ms. Wasser could only be removed as Manager "for Cause by vote of Members holding a majority of the Percentage Interests," meaning that only Ms. Wasser could remove herself).)

ESquared Hospitality: R30 (dated October 15, 2015), is a similar a document in which Ms. Wasser appoints Mr. Haber as CEO, in this instance, of ESquared *Hospitality*, conferring

upon him similar authorities as R29 conferred on him for ESquared *Holdings*. Here again, the

ESquared Hospitality operating agreement states that "any officer appointed by the Manager may

be removed at any time by the Manager." (J10 § 7.3.) ESquared Hospitality's Manager was

ESquared Holdings, which acted through its Manager, Ms. Wasser. Thus, any authority

delegated to Mr. Haber pursuant to R30 was limited and controlled by Ms. Wasser. Ms. Wasser

retained control through her 100% Voting Percentage Interest in ESquared Holdings and ability

to remove any appointed ESquared Hospitality officers, thereby revoking any authority granted.

In short, Ms. Wasser had the power under the ESquared Holdings and ESquared Hospitality

operating agreements to fire Mr. Haber.

While the concept of common control could conceivably exist under certain factual

circumstances, those facts are not present here. Prior to October 15, 2015, the relevant operating

agreements and delegation documents make it clear that Mr. Haber was in both direct and

indirect control of ESquared; after that date, Ms. Wasser held that same degree of control. The

ESquared Transfer resulted in Ms. Wasser assuming that control; it was, therefore, a "change of

control". Whatever authorities are delegated could always have been revoked, and at no time did

Mr. Haber (prior to October 15) or Ms. Wasser (after October 15) grant any of the 100% Voting

Percentage Interest that each held under the relevant operating agreements to the other.[19]

---

[19] ESquared additionally asserts that various pleadings by Chef Chloe assert that Mr. Haber
controls all of his entities to argue that Chef Chloe should be foreclosed from its change in
control argument. (ESquared Post- Hr'g Br. at 13.) The statements by Chef Chloe relied on by
ESquared are (i) six pleadings in other, separate actions between the parties and (ii) a statement
made in Chef Chloe's pre-hearing brief. Both parties rely on *Banks v. Yokemick*, which states
that "judicial admissions generally pertain to . . . matters that a party unequivocally declares to
be true because that party is uniquely positioned to know so and concede." 214 F. Supp. 2d 401,
406 (S.D.N.Y. 2002). Because the statements by Chef Chloe relate to the business
arrgangements of ESquared, the allegations and denials by Chef Chloe cited by ESquared do not
constitute facts that Chef Chloe is "uniquely positioned to know." Further, each of these

ii.    **ESquared Alternative Argument:  There Was "No Daylight" Between Haber and Wasser.**

Second, ESquared argues that, notwithstanding certain "technicalities" in the relevant operating agreements, there was "no daylight" between Ms. Wasser and Mr. Haber, such that neither would have attempted to fire the other nor take a significant action without the consent of the other.  Mr. Graev, Respondents' expert, largely rested his opinion on his belief that at all relevant times, Mr. Haber and Ms. Wasser are very close to each other personally, and that "control" must be assessed based on the close nature of this personal relationship.  (Graev Rebuttal 16 ¶ 40.)  Mr. Graev dismissed as "speculative" the notion that Mr. Haber and Ms. Wasser could ever have such a substantial disagreement about management that, for example, one might terminate the other.  (Hr'g Tr. at 1385:19-23, 1462:21-1463:7.)  (Mr. Graev conceded that he rendered this opinion despite having never met nor spoken to Ms. Wasser.  (*Id.* at 1415:25-1416:4.))  Likewise, when asked who had authority under the BLT Restaurant Group operating agreement if there was a disagreement about how to proceed, Mr. Haber testified that he "can't make a distinction" between the father/daughter relationship and legal requirements "when you're talking about my daughter."  (*Id.* at 427:19-428:5.)

ESquared's post-hearing brief similarly argues that the "facts and circumstances" of Mr. Haber and Ms. Wasser's personal relationship matters more than what the operating agreements

---

statements appear in pleadings in other actions, which at most may be considered as evidence in this action, but are not binding judicial admissions in the record before the Arbitrator.  *See Hausler v. JP Morgan Chase Bank*, 127 F. Supp. 3d 17, 37 (S.D.N.Y.  2015).  As to the statement in Chef Chloe's pre-hearing brief in this case on which ESquared relies, it is the first sentence in the brief and says, in full, "[o]n its face, CCSW LLC is a straightforward partnership between Chef Chloe LLC, owned by famed vegan chef Chloe Coscarelli, and ESquared Hospitality, run by James Haber."  (Chef Chloe Pre- Hr'g Br. at 1.)  This sentence is a broad introductory point that does not differentiate the time period being referenced.  This is not an explicit enough statement to bind Chef Chloe to an admission that, after the October 15, 2015 ESquared Transfer, ESquared Hospitality remained in Mr. Haber's control.

say and criticizes Chef Chloe's expert, Mr. Haas, for basing his analysis on the "words of the operating agreement" rather than the "reality" of the relationship between Mr. Haber and Ms. Wasser.  (ESquared Post-Hr'g br. at 9-10.)  However, the brief cites no legal authority of any kind for the proposition that the that the closeness of a father-daughter relationship at a particular point in time trumps the corporate documents in determining what control is and who possesses it, nor what happens if/when a close familial relationship were ever to sour.  One hopes that never occurs, but history is rife with occurrences in which that hope was dashed.

The Arbitrator finds no persuasive legal authority in the ESquared briefs to support its argument that the question of control rests upon the interpersonal dynamics that exist between people at any moment in time and presuming what these individuals would have chosen to do; rather, the task before the Arbitrator is to determine what authority each individual had under the relevant operating agreements as of the critical dates at issue in this case.

Both parties define control as "the power to direct or cause the direction of the management and policies of a person whether *through the ownership of voting securities, by contract*, or otherwise."  17 C.F.R. § 230.405 (emphasis added).  (Chef Chloe Post-Hr'g Br. at 16; ESquared Post-Hr'g Br. at 8, 11.)  The Arbitrator's analysis of what determines "change of control" is therefore most properly based upon voting rights and contract provisions that determine which person or persons held the power to direct management, comparing those voting rights and contract provisions that existed before the ESquared Transfer with those provisions existing after the ESquared Transfer.  The various operating agreements in this case provide the answers to who held what power at what time.  While it is laudable and lovely that

father and daughter are inseparable, those interpersonal dynamics do not drive the outcome of this legal analysis.[20]

### iii.    ESquared Argument:  Form over Substance.

Third, ESquared dismisses the documentary chain of changes of control as "technical arguments" that elevate "form over substance."  ESquared's expert, Mr. Graev's expert report attacked Chef Chloe's expert, Mr. Haas, several times for lacking "thoughtful and intellectually honest legal analysis."  (R16 ¶¶ 11, 15, 18.)  Mr. Graev further opined that Mr. Haas was "choosing to favor form over substance" for his purported failure to consider that "the identical transaction and subsequent resulting ownership structure could have been accomplished without denominating it as a 'sale.'"  (*Id.* ¶ 15.)  According to Mr. Graev, there was no actual change of control because the same results could have been accomplished through the following chain of steps:

1. "BLT *could have made* a distribution to JL Holdings of the 50% Membership Interest in [CCSW];

2. "JL Holdings *could have made* a distribution to the three 2002 Trusts of the 50% Membership Interest in [CCSW]; and

3. "[T]he three 2002 Trusts *could have contributed* the 50% Membership Interests to Samantha and the Restaurant Trusts."

---

[20] And, of course, no matter how much goodwill and harmony exists in the Haber family as of today, no one can foresee the future.  That is why contracts and operating agreements exist to provide clarity to who holds what authority should an unforeseeable fallout occur.  Mr. Graev dismissed as "highly speculative" the hypothetical scenario proffered by counsel for Chef Chloe that Ms. Wasser could fire Mr. Haber if they disagreed about a management decision.  (Hr'g Tr. at 1432:21-1433:4.)  So too is the assertion that Mr. Haber and Ms. Wasser would never reach such an impasse.  No one knows the future, and resting an important legal ruling from an inference about the dynamics between father and daughter is not what the law requires; rather, the job of the Arbitrator is to interpret legal documents and analyze what rights belonged to each individual to take what action.

(R15 at 12; R16 ¶ 15 (emphasis added).)  Mr. Graev opined that ESquared *could have used* these three hypothetical "Permitted Transfers" to accomplish the "same ownership structure that resulted from the" ESquared Transfer.  (*Id.*)

When cross-examined about this hypothetical multi-step alternative during the Hearing, several factors not previously considered by Mr. Graev were brought to his attention that seriously undermined his credibility as an expert witness.

As to the hypothetical distribution by BLT to JL Holdings, Mr. Graev was directed to the fact that JL Holdings only owned 85% of BLT Restaurant Group, while its President, Mr. Treyball, held the remaining 15%.  (Hr'g Tr. at 1419:14-18.)  Thus, for Mr. Graev's hypothetical to be sound, there must be some mechanism in the BLT Restaurant Group operating agreement for the "distribution" to be made to JL Holdings while somehow excluding Mr. Treyball, despite his 15% ownership interest in BLT (and its property).  Mr. Graev conceded that he never did an analysis of whether the relative economic interests held by Mr. Treyball and JL Holdings would permit the distribution proffered in his hypothetical.  (*Id.* at 1427:7-21.)[21]

---

[21] During Mr. Haber's rebuttal testimony, he attempted to rescue his expert's apparent lack of knowledge as to how such a distribution would actually occur by pointing to the "payback provision" in the BLT Restaurant Group operating agreement, which referred to repayments to JL Holdings for capital contributions made to BLT.  (Hr'g Tr. at 1491:5-9; J9 at 012.)  Mr. Haber testified that Mr. Graev "didn't realize immediately about the payback provision," which according to Mr. Haber, would allow for a "distribution from BLT of those interests [in ESquared Hospitality] to JL Holdings, [then] from JL Holdings to the trusts."  (Hr'g Tr. at 14912-18.)  The Arbitrator notes that Mr. Graev's report and rebuttal say nothing about the payback provision, and thus he obviously did not rely on that provision in rendering his opinion about the hypothetical alternative transactions.  Mr Haber is not an expert and did not submit an expert opinion of the sort generally submitted by a lay witness who claims special expertise and experience in an area.  His opinion about a different type of alternative transfer that might have been considered is neither an expert opinion in this case, nor it is a qualified lay opinion, because it was never stated in any report of an experienced lay witness, which would also have been required to be submitted in advance of the Hearing, and subject to deposition and rebuttal expert report.  Thus, this testimony is inadmissible and speculative lay opinion.

As to the final step in Mr. Graev's hypothetical—*i.e.*, the hypothetical transfer of the LLC ownership interest from the 2002 Trusts to the Restaurant Trusts and Ms. Wasser—Mr. Graev testified that this would be accomplished by having Mr. Haber tell the Trustee of the 2002 Trusts (Fiduciary Management Services, Inc.) that Mr. Haber would make the "distribution to each of these [2002] trusts of a one-third interest *if you as trustee* of these trusts are *prepared to move it to the other trusts and Samantha*." (*Id.* at 1434:8-15 (emphasis added).)

When asked whether the hypothetical role of Mr. Haber imposing such conditions on the actions of an independent trustee to seek and cause a distribution to, and then from, the irrevocable 2002 Trusts might pose severe legal problems, including serious tax consequences, Mr. Graev admitted that he had not even considered what the tax consequences of this hypothetical might be. (*Id.* at 1436:12-23.) This is a rather stunning admission of an expert witness when the structure of both the children's irrevocable trusts, and the ESquared Transfer, were done upon the advice of Pryor Cashman expert tax counsel to achieve Mr. Haber's desired tax objectives. (*Id.* at 533:24-534:10, 560:23-561:10, 1490:19-22.)

Mr. Graev was asked whether a request by Mr. Haber to the Trustee of the 2002 Trusts to transfer the Membership Interest out of the 2002 Trusts and into the Restaurant Trusts, as well as to Ms. Wasser outside the trust and into her individual capacity, would constitute improper control over property placed in the irrevocable 2002 Trusts. Mr. Graev responded that the Trustee would have to make its own independent judgment, and that if the Trustee declined to

---

Further, the provision in the BLT operating agreement that both Mr. Haber and Mr. Graev rely on to contend that the interest in ESquared Hospitality could have been transferred to JL Holdings as a "distribution" states that "Distributions pursuant to this Section 13.1 shall be made only in cash." (J9 § 13.1(b).) Thus, the plain language of that operating agreement appears to contradict the concept advanced by Mr. Graev that the ESquared Transfer—a transfer of an ownership interest in an LLC, and *not* cash—could have been effectuated via a "distribution" under the BLT operating agreement.

make the requested transfer, "that's the end of the hypothetical." (*Id.* at 1438:20-1439:15.)  Mr. Graev conceded that he "didn't go anywhere close to that level of analysis" in opining that this hypothetical three-step transaction could have avoided a sale. (*Id.* at 1439:16-19.)  Based upon this colloquy, it is quite clear that this multi-step hypothetical transaction that was posited as a way to avoid the consequences of the ESquared Transfer was not seriously thought through by Mr. Graev.  And, of course, this hypothetical series of transactions never occurred at all, and there is no testimony that Mr. Haber ever discussed them with his tax counsel before embarking on his decision to execute the ESquared Transfer as the transaction that really did happen on October 15, 2015.

It is, frankly, rather surprising that an expert corporate lawyer with decades of experience would so sternly criticize his opposing expert for not hypothesizing that Mr. Haber could ignore the formalities required by excellent trust and tax law attorneys, and take steps to exert control over the property transferred to irrevocable trusts and risk defeating the tax benefits he sought to attain.[22]  This lack of preparation and analysis undermines the value of Mr. Graev's expert opinions.  Mr. Graev knew that the 2002 Trusts were irrevocable.  Mr. Graev's client set up the ESquared Transfer and Restaurant Trusts after seeking advice from his tax lawyers at Pryor

---

[22] Mr. Graev seemed unaware that his expert report accused the opposing expert of lacking "thoughtful and intellectually honest legal analysis" because he had not considered this hypothetical alternative way to effectuate the transaction.  When asked whether that criticism was an "unfair shot" in light of the above-referenced line of questioning, Mr. Graev seemed confused about what his report had said, stating, "I think my comment had to do more with the way [Mr. Haas] analyzed the definition of ESquared Hospitality Liquidity event and other determinations and opinions he expressed to support that.  I don't think it related to the hypothetical." (Hr'g Tr. at 1439:23-1440:24.)  Mr. Graev was then directed to the paragraph in his report where he made that accusation precisely about this hypothetical, and he conceded that he had in fact criticized Mr. Haas for not thinking of the hypothetical alternative transaction proffered in Mr. Graev's report. (*Id.* at 1441:3-11.)  His demeanor and apparent confusion on this and other points was not helpful to the Arbitrator.

Cashman, who had advised him to structure the ESquared Transfer as a sale for significant consideration, precisely because that was their advice about the legal way to effectuate this transaction to achieve the tax benefits sought by Mr. Haber. (*Id*. at 560:23-561:10, 1490:19-22.) And yet ESquared's own expert did not even consider the tax consequences of his hypothetical alternative, despite the fact that the explicit purpose of the ESquared Transfer, according to Mr. Haber's own testimony, was for tax planning purposes.

As stated by Mr. Haber himself when explaining the purpose of the ESquared Transfer:

[W]e knew eventually [outside investment] would lead to some sort of sale because investors want a return on their capital. So rather than leave it in the same structure for state tax purposes that we had set up previously with JL, I wanted, after discussion with my tax counsel, to have it as a separate ownership so that when By Chloe sold, it went directly to my three children.

(*Id*. at 533:24-534:10.) Thus, the legally mandatory total separation between Mr. Haber and the irrevocable trusts was essential to the tax advice provided by Mr. Haber's tax lawyers at Pryor Cashman; this tax advice was designed to give substantial tax benefits to the Haber family, by placing property into these irrecoverable trusts in the first place.

The ESquared Transfer was not just a mere formality to gain advantageous tax treatment in the event of a sale of the "By Chloe" brand. In order to meet his tax objectives that the profits of such a sale would run directly his children, strict legal regulations apply, which require the transactions to be genuine, and not merely a formality. ESquared's "form over substance" argument ignores this: There cannot be one version of events presented for tax purposes and an entirely different one presented in this dispute with Chef Chloe.

The ESquared Transfer was carefully effectuated by tax counsel to avoid being seen as "legal form over substance." They are not corporate transactions in form only; they are real transactions in every sense of the word, because they had to be genuine in order to hold up to tax

authorities' scrutiny.  With the desired tax benefits come any consequential outcomes of those transactions in the corporate context of these transactions.

In sum, the transactions engaged in, and the consequences thereof, including the occurrence of an ESquared Hospitality Liquidity Event, were the result of decisions made by Mr. Haber long before the consequences would manifest themselves.  Mr. Haber testified that ESquared Hospitality was made a member-managed LLC because it "really had no corporate activity whatsoever other than just being a trade name."  (Hr'g Tr. at 435:7-16.)  However, ESquared Hospitality was the entity selected by Mr. Haber in 2014 to become the 50% Member in CCSW.  This entity was put at the center of the ESquared Hospitality Liquidity Event provision in the Operating Agreement drafted by Mr. Haber's counsel, and this was the provision that could extinguish the Repurchase Right.  Therefore, the entity that could potentially trigger the loss of the Repurchase Right if, *inter alia*, a change of control occurred, was set up as a member-managed LLC, which, if sold or transferred, would likely be controlled by a different Member-Manager.  And that is precisely what happened here, in the decisions made by Mr. Haber together with his corporate drafting counsel, on the one hand, and his personal tax counsel on the other. These were all decision made by Mr. Haber by the manner in which he conducted his business and personal affairs.

\*     \*     \*

The Arbitrator finds that the extensive documentary exhibits referenced above, together with the persuasive expert testimony of Mr. Haas, demonstrates that Claimant has met her burden of proof that there was a change of control under the ESquared Liquidity Event clause in the CCSW Operating Agreement.  This is a third separate and independent basis, together with the other findings made above, to wit, that (1) a "sale" also occurred, and (2) that a "sale" does

not require a change of control to constitute an ESquared Hospitality Liquidity Event. These constitute three separate and independent bases upon which it has been proven that a Liquidity Event occurred prior to the purported Membership Interest Recapture of Chef Chloe's 50% Membership Interest. Together, as well as individually, each of these events had extinguished the ESquared Repurchase Right under Section 19.5(e)(ii), long before the purported Membership Interest Recapture of Chef Chloe's 50% Membership Interest in CCSW. Accordingly, after October 15, 2015, CCSW had no Repurchase Right to exercise. The purported exercise of it is null and void and constitutes a breach of the Operating Agreement. Chef Chloe's 50% Membership Interest was never legally recaptured by CCSW, and still belongs to her.[23]

### C.  **Amendments to the Operating Agreement**

Chef Chloe argues that, if the Arbitrator finds that the Repurchase Right had been extinguished, and that the purported Membership Interest Recapture of Chef Chloe's Membership Interest was invalid, the Arbitrator must also find that the amendments to the CCSW Operating Agreement made by ESquared were also improper and void.

---

[23] Chef Chloe pleads two grounds for relief, pled in the alternative, if the Arbitrator were to find that the Repurchase Right had not been extinguished: First, Chef Chloe claims in the alternative that the Repurchase Letter send on March 22, 2017 invoked the wrong entity in effectuating the Membership Interest Recapture and thus was ineffective. (Demand ¶¶ 71-76; Chef Chloe Post - Hr'g Br. at 19-22.) Second, that Chef Chloe was terminated by Arbitrator Garay (and not "by the Company" as provided in Section 19.3 of the Operating Agreement); therefore Claimant argued in the alternative that Chef Chloe was terminated by "operation of law" and entitled to a fair market value payment of her Membership Interest rather than the value of her capital account (which was $0) upon the purported Recapture. (Demand ¶¶ 81-87; Am. Prayer ¶ d; Chef Chloe Port-Hr'g Br. at 26-28.)

The Arbitrator need not reach either of these alternative claims for relief. Because the Repurchase Right was extinguished upon the ESquared Transfer, there was no lawful basis on which to recapture Chef Chloe's 50% Membership Interest after October 15, 2015 (regardless of the entity on whose behalf the Repurchase Right was asserted, nor the dollar amount of the unlawful recapture). Therefore the Arbitrator need not decide these claims that were pled in the alternative, and intended to be reached only if the Arbitrator had found that the Repurchase Right had not been extinguished.

Several purported corporate actions taken after ESquared exercised the defunct Repurchase Right:

1. The Amended and Restated Limited Liability Operating Agreement of CCSW LLC, executed the same day as the invalid Membership Interest Recapture (March 22, 2017), purported to grant Ms. Wasser a 1% Membership Interest in CCSW. (J14 ("First Amended Operating Agreement") § 2.1, Ex. A.)

2. The First Amended Operating Agreement also purported to expunge the provisions of the original Operating Agreement to delete Chef Chloe's right to consent to (or withhold consent for) Approved Projects that expanded the use of the By Chloe Mark on products or projects beyond the initial Concept for CCSW, to wit, fast casual vegan restaurants. (*Compare* J1 § 4.1 and J14.) The First Amended Operating Agreement also purported to remove Chef Chloe's right to consent to (or withhold consent for) Major Decisions for the Company. (*Compare* J1 § 7.4 and J14.) (Many other terms were also deleted from the Operating Agreement by virtue of this purported amendment).

3. The BC Hospitality Group LLC Second Amended and Restated Operating Agreement changed the name from CCSW LLC to BC Hospitality Group LLC. (J15, together with J14, the "Amendments".)

These disputed Amendments were all executed without Chef Chloe's consent, on the assumption that she no longer held a Member Interest in CCSW. Each of these actions was among a series of transactions executed on the assumption that ESquared had acted lawfully in exercising the Repurchase Right. And each of these actions was taken quickly by ESquared, without seeking a declaratory arbitral judgment to confirm the validity of the purported Membership Interest Recapture before relying upon it to act. That is most unfortunate, because

many actions were taken based upon an untested assumption that the Repurchase Right still existed.

Claimant seeks a declaratory judgment that both Amendments were void because they were executed in breach of the CCSW Operating Agreement, which required Chef Chloe's consent because she still held a Membership Interest. (Chef Chloe Post-Hrg. Br. at 23; Claimant Chef Chloe LLC's Am. Prayer for Relief at 2; J1 § 7.4.)

Section 7.4(f) lists Major Decisions requiring Chef Chloe's consent, including "altering or waiving any provision or otherwise amending any provision of this Agreement . . . ." (J1 §§ 7.4, 7.4(f).) This consent requirement applied "for so long as the CC Entity owns any of the outstanding Membership Interests." (*Id*.) Section 20.1 states that "written consent of . . . CC Entity" was required for amendments to the Operating Agreement, except for certain ministerial amendments, which ESquared does not rely upon to support the actions complained of by Chef Chloe. (*Id.* § 20.1.)

Accordingly, because the Arbitrator has found that Chef Chloe retained her 50% Membership Interest, the above-described Amendments are thus null and void, because they were made without Claimant's required consent, as mandated under the terms of the Operating Agreement.

ESquared does not appear to dispute this outcome. In its post-hearing brief, it argues only that the Amendments were valid, based upon its theory that the Recapture of Chef Chloe's Membership Interest was lawful. (ESquared Post- Hr'g Br. at 30.) ESquared has not presented any argument that the Amendments had any other legally valid basis if the Arbitrator were to find that the Repurchase Right was extinguished and ineffective. Both parties presented

arguments in the alternative on several issues, and ESquared had the opportunity to present evidence and argument to contest this point but chose not to do so.

The Arbitrator finds that both disputed Amendments to the CCSW Operating Agreement (J14 and J15) are void as unauthorized and constitute a breach of Operating Agreement Section 7.4, by purporting to amend the Operating Agreement without consent of Chef Chloe.

Having found that the disputed Amendments that purported to amend the Operating Agreement are similarly null and void for the same reason, the Arbitrator finds that all terms of the Operating Agreement shall revert to the terms in the November 7, 2014 Operating Agreement (J1). These terms include, without limitation:

- the name change of the Company from CCSW LLC to BCHG LLC is void and ineffective, and the Company remains named CCSW LLC and shall hereafter be referred to it by that name;

- the transfer of a 1% Membership Interest to Samantha Wasser is null and void;

- Chef Chloe retains all rights held as a Member of CCSW as stated in the November 7, 2014 Operating Agreement (J1);

- Chef Chloe retains her right as a Member of CCSW to consent to (or withhold consent from) Approved Projects using the By Chloe Mark or the NFL Rights incorporated into Section 4.1 of the Operating Agreement; and

- Chef Chloe retains her right as a Member of CCSW to consent to (or withhold consent from) Major Decisions under Section 7.4.

### D.    ESquared Remedy Defense:  Chef Chloe's Membership Interest Should Be Diluted by Investment into BCHG Inc.

ESquared's defense throughout this Arbitration has been that the Repurchase Right was never extinguished, and that the Repurchase Letter properly invoked the right to recapture Chef

Chloe's 50% Membership Interest for $0.  (*See* ESquared Pre-Hr'g Br. at 20-31.)  However, during opening statements at the Hearing, ESquared for the first time raised a new defense that was not pled, nor briefed nor even alluded to prior to the merits Hearing:  It added, presumably as an unpled affirmative defense, a right to dilute Chef Chloe's 50% Membership Interest, even if it was unlawfully recaptured.

During the Hearing, for the first time, counsel for ESquared stated that even if the Arbitrator were to find that the Repurchase Right "had expired or wasn't properly exercised . . . we say that the only proper remedy here would be to restore the Membership Interest *as now diluted* as a result of the $31.5 million investment by Bain Capital and other investors."  (Hr'g Tr. at 165:21-166:5 (emphasis added).)  The Arbitrator noted the new argument, and asked why it had not appeared as an affirmative defense in the pleadings, nor briefed in the pre-hearing brief.  The response stated was, rather weakly, the lack of sufficient pages.  (*Id.* at 1025:21-1026:4.)  That excuse is not listed in the AAA Rules as a basis upon which to raise an unpled affirmative defense such as this.

 In post-hearing briefing, ESquared elaborated its specific contention that, rather being restored to a 50% Membership Interest in CCSW LLC, Chef Chloe should instead receive only an approximately 20% interest in a newly created entity, BCHG Inc., in the form of common shares with subordinated rights to other shareholders in BCHG Inc.  (ESquared Post-Hr'g Br. at 25-26; *see* J16 § 2.)

ESquared's affirmative defense of "forced dilution" is an unpled defense to a claim for relief and a remedy that have been in this Arbitration since the Demand.  (Demand for Arbitration at 18, 31 ¶ b.)  ESquared did not plead this defense in its Answer.  Nor was this defense raised as an Affirmative Defense in any pleading.  Even when Chef Chloe filed an

Amended Prayer for Relief, there was no pleading by ESquared seeking to add this issue into the case.

From its inception, Chef Chloe's Arbitration Demand has contended that the outside investment from the Bain consortium was unlawful because it was an action that required Claimant's consent under the terms of the Operating Agreement, and such consent was never obtained. (*Id.* ¶¶ 79-80.) Thus the facts that ESquared uses to argue that Chef Chloe should be forcibly diluted—the existence of an outside investment—were pled and at issue from the very start of this Arbitration. Yet, ESquared did not plead nor argue that the Bain deal was key to a significant unpled defense. Instead ESquared answered these allegations by denying "each and every allegation" and stating that the "identifies of BCHG's shareholders and investors are irrelevant to this proceeding." (Answer ¶ 60.) Not once in the procedural history of this Arbitration did ESquared file a pleading to assert this dilution defense to the primary remedy sought by Chef Chloe since the outset of this Arbitration. And ESquared never amended the position in its Answer that the Bain and other outside investors' identities are "irrelevant" to this Arbitration. ESquared's counsel never stated why, if the existence and identity of those outside investors was "irrelevant", it nonetheless had the right to assert an unpled new affirmative defense of nonconsensual dilution, based on those "irrelevant" outside investors' investments. Paragraph 60 of the Answer remains in this case as the position of ESquared. There has never even been a motion seeking leave to amend that paragraph, nor the Answer.

When the issue was raised during the Hearing, the Arbitrator did not excuse the lack of any pleading presenting it, nor was the Arbitrator asked to rule on the procedural inability of Chef Chloe to refute it. The Arbitrator instead conditionally permitted ESquared to present the facts showing the effect of its decisions to dilute Claimant's 50% Membership Interest in the

form of a chart prepared by ESquared and through testimony by Mr. Haber. (R35; Hr'g Tr. at 1483:22-1485:9.) In this chart, ESquared memorialized the effect of the Bain transaction, including the number and percentages of shares held in BCHG Inc. after completion of the Bain transaction. This chart is evidence adduced by Respondents to demonstrate the economic terms of the Bain deal that it claims justify diluting the interest Chef Chloe can recover as a remedy for the ineffective Membership Interest Recapture.

ESquared presented no evidence that Chef Chloe was given the opportunity to object to this deal, nor any evidence that she consented to this dilution, because no such evidence exists. Instead, the evidence adduced by ESquared was that each time Mr. Haber sought her consent to certain outside investors' terms prior to March 22, 2017, she objected to it. (Hr'g Tr. at 576:2-10.) Indeed, that was one of the reasons that the relationship between Claimant and Respondents went south. Claimant asserted her rights under the contract, and the evidence is clear that James Haber was frustrated by that lack of consent (*id.* at 503:15-22), which was a right possessed by Claimant that had been written in the Operating Agreement drafted by Mr. Haber's corporate counsel. In sum, the evidence that supported (or refuted) this new defense does not include any evidence that Chef Chloe consented to the dilution of her Membership Interest. To the contrary, the evidence leads to a clear inference that she would not have consented to it, had she been given the opportunity to state her objection.

At the end of the Hearing, the Arbitrator kept the evidentiary record open because this issue had arisen during the Hearing, and the Arbitrator needed time to determine what should be done about this newly asserted, yet never pled, affirmative defense, and to determine, based upon the evidence presented, whether any additional evidence would be sought by the Arbitrator on this issue. Having now studied the evidence presented, the Arbitrator has determined that there

is not a need to admit additional fact evidence on this question.  The Answer filed by ESquared

still claims that the evidence is irrelevant; the Arbitrator fully understands what is, and is not, in

the defensive pleadings; the Arbitrator understands the only explanation given for why this

defense was not raised prior to the Hearing in any pleading or brief; the Arbitrator understands

the economic terms of the transactions that occurred in the Bain deal, as well as the related

evidence and testimony in the Hearing record.  The Arbitrator does not see any need to continue

the evidentiary portion of the Hearing to obtain any additional fact evidence about the Bain

transaction.  It was the duty of counsel for ESquared to put a Bain witness on the witness list, if it

wished to present a Bain fact witness, and counsel decided not to do so.  The Arbitrator has

determined that this issue presents legal questions, rather than a need for more fact evidence at

this late stage in the case.

  Indeed, the facts are known.  Both parties have known from the outset that Claimant

seeks as her primary remedy the return of her full 50% Membership Interest in CCSW, and the

nullification of the outside investment made without Chef Chloe's consent, which began the day

after her Membership Interest was unlawfully recaptured by CCSW.[24]

  The question before the Arbitrator is predominantly a *legal* question—whether Chef

Chloe should be reinstated as a 50% undiluted Member of a company that has now received a

substantial outside investment, even if done wrongfully by denying Chef Chloe the contractual

right she had to object to such investment.  ESquared argues that, even if her consent rights were

wrongfully denied to her, she should be diluted to a subordinated 20% interest by virtue of

---

[24] What is also lacking is a justifiable basis under the AAA Rules for a known affirmative
defense not to be pled.  However, Chef Chloe's counsel did not object to the Arbitrator's
decision to permit both parties to make arguments on this issue during post-hearing briefing and
oral argument summations thereafter.

financial transactions she did not consent to.  Given the legal nature of this question, the Arbitrator requested that the post-hearing briefs argue any relevant authority for this position. During a substantial post-hearing briefing, as well as the lengthy summation oral argument, the question of ESquared's dilution defense was a substantial topic.

Both parties had been directed to do a legal search for all available analogous caselaw in either New York, Delaware, or any other jurisdiction.  At oral argument, both parties asserted vehemently that they had exhaustively researched caselaw in New York, Delaware and elsewhere for analogous situations involving LLC Membership Interests that have been unlawfully converted, and then granted to outside investors for investment monies.  (Hr'g Tr. at 1604:7-1604:9, 1606:9-15.)  Both stated unequivocally that they did not find any cases on point. Given the outstanding law firms on both sides, the Arbitrator trusts that a thorough search was done.  Accordingly, the Arbitrator must undertake to analyze this issue based on the Operating Agreement—the primary source of authority for questions relating to CCSW—as well as the other evidence and testimony relevant to this issue.

A threshold question to determining the appropriate remedy is whether the series of transactions that effectuated the Bain investment—the event on which ESquared relies for its dilution defense—were valid under the Operating Agreement.

i.    **Invalidity of Transfer of CCSW Membership Interest to BCHG Inc.**

By way of background, after the Purported Membership Interest Recapture of Chef Chloe's Membership Interest, ESquared purported to own 100% of the Membership Interest in CCSW.  Under the First Amended Operating Agreement of CCSW, ESquared purported to

transfer 1% of the CCSW Membership Interest to Samantha Wasser. (J14.)[25] ESquared and Ms. Wasser together purported to transfer 100% of the Membership Interest in CCSW LLC to a newly created entity, BCHG Inc. After this transfer, BCHG Inc. acted as if it was the purported 100% owner of CCSW LLC[26]. (*See* J15 (identifying BC Hospitality Group Inc. as the "Member own[ing] one hundred percent (100%) of the membership interests in the LLC").) BCHG Inc., as purported consideration for receiving 100% of CCSW LLC, granted ESquared and Ms. Wasser 3 million shares of common stock in BCHG Inc. (R35.)

**Figure 7:  Purported Transfer of CCSW Membership Interest to BCHG Inc.**



Upon a $31 million investment from a consortium of investors led by Bain Capital, BCHG Inc. issued 3,722,867 in a newly created class of preferred shares to the new investors. (R35.) Additionally, 600,240 of preferred shares were issued to ESquared purportedly as loan repayment for financing Mr. Haber had previously put into CCSW (originating from JL Holdings, through ESquared and into CCSW). (*Id.*; Hr'g Tr. at 589:12-590:6.) The 3 million common shares in BCHG Inc. were therefore diluted by the issuance of a total of 4,322,927

---

[25] However, because the Arbitrator has found that Amendment was itself a breach of the Operating Agreement, that Amendment is deemed void and Ms. Wasser's purported 1% was issued without authority and in breach of the CCSW Operating Agreement.

[26] By this time, CCSW had unlawfully amended the Operating Agreement, including the herein voided change of the name to BC Hospitality Group LLC. (J15.) Chef Chloe had retained her right to have objected to this Amendment and name change, because she still owned a Membership Interest in CCSW. For simplicity, this Award will continue to refer to CCSW by its original name.

preferred shares; the original common shares now comprised approximately 41% of the total ownership of BCHG Inc.

**Figure 8:  Purported Ownership of CCSW LLC and BCHG Inc. after Bain Transaction**



It is this investment of $31 million, plus the loan forgiveness, in exchange for 59% of BCHG Inc. in preferred shares, that ESquared contends should dilute Chef Chloe's remedy for ESquared's breach and conversion.  Specifically, ESquared argues that the remedy should give Claimant only half of the BCHG Inc. common shares (which constitutes approximately 20.5% of the overall ownership of BCHG Inc.), with subordinated rights to the preferred shares. ESquared's proposed remedy for its own breach would have Chef Chloe be a *minority, common shareholder in BCHG Inc.*, when the loss to Chef Chloe caused by the erroneous and ineffective recapture was of a *50% Membership Interest in CCSW LLC.*

Claimant disputes the validity of these dilutive transactions.  Claimant seeks full reinstatement of her 50% Membership Interest in CCSW, without dilution or subordination to the new class of preferred shares.  Claimant argues that ESquared had no legal right to transfer Chef Chloe's 50% Membership Interest in CCSW to common shares in BCHG Inc. because the

transfer of her 50% Membership Interest to BCHG Inc. violated her property rights in her

Membership Interest.  (Chef Chloe Post-Hr'g Br. at 23; Chef Chloe Post-Hr'g Reply at 1-2.)

Claimant relies on Section 20.5 of the Operating Agreement, which states that "[a]ny attempted

Transfer in violation of this Agreement is null and void, and of no force and effect."  (J1 § 20.5.)

For the reasons stated in Section V(B), *supra*, the purported Membership Interest

Recapture of Chef Chloe's Membership Interest—made at a time when the Repurchase Right

had been extinguished—was null and void; therefore, Chef Chloe retains her Membership

Interest in CCSW.  ESquared treated the unlawfully taken property—Chef Chloe's Membership

Interest—as its own property in transferring it to BCHG Inc.  That full unsubordinated 50%

Membership Interest was Chef Chloe's property and was improperly converted from her and

unlawfully transferred to BCHG Inc.  *See* N.Y. Ltd. Liab. Co. Law § 601 ("A membership

interest in the limited liability company is personal property.")  The purported transfer of Chef

Chloe's 50% Membership Interest to BCHG Inc. was an "attempted Transfer in violation of" the

Operating Agreement under Section 20.5  Accordingly, the Arbitrator finds that it was an

unlawful breach of the Operating Agreement by all Respondents to transfer Chef Chloe's 50%

Membership Interest in CCSW LLC to BCHG Inc.

For the foregoing reasons, the Arbitrator finds that ESquared's transfer of Chef Chloe's

50% Membership Interest in CCSW to BCHG Inc. was invalid and in breach of the CCSW

Operating Agreement.  The Arbitrator finds that these actions of Respondents, both, individually

and collectively, breached the Operating Agreement and are null and void and subject to all of

Claimant's Remedies for Breach set forth in Section 20.6.

### ii.    ESquared's Proposed Remedy for Respondents' Breach

ESquared argues that if the Arbitrator finds "that the Repurchase of Chloe LLC's

Membership Interest was invalid in any way, then the only proper remedy is to restore that

interest to Chloe LLC by giving her 50% of the Common Stock of BCHG Inc. . . . Had Chloe

LLC remained a Member of BCHG LLC, then 50% of those shares, *i.e.*, 1.5 million shares

would have gone to Chloe LLC." (ESquared Post- Hr'g Br. at 25-26.)  In other words, ESquared

proposes that Chef Chloe should get a fully diluted share of common stock, further devalued by

being subordinated to the newly issued class of preferred stock.  The remedy that Respondents

suggest is that Claimant be limited to an approximately 20.5% share of BCHG Inc.

**Figure 9:  ESquared Proposed Remedy:  Common Shares in BCHG Inc.**



During summation oral argument, ESquared advanced several arguments for why Chef

Chloe's remedy to recompense ESquared's breach should be a diluted and subordinated 20.5%

of BCHG Inc. held in common shares.  ESquared, however, has no support in any case law,

statute, or regulation for this proposed remedy.  Nor does ESquared persuasively explain why

Chef Chloe's remedy should be diluted and subordinated, as if she had consented to the transfer

of her full, undiluted, and unsubordinated 50% CCSW Membership Interest to BCHG Inc., and

then to the economic terms of the Bain deal, when such consent were never sought from, and

never tendered by the Claimant.

During post-hearing summations, counsel for ESquared argued that after the March 22,

2017 Repurchase Letter, Chef Chloe could have gone to court to seek a return of her 50%

Membership Interest, and that by failing to do so, "she forfeited" the ability to be made whole

now.  (Hr'g Tr. at 1606:7-1611:3.)  When asked if there was a statute of limitations that had run,

counsel acknowledged that there was no statute of limitations defense, but nonetheless asserted

that Chef Chloe did not act fast enough to challenge the purported Membership Interest

Recapture after March 22, 2017, and before the Bain deal closed nine months later.  (*Id.* at

1611:11-1612:14, 1622:17-1623:2.)

However, this argument—which can only be characterized as a laches defense—ignores

the explicit limitation of the scope and basis of the laches defense made during the merits

Hearing by ESquared's counsel.  During the merits Hearing, ESquared explicitly stated that its

laches affirmative defense was confined to the single Claim set forth in Paragraphs 71-73 of the

Demand for Arbitration, which asserted that the Repurchase Letter failed to follow the

procedures set forth in the Operating Agreement, because, *inter alia*, it purported to exercise the

Repurchase Right through the wrong entity.[27]  (Hr'g Tr. at 246:3-19.)  Counsel for ESquared

---

[27] As stated above, the Arbitrator did not reach the merits of this Claim because it was made
solely in the alternative, if the Arbitrator had not concluded that the ESquared Repurchase Right
had been extinguished.  This claim was not reached by the Arbitrator because it was pled in the
alternative.  In brief summary, Chef Chloe argued that the Repurchase Letter failed to comply
with the requirements of the Operating Agreement because it (i) referred to the wrong entity on
whose behalf the Repurchase Right was being exercised, (ESquared, when in fact the right
belonged to CCSW), (ii) and purported to show ESquared acting on behalf of CCSW, when in
fact, CCSW's Manager who had the right to act on CCSW's behalf at that time was an entity
named CCSW Management LLC.  (Chef Chloe Post-Hr'g Br. at 19-22.)  However, because the
Arbitrator found that the Repurchase Right was extinguished by an ESquared Hospitality

stated its laches defense was confined to the 90-day period after the March 22, 2017 Repurchase Letter was sent and related solely to that claim about whether the wording of the Repurchase Letter was wrong.  (*Id.*)  Based upon this narrowing of the Respondents' laches affirmative defense, no evidence was presented by either party at the Hearing regarding potential laches as a defense to Claimant's primary claim that the Repurchase Right was extinguished by a Liquidity Event.  Respondents' counsel made it clear that he was not asserting a laches affirmative defense as to that claim.

Even if ESquared had not disclaimed a laches theory as to this issue, ESquared cannot meet its burden of proof on its affirmative defense of laches.  First, there is no nine-month statute of limitations that would limit Chef Chloe's right to initiate this Arbitration seeking to restore the 50% Membership Interest that had been wrongfully recaptured by Respondents.  Second, these claims of Chef Chloe are based upon a nearly impenetrable shell game of multiple entities; shifting authorizations; and frequent transactions by and between James Haber's many ownership entities.  Even his own counsel showed occasional and justifiable confusion about them.  It has taken this Arbitrator countless hours to disentangle this maze and fully set forth all the entities, and their changes, transfers, Members, and Managers, as set forth above.  To blame Chef Chloe, a chef and outsider not privy to the inner workings of Mr. Haber's companies, for not bringing this Arbitration faster than nine months is rejected as a defense.

And, importantly, laches is an affirmative defense based upon equities.  ESquared, too, had the opportunity to seek declaratory judgment from an arbitrator in the nine months before ESquared signed Representations and Warranties in the Bain transaction, stating, among other

---

Liquidity Event, the validity of the exercise of that right through the Repurchase Letter need not be reached.

things, compliance with agreements to which ESquared was bound.  (C84 § 2.3.)  Indeed,

Respondents and Mr. Haber had a huge incentive to move quickly to get an arbitral declaratory

judgment on the validity of the purported Membership Interest Recapture, so that Respondents

would know whether or not they owned Chef Chloe's Membership Interest before the first Bain

closing in January 2018.  Respondents and Mr. Haber were the persons most in possession of the

facts to understand the web of entities that they had created, whose respective management

structures, approval rights and transactions determined the validity of the purported Membership

Interest Recapture.

Laches is an affirmative defense and therefore the burden is on Respondents to show that

it also acted equitably.  Instead, Respondents simply argue that blame should be shifted to Chef

Chloe for the sequelae of the cascade of events caused by Respondents' hasty decision to execute

the Amendments and transfer Claimant's Membership Interest without seeking to confirm that

their own actions were lawful before entering a major transaction.

Therefore, even if ESquared's counsel had not limited the laches defense to the

alternative claim made by Chef Chloe regarding the ineffectiveness of the Repurchase Letter,

given the complex web of LLCs, each with its own shifting management structure, the Arbitrator

does not fault Chef Chloe for not acting more quickly to bring this Arbitration.  It would take

even sophisticated lawyers much more time to piece together the entities and transactions at issue

here.

Accordingly, the Arbitrator finds no merit in the laches defense.[28]

---

[28] Respondents' Answer contains several affirmative defenses that were not substantively
presented on at the Hearing, or in post-hearing briefing.  Respondents pled (i) that the Demand
fails "to state any claims upon which relief can be granted;" (ii) that the claims are barred by the

The other argument advanced by ESquared in support of its remedy defense is that CCSW is now, by virtue of the $31 million Bain investment, a more valuable company than it was when Chef Chloe's Membership Interest was wrongly recaptured. (Hr'g Tr. at 1611:23-1612:3, 1618:17-1619:24.) Thus, ESquared argues that to reinstate Chef Chloe as a 50% Member now, when the company has benefited from that investment, without diluting her commensurate with that investment, would be a windfall to Chef Chloe and unfair to the investors.

In support of its argument, ESquared argues that, if faced with the choice between taking the Bain deal and remaining a 50% Member in a company that was in debt, Chef Chloe would have approved the investment because her diluted percentage ownership stake would have been worth substantially more money by virtue of the investment. (*Id.* at 1618:17-1621:20.) Further,

---

Operating Agreement and breach thereof; (iii) equitable estoppel; (iv) waiver; (v) laches; (vi) unclean hands; and (vii) failure to mitigate.

The Arbitrator finds, based on the entire record of this case, that the Demand clearly stated a claim upon which relief can, and will be, granted; that the claims are not barred by the Operating Agreement; that no persuasive grounds were established to prove equitable estoppel; that there was no articulable nor persuasive waiver established by Respondents; that there was no attempt of any kind to persuade the Arbitrator that the Claimant had unclean hands; nor any proofs adduced to demonstrate a failure to mitigate.

While the affirmative defense of laches was argued during colloquy at the Hearing and during summation, the Arbitrator stated reasoning above about why the laches defense is denied, based upon the evidence presented by Respondents.

In post-hearing briefing, ESquared asserted its laches argument, which was confined to the alternatively pled claim regarding the effectiveness of the Repurchase Letter (also asserting that the same facts should bar Chef Chloe's claim as to the Repurchase Letter under the doctrine of equitable estoppel). (ESquared Post-Hr'g Br. at 20-21.) Having found the Repurchase Right was extinguished, the Arbitrator does not reach that alternatively pled claim, and therefore, the question of whether laches and/or equitable estoppel bar that claim need not be reached.

As to any pled affirmative defenses not specifically addressed herein, there was no argument presented pre- or post-hearing, nor evidence adduced at the merits Hearing, to establish proofs of such defenses. Therefore, Respondents have not met their burden with respect to all pled affirmative defenses, and they are denied.

ESquared argues that it could have chosen to foreclose on the CCSW debt, and therefore, Chef Chloe would have opted for the Bain deal over such foreclosure.  (*Id.* at 1627:5-16.)

This argument is entirely speculative, and there is no testimony, nor cross examination of Ms. Coscarelli to support it.  Those questions could have been asked, but they were not.  To accept this theory, one must imagine a world in which Chef Chloe's Membership Interest was not forcibly recaptured in breach of the Operating Agreement, and then assume that Chef Chloe would have accepted transactional terms that were highly dilutive, and further assume that ESquared had announced an impending foreclosure—none of which occurred.  Rather, the evidence in the record shows that Chef Chloe consistently *rejected* dilutive investment opportunities for CCSW proposed by Mr. Haber.  During the time that Chloe Coscarelli worked with Haber on the "by Chloe" fast casual restaurant business, Ms. Coscarelli had in fact refused Mr. Haber's requests that she consent to these outside investors, which would have required dilution of equity.  (*Id.* at 575:18-576:16.)

The  evidence offered by ESquared as to dilution includes testimony by its financial damages expert, Mr. Beaton, who testified in sum and substance that, under ordinary circumstances, when a company accepts an outside investment, the preexisting shareholders have their interests diluted under the economic terms of that transaction, because dilution is a tradeoff for expected growth.  (*Id.* at 1133:21-1134:24, 1136:8-21.)  While that is no doubt correct as a general matter in the world of venture investment, that scenario presumes the *consent* of the shareholders being diluted—a fact entirely absent in the facts here.  No case law nor statute has been presented by ESquared to provide legal support for a forced dilution as is sought here in the proposed remedy by ESquared.

Argued instead on grounds of "fairness," ESquared's remedy defense would not only

reduce Chef Chloe's overall ownership stake, but also would remove important rights not to be

subordinated to the newly issued preferred share class.  Specifically, ESquared not only wants to

dilute Chef Chloe's share to approximately 20% of BCHG Inc., but in the form of common

shares.  Thus, Chef Chloe's rights to be paid would be subordinate to the rights of the preferred

stockholders (comprising approximately 59% of BCHG Inc. held by ESquared and the

investment consortium).  (R35.)  The preferred class gets the right of priority in repayment of

their investment out of any sale, among other rights.  (J16 § 2.)  This priority of the class of

preferred shareholders is a serious devaluation of common stockholders, particularly in a new

venture scenario.

For this reason, the Operating Agreement in Section 7.4 confers substantial rights on

Chef Chloe to withhold her consent to such "Major Decisions," which Chef Chloe argues will be

removed if she is not reinstated as a 50% Member of CCSW.  (Chef Chloe Post-Hr'g Reply at 4.)

The remedy proposed by ESquared would remove this important consent right (among others)

Chef Chloe holds as a Member of CCSW LLC.  By proposing that she should be deemed,

instead, a common minority shareholder in BCHG Inc., ESquared's remedy would also forfeit

important all rights that Chef Chloe validly retains as a Member of CCSW LLC.

ESquared has not presented a single provision in the Operating Agreement that permits

this dilutive remedy.  Therefore, for ESquared to prevail in its remedy defense, it must meet its

burden to demonstrate legal support in a statute, or precedent in common law, to dilute Chef

Chloe's Membership Interest in CCSW to common shares in BCHG Inc.  There has been no

legal support advanced by ESquared to dilute Chef Chloe's stake, on any grounds.  ESquared's

argument that "the only proper remedy" is to deem Chef Chloe the 50% owner of the common

shares that ESquared agreed to accept when it unlawfully transferred Chef Chloe's Membership

Interest in CCSW to BCHG Inc. has no legal support behind it.  The only evidence adduced by

James Haber is that Chef Chloe refused to consent to such dilutive proposals when they were

proposed by him to her while they were in business together.  Under Section 7.4 Chef Chloe had

the right to reject these proposals, and she exercised that right.  There is no evidence that she

would have accepted the result that ESquared urges that she be compelled to accept, in

contravention of the terms of the contract itself.

The same transactions that Respondents claim diluted Chef Chloe's Membership Interest,

were executed in derogation of Chef Chloe's property rights.  Yet, ESquared relies on these

unlawful transactions, done in breach of the Operating Agreement, to argue that Chef Chloe's

full 50% Membership Interest now cannot be returned.  Therefore, with neither factual support

nor any proffered legal support for this argument, ESquared's argument that its proposed result is

"fair" rings hollow.  It asks for the Arbitrator's imprimatur on a result that would compel the

Claimant to receive a remedy for the conversion of her Membership Interest that denies her

economic and voting rights, without support in the Operating Agreement, statute or caselaw cited

by ESquared.  The absence of legal support is breathtaking.

To force Chef Chloe to now accept the economic terms of a transaction to which she did

not consent based upon ESquared's argument that "you can't just unmake the sausage" (Hr'g Tr.

at 1619:25-1620:2), would be the height of unfairness, and wholly unsupported by any evidence

in the case or legal principle.  ESquared made that sausage, and it is the party that is legally

bound to face responsibility for what it chose to do by its unlawful conversion and transfer of

Chef Chloe's 50% Membership Interest to BCHG Inc.

The Operating Agreement, in Section 20.14, states that it also binds the "transferees, successors and assigns" of the CCSW Members. (J1 § 20.14.) ESquared's transferees and assignees are bound by the terms of the Operating Agreement under Section 20.14. This clearly applies by its express terms to BCHG Inc., to whom Respondent purported to transfer 100% of the Membership Interest in CCSW LLC. BCHG Inc. is a direct transferee and the purported 100% Member/owner of Respondent CCSW. Section 20.14 also applies to the purported transfer of a 1% Membership Interest in CCSW from ESquared to Samantha Wasser made in the, now voided, First Amended Operating Agreement. (J14.)

Under Section 20.6, the Respondents have the duty to remedy the breach, and bear the consequences of unmaking their own illegal sausage. Under Section 20.14, BCHG Inc. and Ms. Wasser are equally bound to return the unlawfully transferred Membership Interest in CCSW. To the extent necessary, the 1% Membership Interest transferred to Ms. Wasser in the unauthorized and unlawful First Amended Operating Agreement, is also available to effectuate this Award.

### iii.    Impossibility

ESquared makes a separate argument in support of its dilution defense: that, due to the fact that the Bain deal has already closed before this Arbitration commenced, it is impossible to wind back the proverbial clock to undo investments that have already occurred. ESquared says now that it does not currently possess a 50% stake in CCSW LLC to return to Chef Chloe, even if she is awarded that relief. (Hr'g Tr. at 1609:6-14, 1620:5-11.) ESquared owns approximately 49% of BCHG Inc.—8% in preferred shares, the rest in common shares. (R35.) ESquared contends that the Arbitrator cannot "order Bain, who's not before Your Honor and not subject to any agreement here, to give away any part of its interests." (Hr'g Tr. at 1612:16-20.)

This defense is distinct from the dilution defense, insofar as it does not attempt to support dilution on any legal or economic grounds, but rather is ESquared essentially saying there is nothing the Arbitrator can do to fully restore Chef Chloe to the position she would have been had the Bain deal not occurred.

Chef Chloe responds that all Claimant seeks is a declaration that it is a full, undiluted and unsubordinated 50% Member in CCSW, and argues that any other considerations—such as future litigation involving Bain and future needed action to clarify the impact of that judgment—need not be ruled upon by the Arbitrator.  (*Id.* at 1595:13-1595:11.)  Chef Chloe's position is that the sole question before the Arbitrator as to remedy is to enter judgment declaring that Chef Chloe retains her rights as a 50% Member under the Operating Agreement.  (*Id.* at 1595:7-11.)

Under the best authority the Arbitrator has been given—the Operating Agreement—the Arbitrator finds that Chef Chloe's argument is most consistent with both arbitral jurisdiction and the issues presented in the Demand for Arbitration and the defenses thereto.  Chef Chloe's primary, clearly pled remedy from the inception of this case is to restore her as a full, undiluted, unsubordinated 50% Membership Interest in CCSW based on the terms of the Operating Agreement, plus prejudgment interest, attorneys' fees and other declaratory and equitable relief. Such relief will be awarded in this Partial Final Award.

The Arbitrator finds herein that ESquared's transfer of CCSW LLC's Membership Interest to BCHG Inc. was unlawful in breach of the Operating Agreement because it purported to transfer Chef Chloe's validly held 50% Membership Interest to a third party, without Chef Chloe's consent.  ESquared unlawfully converted Claimant's Membership Interest and transferred it, together with ESquared's Membership Interest, to BCHG Inc. in exchange for 41% of the common shares, all without the requisite consent of Claimant.  The proper remedy—and

the remedy available to the Arbitrator under the terms of the Operating Agreement—is to void

the transaction whereby Chef Chloe's 50% Membership Interest was transferred to BCHG Inc.,

and to return it to Chef Chloe.

The full, undiluted 50% Membership Interest in CCSW LLC to be reinstated to Chef

Chloe is not held by the Bain consortium (who, as ESquared argued, are third parties).  It is held

by BCHG Inc.  BCHG Inc. was created by ESquared, a Respondent in this Arbitration, for the

purpose of effectuating a transaction by which CCSW LLC Membership Interests were

unlawfully transferred to BCHG Inc.  BCHG Inc. is the purported 100% Member (*i.e.* owner) of

Respondent CCSW.  (J15.)  BCHG Inc. is also a direct transferee of ESquared, and under

Section 20.14 of the Operating Agreement is bound by the terms of the Operating Agreement.

(J1 § 20.14.)  It is fully within the jurisdiction of this Arbitration to reach the entire CCSW LLC

Membership Interest held by BCHG Inc. and to order it to return Chef Chloe's 50% Membership

Interest to its bona fide owner Chef Chloe in full.

The fact that BCHG Inc.—after receiving the CCSW LLC Membership Interest from

ESquared—took outside investment in exchange for the issuance of preferred shares, does not

prevent BCHG Inc. from returning the full 50% CCSW LLC Membership Interest to Chef Chloe.

The Bain consortium—who are not parties to this Arbitration—own preferred securities in

BCHG Inc.  Nothing in this Award orders that those shares be removed from the outside

investors.

What this Partial Final Award does declare is that BCHG Inc. must return the wrongfully

obtained 50% Membership Interest in CCSW LLC—which is an asset owned by BCHG Inc.—to

its rightful owner.  While this declaration could result in a decrease in stock value of the

preferred shares held by the BCHG Inc. investors, the only action taken herein is to enter

Declaratory Judgment and enter equitable relief against Respondents with respect to the BCHG Inc. entity, which is unequivocally a direct and knowing transferee of the unlawful conduct and converted assets unlawfully taken by Respondent ESquared.

Accordingly, the Arbitrator hereby finds and enters Declaratory Judgment that:

- The transfer of Chef Chloe's 50% Membership Interest in CCSW LLC by ESquared to BCHG Inc. violated Claimant's property rights and rights under the Operating Agreement; that transfer is void and as equitable relief shall be voided and rescinded, and such Membership Interest shall be forthwith returned to Claimant, in undiluted and unsubordinated form.

- The rightful owners of CCSW LLC are Chef Chloe and BCHG Inc.  Each entity owns a 50% Membership Interest in CCSW LLC.

- All rights as a Member of CCSW LLC under the operative CCSW Operating Agreement (J1) shall be restored to Chef Chloe.

- BCHG Inc. is a knowing and willful transferee of Respondent ESquared under Section 20.14 of the Operating Agreement and is bound by all terms of the Operating Agreement.  (J1 § 20.14.)  BCHG Inc. was established by ESquared to, *inter alia,* receive the unlawfully converted and transferred Membership Interest of Claimant, in exchange for assets transferred back to ESquared, in breach of the Operating Agreement, as having been done without Claimant's consent.

- ESquared, and its direct transferee, BCHG Inc., are ordered to return to Chef Chloe her full, undiluted 50% Membership Interest, and such interest shall be treated by BCHG Inc. as not subordinated to any other interest, including

preferred shares in BCHG Inc.; such Membership Interest shall have equal rights in all respects to the rights of the class of preferred shareholders in BCHG Inc.

- Samantha Wasser is a knowing and willful transferee of Respondent ESquared under Section 20.14 of the Operating Agreement and is bound by all terms of the Operating Agreement. (J1 § 20.14.)

- The transfer of a 1% Membership Interest in CCSW LLC to Samantha Wasser made in the now voided First Amended Operating Agreement of CCSW (J14) is void and ineffective because that Amendment was executed in breach of Section 7.4 of the Operating Agreement. Ms. Wasser did not validly receive a 1% Membership Interest, and therefore she did not validly convey it to BCHG Inc.

## VI.    FEE APPLICATION

Chef Chloe's Amended Prayer seeks an "award of attorneys' fees and costs." (Am. Prayer ¶ i.) In light of the foregoing, Claimant shall submit a brief and appropriate affidavits of counsel stating what amount Chef Chloe seeks and what rule, law or principle should guide the Arbitrator in determination of whether to grant the application. This brief shall not exceed 15 pages, double-spaced, and be submitted within 14 days of the issuance of this Partial Final Award by the AAA. ESquared may respond with a brief of not more than 15 pages, double-spaced, 14 days after receipt of Claimant's brief on this issue. No exhibits shall be attached to such briefs other than Claimant's counsel's affidavit of fees.

## VII.    FINAL AWARD OF RELIEF BY THE ARBITRATOR

**The Arbitrator hereby enters and adjudges the following Declaratory Judgments:**

I. Chef Chloe's right under Section 4.1 of the Operating Agreement to consent to (or withhold consent from) CCSW projects using the By Chloe Mark or her NFL Rights for usage of the trademark beyond fast casual vegan restaurants was not extinguished when she

was terminated as a Service Member, and shall survive even if Chef Chloe no longer holds any Membership Interest in CCSW.

II.  The October 15, 2015 ESquared Transfer constituted an ESquared Hospitality Liquidity Event, prior to the date of the Respondents' purported exercise of the Repurchase Right set forth in Section 19.5(a) on March 22, 2017.

III. Pursuant to Section 19.5(e)(ii) of the Operating Agreement, the ESquared Hospitality Liquidity Event that occurred in 2015 extinguished the Repurchase Right held by CCSW prior to March 22, 2017.

IV. Because the Repurchase Right was extinguished, the Respondents' actions, individually and jointly, that purported to undertake the Membership Interest Recapture of Chef Chloe's 50% Membership Interest on March 22, 2017 was a breach of the Operating Agreement.  The Membership Interest Recapture is ineffective, null and void, *nunc pro tunc*. Chef Chloe's Membership Interest was not lawfully recaptured.  Claimant still owns a full 50% undiluted, unsubordinated Membership Interest in CCSW.

V.  Because Chef Chloe retained a Membership Interest, her consent was required for amendments to the Operating Agreement under Section 7.4.  Respondents breached Section 7.4 of the Operating Agreement by executing the Amendments dated March 22, 2017 and January 26, 2018 (J14 and J15), and they are therefore ineffective, null and void.  The only valid Operating Agreement setting out the rights and obligations of the parties and transferees is the November 7, 2014 Operating Agreement of CCSW LLC (J1).

VI. The Respondents, individually and jointly, breached the Operating Agreement in executing the purported Amendments on March 22, 2017 (J14) and January 26, 2018 (J15) because such Amendments were executed without obtaining Chef Chloe's consent under

Section 7.4 of the Operating Agreement (J1). These unauthorized Amendments purported to transfer a 1% Membership Interest in CCSW LLC to Samantha Wasser, and changed certain terms of the CCSW Operating Agreement, including Chef Chloe's consent rights under Sections 4.1 and 7.4 (among others), and purported to change the name of the Company from CCSW LLC to BCHG LLC. All actions effected by these unauthorized Amendments are all null and void because both Amendments were executed in breach of the Operating Agreement.

VII.    Samantha Wasser and BCHG Inc. are each "transferees, successors and assigns" subject to all terms of the Operating Agreement, pursuant to Section 20.14.

VIII.    The Respondents, individually and jointly, breached the Operating Agreement and violated Chef Chloe's state law property rights by transferring Chef Chloe's 50% Membership Interest in CCSW LLC to BCHG Inc.

IX. Under Section 20.6 of the Operating Agreement, all remedies for breach are available to the Arbitrator to restore Chef Chloe's full rights as a 50% Member in CCSW LLC.

X.    ESquared has not met its burden to set forth a basis under the AAA Rules why it should be permitted to add the affirmative defense of dilution of Claimant's Membership Interest to this case that was not pled in the Answer nor mentioned in ESquared's pre-hearing brief.

XI. Respondents failed to plead, prove or establish any legal bases in the operative contract, nor any statute, nor any case law, that supports its late-filed affirmative defense of dilution. Respondents have not met their burden to prove that Chef Chloe's 50% Membership Interest in CCSW should, after unlawful conversion, be diluted to approximately

20% of BCHG Inc., held in common shares.  Respondents' late-filed affirmative defense of dilution is denied.

XII.    The valid owners/Members of CCSW LLC are Chef Chloe and BCHG Inc.  Each Member owns 50% of CCSW LLC.  As Members, they each have the rights and obligations of Members as set forth in the November 7, 2014 Operating Agreement (J1).

XIII.    ESquared has not met its burden to prove any other pled affirmative defenses, and they are denied.

XIV.    Claimant shall be awarded costs, and prejudgment interest at the rate prevailing in the law of New York, the state selected as the choice of law in the Operating Agreement. Whether, and to what extent, Claimant shall be entitled to an award of attorneys' fees shall be decided after full briefing and a proffer of the amount of such fees.

**The following equitable relief is hereby granted by the Arbitrator:**

I.    Respondents are hereby permanently enjoined from using the By Chloe Mark or Chef Chloe's NFL Rights on any CCSW project or product other than fast casual vegan restaurants, unless such project has been approved and becomes an "Approved Project" pursuant to the terms of Section 4.1 of the Operating Agreement (J1).  No other NFL Rights, beyond those incorporated into the provisions of the Operating Agreement, are ruled upon by this Arbitrator.

II.    Respondents and their transferees (BCHG Inc. and Samantha Wasser) shall effectuate the restoration of Chef Chloe's full, undiluted, unsubordinated 50% Membership Interest in CCSW LLC, and all rights under the CCSW Operating Agreement (J1) attendant to a Member shall be restored to Chef Chloe immediately.

III. The Amendments made to the Operating Agreement (J14 and J15) by Respondents without Chef Chloe's consent under Section 7.4 shall be rescinded forthwith:

        A.  The name of the Company shall be changed back to CCSW LLC;

        B.  The 1% Membership Interest in CCSW LLC unlawfully transferred to Samantha Wasser shall be available, to the extent necessary, to effectuate this Award and shall in no event be retained by Samantha Wasser.

        C.  The purported changes to the terms of the Operating Agreement effected by the unauthorized Amendments, including the removal of rights held by Chef Chloe as a Member, shall be rescinded; the terms of the Operating Agreement shall revert to the operative Operating Agreement (J1, dated November 7, 2014). However, the rights that she lost by being terminated as the Service Member, as set forth expressly in the Operating Agreement shall remain unaffected by this ruling.

IV. No party or transferee, successor or assign or any party, shall take any action in derogation of the Declaratory Judgments and equitable relief entered in this Award until there has been full compliance with this Award and the Arbitrator has confirmed that no party will seek further relief under Operating Agreement Section 20.6.

## VI.    **EFFECTUATION OF THIS AWARD**

This Award constitutes the Final Arbitration Award on all matters ruled upon in Section V above, with the exception of the quantification of attorneys' fees and costs; the only portion of this Award that is not therefore a final award is (1) the appropriate and fair amount to be awarded in the attorneys' fee application, which shall require briefing and appropriately detailed support in a declaration from Claimant's counsel; and (2) quantification of Costs by AAA after all work on this matter is completed.

Claimant has sought "[s]uch other and further relief as the Panel may deem just and proper." (Am. Prayer ¶ j.) Therefore, the Arbitrator gives the parties 90 days to implement the Declaratory Judgments and equitable relief awarded herein, with the right to seek such other relief as may be necessary and appropriate under Section 20.6 after that 90-day period has elapsed; such application, if any, shall be made not later than 90 days from the issuance of this Partial Final Award.

Dated:  May 13, 2020
New York, NY

By the Arbitrator

_Faith A. Hochberg_
Hon. Faith S. Hochberg, Arbitrator

I, Hon. Faith S. Hochberg, so hereby affirm upon my oath as an Arbitrator, that I am the individual described herein and who executed this instrument, which is the PARTIAL FINAL AWARD.

_May 13, 2020_
Date

_Faith A. Hochberg_
Hon. Faith S. Hochberg

Sworn before me this 13th day of May, 2020

_Taryn S Hyson_

**TARYN S. HYSON**
Notary Public - State of New York
No. 01HY6376914
Qualified in Queens County
My Commission Expires June 18, 2022

# APPENDIX B

## to

## FINAL AWARD:

## Partial Final Award: Fee Application, Dated August 13, 2020

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
------------------------------------------------------------------------x
CHEF CHLOE LLC,                                    :
                                                              Case No. 01-19-0000-7965
                  Claimant,                        :

        -against -                                 :

ESQUARED HOSPITALITY LLC and BC                    :
HOSPITALITY GROUP LLC f/k/a CCSW LLC,
                                                   :
                  Respondents.                     :
                                                   :
------------------------------------------------------------------------x


**Claimant Counsel**                          **Respondents Counsel**

Ronald J. Schutz                              William L. Charron
Robins Kaplan LLP                             Pryor Cashman LLP
399 Park Avenue, Suite 3600                   7 Times Square
New York, NY 10022                            New York, NY 10036-6569
RSchutz@RobinsKaplan.com                      wcharron@pryorcashman.com

Patrick M. Arenz                              Matthew S. Barkan
Robins Kaplan LLP                             Pryor Cashman LLP
800 LaSalle Avenue, Suite 2800                7 Times Square
PArenz@RobinsKaplan.com                       New York, NY 10036-6569
Minneapolis, MN 55402                         mbarkan@pryorcashman.com

Frederick A. Braunstein
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022
FBraunstein@RobinsKaplan.com

Reena Jain
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022

<u>**Partial Final Award:  Fee Application**</u>

The undersigned Arbitrator, having been duly appointed and qualified pursuant to the arbitration agreement contained in the Operating Agreement of CCSW LLC (a New York Limited Liability Company), and having been duly sworn and having duly heard the allegations and proofs of the parties does hereby issue this Fee Award as follows:

**I.    <u>Procedural Background</u>**

Before the Arbitrator is the fee application by Claimant Chef Chloe LLC ("Chef Chloe"). Chef Chloe initiated this Arbitration on March 12, 2019, in which Chef Chloe sought as the primarily pled remedy, "finding and judgment that Chef Chloe LLC still owns 50% of the Membership Interests in [CCSW] LLC and restoring her rights as a Member retroactively to March 22, 2017" among other relief.  (Am. Prayer ¶ b.)  Chef Chloe additionally sought an "award of attorneys' fees and costs."  (*Id.* ¶ i.)

Following a four-day merits hearing in New York from December 9-12, 2019 ("Final Hearing"), and summation arguments on February 3, 2020, the Arbitrator issued the Partial Final Award on May 13, 2020.  The Partial Final Award granted Chef Chloe the primary remedy sought—reinstatement of her 50% Membership Interest in CCSW—as well as a permanent injunction against CCSW related to its use of certain IP on products or projects other than the "by Chloe" fast casual chain of restaurants, and such other relief as stated expressly therein.  The Partial Final Award is hereby incorporated by reference, in lieu of restating its terms.

The Operating Agreement of CCSW LLC ("Operating Agreement") provides that the "administrative costs of this arbitration, and fees and expenses of any arbitrator, . . . shall be divided equally between the parties, subject to any re-allocation thereof contained in any arbitration award."  (Operating Agreement § 20.19(b).)  Section 20.19(b) further provides that

2

"[a]ll other legal fees, costs and expenses incurred in connection with any dispute under this Agreement shall be paid as determined/apportioned by the arbitrator." (*Id.*) Section 20.7 states that if "any holder of Membership Interests retains counsel for the purpose of enforcing . . . the breach . . . of any provision of this Agreement . . . , then the prevailing party shall be entitled to be reimbursed by the non-prevailing party for all costs and expenses so incurred (including reasonable attorneys' fees, costs of bonds, and fees and expenses for expert witnesses). (*Id.* § 20.7.)

> The Partial Final Award stated that:
>
> Claimant shall be awarded costs, and prejudgment interest at the rate prevailing in the law of New York, the state selected as the choice of law in the Operating Agreement. Whether, and to what extent, Claimant shall be entitled to an award of attorneys' fees shall be decided after full briefing and a proffer of the amount of such fees.
>
> . . . Claimant shall submit a brief and appropriate affidavits of counsel stating what amount Chef Chloe seeks and what rule, law or principle should guide the Arbitrator in determination of whether to grant the application.

(Partial Final Award at 87, 84.)

## II.    The Fee Application

Chef Chloe submitted its fee application on May 27, 2020, with accompanying affidavits and exhibits ("Chef Chloe Brief"). Chef Chloe seeks a fee award in the range of $12.2 to $25.2 million, which represents the 40% contingency fee agreed to between Chef Chloe and her counsel. (Chef Chloe Br. at 5-6.) Chef Chloe arrives at this rate by taking 40% of the purported value of the 50% Membership Interest that was reinstated to Chef Chloe pursuant to the Partial Final Award. The valuation used for this calculation is based on range of valuations of CCSW LLC presented at the Final Hearing. (*Id.* at 6-7.)

Chef Chloe alternatively seeks its full lodestar in the amount of $1,296,352.50 (derived from multiplying lawyer hours times established New York rates). (*Id.* at 9-12.) Chef Chloe

requests a 4x lodestar multiplier to this amount to account for the risk taken by its counsel in taking on this matter on a contingency basis. (*Id.* at 13.)

Chef Chloe additionally seeks its costs, totaling $449,628.09, including AAA costs, expert witness fees, transcripts, copies, deliveries, and travel expenses. (*Id.* at 15.)

Respondents ESquared Hospitality LLC and CCSW LLC (collectively, "Respondents") opposed the fee application on various grounds on June 15, 2020 ("Respondents Brief"). Respondents dispute Chef Chloe's claimed attorneys' fees in three ways: (i) that is improper for Chef Chloe to seek a contingency fee award of a non-financial award based on a contract between Chef Chloe and counsel, rather than use the more typical lodestar method; (ii) that a lodestar multiplier is not warranted in these circumstances; and (iii) that certain attorney tasks and attorney rates were improperly included in the lodestar and costs. Accordingly, Respondents argue the fee award should be limited to the lodestar, but with certain reductions in hours and lawyer rates.

### III.    Analysis

#### A.    Use of Contingency Fee, Rather than Lodestar

Chef Chloe's primary requested fee award is 40% of the value of the Membership Interest reinstated to Chef Chloe in the Partial Final Award. Chef Chloe states that the contingency fee agreement provided that her counsel would receive 40% of any award obtained through this Arbitration as a contingency in exchange for Robins Kaplan taking on Chef Chloe's case, when she was at the time unable to pay any legal expenses. (Schutz Decl. ¶ 7.) Because the award ultimately obtained was of an LLC Membership Interest, and not a financial award, Chef Chloe argues that the 40% contingency should be based on the valuation evidence presented at the Hearing as to the value of CCSW LLC at certain periods of time. Based on a

range of potential valuations for the LLC presented at the Hearing, Chef Chloe seeks a range of $12.2 million to $25.2 million (which reflects 40% of the range of valuations presented at the Hearing for Chef Chloe's 50% Membership Interest in the LLC).

ESquared disputes that the contingency agreement displaces the more typical lodestar methodology for determining a fee award. ESquared argues that the cases relied on by Chef Chloe do not support the legitimacy of the requested fee award, including to the extent Chef Chloe seeks an award reflecting a 40% contingency of a non-financial award.

The cases relied on by Chef Chloe to support the request for the contingency fee of $12 - $25 million relate to specific contexts, such as federal student loan collection cases. In *United States v. Vilus*, the court stated that, in the context of federal student loan collection, departing from the more typical lodestar method was warranted because the "Secretary of Education has determined that tracking costs of collection of each defaulted loan would create too onerous of a system, that such a level of specificity would be untenable, inefficient, and that such detailed record keeping would result in far higher collection costs for debtors than percentage-based collection costs." 419 F. Supp. 2d 293, 298-99, 301 n.7 (E.D.N.Y. 2005) (citation omitted).

Other cases state the general proposition that contingency arrangements can be honored, but the specific findings of each case differ from the contractual agreement that the parties agreed to apply in this case, in significant ways. In *Silverman & Silverman, LLP v. Pacifica Found.*, No. 11 CV 1894 (FB) (RML), 2015 WL 7118246, at *5 (E.D.N.Y. Sept. 22, 2015), the court noted that courts award fees pursuant to contingency fee arrangements, but specifically declined to award the contingency fee because the party failed to produce any evidence of the reasonableness of the requested contingency fee in that case. In *CPMI Inc. v. Kaloj*, the parties *mutually agreed* that the contingency fee, and not the lodestar, was the proper metric to

determine fees.  No. 12831/03, 2007 N.Y. Misc. LEXIS 7833, at *52 (Sup. Ct., Westchester Cty. Oct. 10, 2007), *aff'd*, 65 A.D.3d 605 (2d Dep't 2009).  In *OOCL (USA) Inc. v. Transco Shipping Corp.*, the court found that the contingency fee should govern because it would result in a *lower* fee to be shifted to the defendant than the lodestar.  No. 13-cv-5418 (RJS), 2016 WL 4481153, at *4 (S.D.N.Y. Aug. 23, 2016).  No case cited by Claimant supports the proposition that a 40% contingency fee agreement should be applied by the applicable contract in this case to a non-financial award, requiring the losing party to pay tens of millions of dollars in a fee award based on a fee agreement to which they were not a party.

Further, each of the cases cited by Chef Chloe states that a contingency fee arrangement is not dispositive of the question of fees owed in a fee award; rather, the lodestar is in all events used a cross-check to confirm the reasonableness of any fee award.  *See Wei Wei Gao v. Sidhu*, No. 11 CV 2711 (WHP) (JCF), 2013 U.S. Dist. LEXIS 83446, at *14-16 (E.D.N.Y. June 13, 2013) (comparing the lodestar calculation to the contingency fee of 25% and finding the contingency (which was *lower* than the lodestar) was reasonable).

In this case, Chef Chloe seeks a range of $12 to $25 million in fees when the lodestar calculation is $1.3 million, which constitutes a 10-20x multiplier.  No case cited by Chef Chloe supports a lodestar multiplier in this range.  Accordingly, even if Chef Chloe's position were correct that the contingency fee agreement could apply in these circumstances, any contingency agreement must be limited by principles of reasonableness, as determined by the lodestar itself.  The Arbitrator finds that a 10-20x lodestar multiplier is unreasonable.

Finally, the cases relied on by Chef Chloe note that the plaintiff and counsel cannot take advantage of fee shifting to require the defendant to pay a fee quantified by a dollar amount that the plaintiff itself would never have been reasonably expected to pay, absent fee shifting.  *See*,

6

*e.g.*, *Wei Wei*, 2013 U.S. Dist. LEXIS 83446, at *12 ("a court should ask whether the fee

arrangement is grossly disproportionate to the arrangement the plaintiff would have been

expected to make with counsel in the absence of a fee-shifting agreement." (internal quotations

and citation omitted)); *OOCL*, 2016 WL 4481153, at *3 (plaintiff may not seek excessive fees

"simply because Defendant is paying"); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d

1250, 1263 (2d Cir. 1987) (fee agreement "should not be permitted to manipulate the actual

damage incurred by burdening the defendant with an exorbitant fee arrangement.") (citation

omitted).

Accordingly, the Arbitrator finds that the lodestar, and not the contingency fee agreement

between Chef Chloe and counsel, is the proper metric to use in determining the fees that

Respondent will be responsible for.

**B.  Lodestar Multiplier**

Chef Chloe alternatively seeks a 4x multiplier of its approximately $1.3 million lodestar

calculation.  Chef Chloe argues that courts "deem[] reasonable" a range of multipliers between

3-4.5x due to the "risk associated with a contingent fee agreement."  (Chef Chloe Br. at 13.)

However, the only case relied on by Chef Chloe is a class action megafund case in which the

Second Circuit used the lodestar multiplier of 3.5 as a "cross-check" on the reasonableness of the

district court's fee award, which represented a "low percentage of the fund". *Wal-Mart Stores,

Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (citing *In re Cendant Corp. PRIDES

Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) and *NASDAQ Market Makers* 187 F.R.D. 465, 489

(S.D.N.Y. 1998) (both megafund cases)).

The Arbitrator finds that Chef Chloe has not established that a lodestar multiplier of 300-

400 percent should apply in the facts and circumstances here.  Rather, a much smaller multiplier

can be considered to account for the risk undertaken by counsel in such a case.  The cited class action megafund cases do not stand for a blanket rule that counsel of prevailing party is entitled to a 3-4x lodestar multiplier, even if, as Chef Chloe argues, the lawyers assumed risk in taking on the representation on a contingency only basis.  Rather, the principle here is the appropriate exercise of discretion by the Arbitrator, applying AAA Rules, to award a multiplier of an amount that reasonably accounts for the risk undertaken.

The cases relied on by Chef Chloe provide a list of factors to be considered in determining whether a fee award is reasonable, including "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; [and] the lawyer's experience, ability and reputation."  *F.H. Krear*, 810 F.2d 1250 at 1263; *see also Wal-Mart*, 396 F.3d at 121 (listing factors including "the risk of the litigation").

In this case, Chef Chloe's counsel took on the risk of seeing this Arbitration through a merits hearing, where both parties litigated vigorously on complex issues of fact and law.  The Arbitration involved deciphering, and then presenting to the Arbitrator in a coherent fashion, a litany of interwoven LLCs and trusts created by Respondent ESquared as well as by James Haber—each with different governance procedures—resulting in a 90-page Partial Final Award.  Ms. Coscarelli, a young chef, was unable to pay the fees and costs of the case, which required using a contingency arrangement where her counsel fronted substantial costs and bore all of the risk of an unfavorable outcome.  (Schutz Decl. ¶ 7.)  Without the contingent fee arrangement, a meritorious case would not have been able to be filed and tried to successful conclusion.

The Arbitrator finds in her discretion that a modest multiplier of 1.25 times the lodestar is appropriate in these circumstances.  *See* AAA Commercial Arbitration Rule 47(b).  (*See also* Operating Agreement § 20.19(b).)

8

### C. Lodestar Hours and Rates

The Arbitrator having concluded that the lodestar is the proper basis upon which to measure the fees that Respondents must pay pursuant to the applicable contractual provision, now considers the fees and rates sought by Chef Chloe in the fee petition lodestar calculation. The Arbitrator has reviewed the affidavits and exhibits submitted and finds, as a general matter, that the tasks listed, and the amount of hours, are what is customary and reasonable in a complex commercial dispute such as this Arbitration. The time entries are reasonably specific, and the tasks billed are what one would expect to see as a legal team prepares for a merits hearing, post-hearing briefing and summation argument.

Respondents argue that certain aspects of the lodestar evidence warrant a more careful review. The Arbitrator will therefore duly consider Respondents' various arguments that the lodestar fees sought by Chef Chloe are excessive.

### i. Excessive Attorney Time

Respondents argue that certain tasks completed by Chef Chloe's counsel were unnecessary, resulted in excessive hours and therefore should not be included in the lodestar.

1. Preliminary Injunction

Respondents argue that Chef Chloe's counsel's work on the preliminary injunction motion before Judge Furman in the Southern District of New York[1] should be excluded from the lodestar "because there is no causal connection between that work and the Final Partial Award." (Respondents' Br. at 2.) Respondents rely on the standard articulated in *Gerena-Valentin v.*

---

[1] The preliminary injunction was heard in Federal Court pursuant to Operating Agreement Section 20.19(e), which states that for "a claim for which immediate injunctive relief is being sought, a party shall have the right to bring an action for such relief in a court of competent jurisdiction prior to commencing an arbitration action."

*Koch*, 739 F.2d 755, 758-59 (2d Cir. 1984) that a causal connection exists if the work to be reimbursed was "a catalytic, necessary, or substantial factor in attaining the relief."  Respondents argue that the preliminary injunction was not necessary to reach the result ultimately reached in this Arbitration, that any work was "duplicative," and that because Judge Furman did not grant the preliminary injunction, Chef Chloe prevailed in the Arbitration "*despite* the result in the federal action, not *because* of the preliminary junction motion it filed in that action." (Respondents' Br. at 4.)

However, the cases relied on by Respondents to support these assertions involve attorneys' fees for civil rights violations pursuant to 42 U.S.C. Section 1988, and the analysis of whether certain pre-litigation administrative proceedings are reimbursable as part of attorneys' fees in the ultimate litigation involved questions of interpretation of the specific Federal statute. *See Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic Dist. Comm'n*, 934 F.3d 238, 244-45 (2d Cir. 2019) ("even if the prior proceeding is not a proceeding to enforce one of the § 1988 civil rights laws, the discrete portion of the work product from the administrative proceedings that was both useful and of a type ordinarily necessary to secure the final result obtained from the litigation can be part of the attorney's fees awarded under § 1988."); *Peacock v. City of Rochester*, No. 6:13-cv-6046-MAT, 2016 WL 4150445, at *7 (W.D.N.Y. Aug. 5, 2016) (same); *Cullen v. Fliegner*, 18 F.3d 96, 105-06 (2d Cir. 1994) (same).

Further, in *Gerena-Valentin* (also a Section 1988 case), the "duplicative" action for which the Second Circuit affirmed the district court's denial of attorneys' fees was a "repetitive action" pleading "virtually identical claims" that was brought as a separate action by a different "latecomer" lawyer.  *Gerena-Valentin*, 739 F.2d at 757-59.  This is readily distinguishable from a preliminary injunction that sought much of the same relief as the Partial Final Award

10

ultimately awarded, brought as an initial litigation step by the same legal team that represented in Chef Chloe in this Arbitration.

The Arbitrator finds that the preliminary injunction, though unsuccessful, was "catalytic" of the claims ultimately heard and resolved in this Arbitration. Chef Chloe's decision to seek speedy clarification of Chef Chloe's rights through a preliminary injunction, rather than waiting for final disposition through Arbitration, is within the discretion of a lawyer and its client to determine the best litigation strategy. That Judge Furman determined that the arguments did not meet the high standard required before a court can grant a preliminary injunction does not negate the factual and legal ties between the issues presented to Judge Furman and those presented in this Arbitration, on which Chef Chloe ultimately prevailed. *See Hensley v. Eckhart*, 461 U.S. 424, 440 (1983).

Accordingly, Chef Chloe's fee application validly includes fees associated with the preliminary injunction.

2.    <u>Final Hearing Attendance</u>

Respondents also argue that attorney attendance at the Final Hearing was excessive, including because two associates attended the full Hearing, despite all of the speaking roles being performed by the two partners on the case. (Respondents' Br. at 6.) The case primarily relied on by Respondents is *Daiwa Special Asset Corp. v. Desnick*, No. 00 Civ. 3856 6 (SHS), 2002 WL 31767817, at *3 (S.D.N.Y. Dec. 3, 2002), in with the court rejected as excessive the lawyer hours sought in a fee application. There, "17 different lawyers and summer associates worked on [the] action," including excessive travel charges, such as $10,000 billed for travel time in a 24-hour period, and one associate billing 34.8 hours reviewing a single deposition

11

transcript.  *Id.* at *3.  That case also "did not require a trial and was ultimately litigated and decided on the basis of written agreements."  *Id.*

In contrast, this Arbitration culminated in a four-day Final Hearing, which involved multiple fact and expert witnesses and complex arguments, and a lengthy summation argument, resulting in a 90-page Partial Final Award.[2]  The same legal team members whose names consistently appeared on multiple pre-hearing briefs and other submissions to the Arbitrator attended the Hearing.  Thus there was a consistent core team, and the concerns expressed in *Daiwa* of rotating team members needing to "familiariz[e] themselves with the file" are not present here.  *Id.*  The Arbitrator does not find attendance by two partners and two associates at the Final Hearing to be excessive in these circumstances.  In complex matters such as this one, the assistance of associates who work on the matter is customary and appropriate, regardless of whether they have speaking roles.  Much legal work is done through research, fact development, and writing, rather than speaking orally at hearings.  And that work is more productive and informed because these associates see, hear and understand what occurred during the hearing day.  The helps them prepare witnesses and prepare other to cross examine witnesses, even without appearing as speakers on the transcript.  The Arbitrator finds that the work of the partners and associates was reasonably calibrated to the demands of this complex case, involving multiple layers of corporate entities, LLCs and trusts created by the Respondents.

3.    Damages Expert Work

Respondents seek to exclude fees and costs related to Chef Chloe's damages expert, Michele Riley, because her "report and testimony . . . does not factor into the Partial Final

---

[2] For these reasons, the Arbitrator also does not find that Chef Chloe's legal team's collective 31.9 hours reviewing and conferring about the 90-page Partial Final Award to be excessive.

Award." (Respondents' Br. at 6-7.)  Respondents then reiterate the argument made at the Final

Hearing and in post-Hearing argument that the methodology and analysis employed by Ms. Riley

was improper and unsupported.  (*Id.* at 7.)  Respondents argue that "[t]he substantial amount of

time and costs that Claimant devoted to trying to create the appearance of a windfall damages

claim through Riley is not properly considered under the lodestar, particularly where Riley's

opinion plays no part of the Partial Final Award."  (*Id.*)

The reason the Arbitrator did not consider Ms. Riley's report or testimony is not because

it was found in any manner lacking or improper; rather, the Arbitrator explained quiet clearly

that it was unnecessary to reach the question of a financial valuation of CCSW LLC, which was

an alternatively pled claim for relief.  (Partial Final Award at 60 n.23.)  This occurred solely

because Claimant prevailed on her primary theory of relief.  The Arbitrator thus made no

findings about the validity of Ms. Riley's work or opinions, although they were fully read and

understood as a basis for the alternative relief sought.  The Arbitrator notes that Respondents

deemed Ms. Riley's damages opinions sufficiently robust so as to retain their own damages

expert, at substantial cost, to rebut them.

Accordingly, the Arbitrator finds that the fees and costs[3] associated with Ms. Riley's

report and testimony—the lawyer fees, and Ms. Riley's compensation—are properly included in

the lodestar and cost calculations.[4]

---

[3] The costs associated with Ms. Riley's expert fees are the only costs disputed by Respondents.
[4] Respondents also describe the attorney bills related to time spent on Ms. Riley's report and
testimony as "87 aggregate hours" amounting to "$54,549 in aggregate fees (in block-billing)"
that should be excluded because block billing "may render the time record entries vague."
(Respondents Br. at 8 (quoting *Terra Energy & Resources Techs., Inc. v. Terralinna Pty. Ltd.*,
No. 12-CV-1337 (KNF), 2014 WL 6632937, at *4 (S.D.N.Y. Nov. 24, 2014)).)  The time entries
pertaining to Ms. Riley's expert opinion and testimony appear consistent with the many other
time entries submitted by Chef Chloe.  (*See* Arenz Decl. Ex. 1.)   The Arbitrator finds that these

### ii. Partner Billing Rates

The final aspect of Chef Chloe's fee application that Respondents dispute is the billing rate applied by the two partners, Mr. Schutz and Mr. Arenz, in the lodestar calculation. While the two associates on the Chef Chloe legal team reside in New York, Messrs. Schutz and Arenz reside in Minneapolis, Minnesota, but litigate matters nationally, including New York, where this Arbitration is seated by contractual agreement with the Respondents. These partners litigated successfully against New York counsel, and also have a major office in New York City, with 20 fellow partners. Chef Chloe applied New York billing rates for all lawyers under the "forum rule." (Chef Chloe Br. at 9 (citing *Bergerson v. New York State Office of Mental Health*, 652 F.3d 277, 289-90 (2d Cir. 2011)).)

Respondents dispute that applying New York rates to the partners' time is proper. Respondents argue that the forum rule states that "to the extent the reasonable hourly rate for an out-of-district lawyer is less than the billing rate in the district court where the court sits, the lower rate should apply." (Respondents' Br. at 9 (quoting *Ryan v. Allied Interstate, Inc.*, 882 F. Supp. 2d 628, 633 (S.D.N.Y. 2012) (internal quotations and citations omitted).) Accordingly, Respondents argue that the reimbursable rate for Messrs. Schutz and Arenz should be 40% lower, commensurate with local rates in Minneapolis, Minnesota . (Respondents' Br. at 9-10.) However, fees may be awarded at a higher out-of-district rate if a "reasonable client would have selected out-of-district counsel because doing so would likely . . . produce a substantially better net result." *Bergerson*, 652 F.3d at 290 (citation omitted).

---

block-billed entries are not impermissibly vague. Taking just one example, on November 21, 2019, Mr. Arenz billed 6.3 hours for the following tasks: "Finalize and serve exhibit list. Review and summarize Haber deposition testimony. Outline Riley direct." (*Id.* at 7.) The Arbitrator finds that entries such as these, including those relating to the work with Ms. Riley, are not vague.

Robins Kaplan is a well-known, highly reputable national law firm. It is not a regional firm primarily handling matters in the Minneapolis area. Indeed, Mr. Schutz, the Chairman of the firm's Executive Board, maintains offices in both Minneapolis and in New York. Chef Chloe engaged Robins Kaplan, and specifically Mr. Schutz, to handle this litigation against Respondents, both New York-based LLCs pursuant to an Operating Agreement with a New York forum selection clause, and represented by a team of New York litigation counsel. Under these circumstances, it is entirely reasonable and appropriate to apply the Robins Kaplan firm's New York billing rates to its partners who worked on this Arbitration.

*        *        *

Accordingly, the Arbitrator finds that the hours and rates used in the lodestar, and substantiated by declarations and exhibits, are appropriate and supported. Accordingly, the Arbitrator finds that Chef Chloe is entitled to the full lodestar it seeks.

Risk-based adjustment: The Arbitrator further finds that counsel of the quality of Claimant's counsel would not have undertaken this representation based purely upon a straight hourly rate, due to Claimant's inability to pay, compounded by the risk of litigation where the primary relief sought is the declaratory judgment issued in the Partial Final Award. Therefore, while the Arbitrator will not apply the 4x multiplier sought, some adjustment for the risk undertaken by counsel in this matter is warranted. For that reason, a modest multiplier of 1.25 (25%) will be added to the lodestar, resulting in an award of counsel fees in the amount of $1,620,440.63.

## IV.    Conclusion

For the foregoing reasons, the Arbitrator finds that:

1. The fee award is granted in the amount of $1,620,440.63;

2. Chef Chloe is awarded her full costs of $449,628.09;

3. Chef Chloe may submit an additional application to the Arbitrator for fees and costs as may have been, or may be, incurred, after May 27, 2020; and

4. This Partial Final Award is in addition to such other relief as has been awarded pursuant to the Partial Final Award issued on May 13, 2020 which is incorporated herein by reference.

So Ordered,                                          Dated: August 13, 2020

_____

Hon. Faith S. Hochberg, Arbitrator

# APPENDIX C

## to

## FINAL AWARD:

## Interim Order re: Effect of Partial Award Pending Confirmation/Vacatur Proceedings, Dated August 14, 2020

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
------------------------------------------------------------------------x
CHEF CHLOE LLC,                                          :
                                                                                    Case No. 01-19-0000-7965
                            Claimant,                          :

           -against -                                                 :

ESQUARED HOSPITALITY LLC and BC                 :
HOSPITALITY GROUP LLC f/k/a CCSW LLC,
                                                                         :
                            Respondents.
                                                                         :
------------------------------------------------------------------------x


**Claimant Counsel**                                    **Respondents Counsel**

Ronald J. Schutz                                             William L. Charron
Robins Kaplan LLP                                         Pryor Cashman LLP
399 Park Avenue, Suite 3600                        7 Times Square
New York, NY 10022                                     New York, NY 10036-6569
RSchutz@RobinsKaplan.com                        wcharron@pryorcashman.com

Patrick M. Arenz                                            Matthew S. Barkan
Robins Kaplan LLP                                         Pryor Cashman LLP
800 LaSalle Avenue, Suite 2800                   7 Times Square
PArenz@RobinsKaplan.com                         New York, NY 10036-6569
Minneapolis, MN 55402                               mbarkan@pryorcashman.com

Frederick A. Braunstein
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022
FBraunstein@RobinsKaplan.com

Reena Jain
Robins Kaplan LLP
399 Park Avenue, Suite 3600
New York, NY 10022

## Interim Order re:
## Effect of Partial Final Award Pending Confirmation/Vacatur Proceedings

Before the Arbitrator is the question of the effect of the Partial Final Award while cross-motions to confirm/vacate the award are pending. The Partial Final Award gave the parties 90 days to implement the relief in the Partial Final Award, but that period will expire without confirmation (or vacatur) of the Award.

### I.    Background

Following a four-day merits hearing in New York from December 9-12, 2019, and summation arguments on February 3, 2020, the Arbitrator issued the Partial Final Award on May 13, 2020. The Partial Final Award granted Chef Chloe the primary remedy sought—reinstatement of her 50% Membership Interest in CCSW—as well as a permanent injunction against CCSW related to its use of certain IP on products or projects other than the "by Chloe" fast casual chain of restaurants, and such other relief as stated expressly therein. The Partial Final Award is hereby incorporated by reference, in lieu of restating its terms.

When the Arbitrator issued the Partial Final Award on May 13, 2020, the Award stated that the parties had a 90-day period "to implement the Declaratory Judgments and equitable relief awarded herein." (Partial Final Award at 88.) Operating Agreement Section 20.6 states that "all legal remedies . . . as well as all equitable remedies . . . shall be available for any breach or threatened breach of any provision of this Agreement." The Partial Final Award found that Respondents breached the Operating Agreement in various ways. Accordingly, the Partial Final Award stated that, in addition to the declaratory relief awarded in the Partial Final Award, the parties had the "right to seek such other relief as may be necessary and appropriate under Section 20.6 after that 90-day period has elapsed; such application, if any, shall be made not later than 90 days from the issuance of this Partial Final Award." (*Id.* at 88-89.) The Partial Final Award

2

further stated that "[n]o party or transferee, successor or assign or any party, shall take any action in derogation of the Declaratory Judgments and equitable relief entered in this Award until there has been full compliance with this Award and the Arbitrator has confirmed that no party will seek further relief under Operating Agreement Section 20.6." (*Id.* at 88.)

## II.   The Parties' Submissions

The Partial Final Award is pending before Judge Furman in the Southern District of New York in cross-motions to confirm/vacate the award.  The motions are fully-submitted, but Judge Furman has yet to issue a ruling, and the 90-day period following the Partial Final Award has now elapsed.  The parties disagree as to the appropriate action of the Arbitrator at this juncture. Respondents argue that the Partial Final Award is "unenforceable" and "inchoate pending the District Court's rulings on the parties' pending motions, and as such is not subject to enforcement at this time." (Respondents' Aug. 10, 2020 Ltr. (citing *Fotochrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975).)

Claimant responds that the Partial Final Award is "binding" and therefore that Respondents are improperly "deny[ing] Chef Chloe the membership interest" reinstated in the Partial Final Award by refusing to effectuate the relief in the "decisive" Partial Final Award. (Claimant's Aug. 11, 2020 Ltr. (citing Operating Agreement § 20.19(b)).)  Claimants also seek certain discovery relevant to the question of whether Respondents are breaching their fiduciary duty owed to Chef Chloe, who pursuant to the Partial Final Award, is a Member of CCSW LLC. (Claimant Mot. for Additional Relief at 4.)

## III.   Analysis

While the Partial Final Award remains subject to confirmation/vacatur proceedings, it is the Arbitrator's duty to ensure that the parties are fully ready to implement a plan to effectuate

the declaratory relief awarded to the Claimant; and to ensure that the other orders within the Partial Final Award are complied with, which were, and are, intended to preserve the status quo so that the relief set forth in the Partial Final Award of this binding Arbitration can be effectuated in a just and speedy manner.

The Arbitrator further notes that Respondents, and its counsel at the Pryor Cashman firm, treated as binding and enforceable the final award in the prior arbitration before Arbitrator Garay immediately upon issuance, and long before it was confirmed by a Court.  Indeed, the very next day they wrote to Chef Chloe to announce that they were recapturing her membership interest in CCSW LLC.  At that time, Respondents and the lawyers of Pryor Cashman took the opposite position that they take now—that an unconfirmed award can be acted on and effectuated even if confirmation proceedings have yet to occur.  While that unilateral action may not be "law of the case" in this Arbitration, it is telling about the apparent switch of position by the same counsel who represented Respondents in that immediate action.

The Arbitrator grants the parties an additional 30 days to inform the Arbitrator of a plan for implementation of the Partial Final Award, to be enacted immediately upon confirmation of the Partial Final Award.  The Arbitrator expects the parties, as well as their transferees, successors and assigns, who are bound for the reasons stated in the Partial Final Award, to participate in the creation of this plan in good faith.  In so ordering, the Arbitrator does not state that the Partial Final Award is self-executing without judicial action.  Rather, the Arbitrator states that the parties shall forthwith take steps to ensure the enforceability of all relief specified in the Partial Final Award upon confirmation.  This plan shall be written and submitted to the Arbitrator in 30 days, and the initial meeting between all parties necessary for effectuation shall occur within the next 7 days.  This is a peremptory date, set because nothing appears to have

occurred to develop an implementation plan within the 90 days required by the Partial Final Award.

Finally, if the parties cannot agree, within the 5 calendar days following issuance of this Order, to the exchange of such information as may be necessary to confirm that no action has been taken to alter the status quo in any of the pertinent entities, such party may apply to the Arbitrator for discovery in aid of the implementation plan. To be clear, if the information exchange is not done voluntarily, the Arbitrator will consider requests for discovery as may be necessary to set a plan for implementation and to determine if there has been any derogation of the Declaratory Judgments and equitable relief entered in the Partial Final Award. Chef Chloe may re-submit its current, or other, discovery requests based upon the guidance in this Interim Order. Such requests shall be targeted to the issues identified herein. Respondents shall then submit a response to the requested discovery within 3 days thereafter so the Arbitrator can consider whether the requested discovery is relevant, necessary and appropriate. The short response time is necessary because there does not appear to have been any effort made to prepare for compliance with the Partial Final Award. Any failure to promptly comply may result in sanctions.

So Ordered,                                                    Dated: August 14, 2020


S/Hon. Faith S. Hochberg, Arbitrator

# APPENDIX D

### to

## FINAL AWARD:

## Interim Order: Chef Chloe Supplemental Fee Application, Dated August 27, 2020

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK
------------------------------------------------------------------------x
CHEF CHLOE LLC,                                         :

                               Case No. 01-19-0000-7965

             Claimant,                             :

     -against -                                        :

ESQUARED HOSPITALITY LLC and BC                :
HOSPITALITY GROUP LLC f/k/a CCSW LLC,

                                 :

             Respondents.                          :
------------------------------------------------------------------------x

| **Claimant Counsel** | **Respondents Counsel** |
|---|---|
| Ronald J. Schutz | William L. Charron |
| Robins Kaplan LLP | Pryor Cashman LLP |
| 399 Park Avenue, Suite 3600 | 7 Times Square |
| New York, NY 10022 | New York, NY 10036-6569 |
| RSchutz@RobinsKaplan.com | wcharron@pryorcashman.com |
| | |
| Patrick M. Arenz | Matthew S. Barkan |
| Robins Kaplan LLP | Pryor Cashman LLP |
| 800 LaSalle Avenue, Suite 2800 | 7 Times Square |
| PArenz@RobinsKaplan.com | New York, NY 10036-6569 |
| Minneapolis, MN 55402 | mbarkan@pryorcashman.com |
| | |
| Frederick A. Braunstein | |
| Robins Kaplan LLP | |
| 399 Park Avenue, Suite 3600 | |
| New York, NY 10022 | |
| FBraunstein@RobinsKaplan.com | |
| | |
| Reena Jain | |
| Robins Kaplan LLP | |
| 399 Park Avenue, Suite 3600 | |
| New York, NY 10022 | |

## Interim Order:  Chef Chloe Supplemental Fee Application

On August 13, 2020, the Arbitrator issued a Partial Final Award regarding Chef Chloe's fee application ("Fee Award").  The Arbitrator did not grant Chef Chloe's primary fee request, which sought 40% of the value of the Membership Interest reinstated to Chef Chloe in the Partial Final Award, nor a large 4x multiplier of the lodestar.  Instead, the Arbitrator determined that the lodestar with a modest 1.25x multiplier was more appropriate in the circumstances of this Arbitration, plus costs.  The Fee Award stated that "Chef Chloe may submit an additional application to the Arbitrator for fees and costs as may have been, or may be, incurred, after May 27, 2020," the date of Chef Chloe's first fee application.

Chef Chloe therefore now seeks a supplemental fee and cost award of $208,768.62 ("Supplemental Fee Application").  Chef Chloe subsequently paid Arbitrator fees of $12,530, increasing the total amount sought to $221,298.62.  (Aug. 19, 2020 email from P. Arenz.)

Respondents dispute the Supplemental Fee Application in three respects.[1]

### a.  Fees for Confirmation/Vacatur Proceedings

First, Respondents argue that $100,224 of the requested additional fees "were incurred as part of the pending confirmation/vacatur motions before the District Court."  (Aug. 18, 2020 Ltr.

---

[1] Respondents also object to the Supplemental Fee Application on the same grounds as it raised with respect to Chef Chloe's first fee application.  Respondents argue that the first Fee Award was "manifest[ly in] disregard of controlling law" and "will be the subject of a motion to vacate by Respondents."  (Aug. 18, 2020 Ltr. from Respondents at 3.)  Because Respondents do not specifically argue which aspects of the Fee Award disregard controlling law that also apply to the Supplemental Fee Application, the Arbitrator will not reconsider any issues analyzed in the Fee Award herein.  Respondents reiterate their objection to "block-billing."  (*Id.* at 4.)  However, the pertinent rule is not that block-billing in all instances is improper, but rather that such entries "may render the time record entries vague."  *Terra Energy & Resources Techs., Inc. v. Terralinna Pty. Ltd.*, No. 12-CV-1337 (KNF), 2014 WL 6632937, at *4 (S.D.N.Y. Nov. 24, 2014).  The Arbitrator has reviewed the entries cited by Respondents and does not find them impermissibly vague, particularly because the "block-billed" entries to which Respondents object are for small amounts of time, such as 0.3, 0.4 and 0.5 hours.

from Respondents at 4.)  Respondents argue that parties to arbitration do not have the right to recover fees for such proceedings.  (*Id.* (citing *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994).)  In *Menke*, the Seventh Circuit affirmed the district court's declination to award fees for confirmation proceedings because "[t]here is nothing in the Federal Arbitration Act itself that would authorize a district court to go beyond confirming an arbitrators' award and independently award additional attorneys' fees."  *Menke*, 17 F.3d at 1009-10.  ("In such circumstances, where the parties made an agreement intended to avoid court litigation by resolving the entire dispute through arbitration, *intervention by the court* to award additional relief would be inconsistent with the language and policy of the Federal Arbitration Act.") (emphasis added) (citation omitted).

Here, by contrast, Chef Chloe does not ask the District Court to award her fees for the confirmation proceedings, but rather makes that request to the Arbitrator, pursuant to the parties' contractual agreement embodied in their Operating Agreement, which has a mandatory arbitration clause for the issues set forth therein.  Therefore, Arbitrator looks to the parties' agreement for guidance on whether such fees may properly be sought in this Arbitration for the costs and fees incurred in connection with confirmation proceedings.

The Operating Agreement, in Section 20.19(b), provides that "[a]ll other legal fees, costs and expenses incurred *in connection with any dispute under this Agreement* shall be paid as determined/apportioned by the arbitrator."  (Operating Agreement § 20.19(b) (emphasis added).)  Section 20.7 further states that if "any holder of Membership Interests retains counsel *for the purpose of enforcing . . . the breach* . . . of any provision of this Agreement . . . , then the prevailing party shall be entitled to be reimbursed by the non-prevailing party for all costs and

3

expenses so incurred (including reasonable attorneys' fees, costs of bonds, and fees and expenses for expert witnesses)." (*Id.* § 20.7 (emphasis added).)

The Arbitrator finds that this language, which uses the word "enforce" a remedy for "breach", together with the arbitration clause, confers on the Arbitrator the authority to award fees for "any dispute" arising under, or to "enforc[e] . . . the breach" of, the Operating Agreement. *Menke* did not address comparable contractual language, nor the question of an *arbitrator's* authority to award fees for confirmation proceedings under these circumstances. The Arbitrator finds that the above-quoted language of the Operating Agreement covers confirmation proceedings, by its use of the word "enforce," which only a court can do. Indeed, that is precisely what Respondents continually argue about the Partial Final Award: to wit, that it can only be "enforced" by a Court.

As to Respondents' argument that Chef Chloe's request for "'prevailing party' fees in connection with *pending* motions to confirm/vacate . . . [is] unripe," any fee award in this case is premised on Chef Chloe being confirmed as the prevailing party. Should the District Court vacate the Partial Final Award, and find that Chef Chloe is not the prevailing party in the dispute, so too would any fee award be vacated.

### b. Fees for "Motion for Equitable Relief"

Respondents also dispute the inclusion of $14,228 in fees "for a 'motion for equitable relief' that was made in derogation of the well established law discussed above [*Menke*] and is incapable of receiving any legally valid relief from you." (*Id.*) To support this assertion, Respondents rely on *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 538-39 (S.D.N.Y. 2008), which states that "counsel should not be compensated for time spent pursuing claims or taking positions that were unreasonable, . . . unjustified . . . [or] futile." However, Respondents do not attempt to

4

explain why the referenced motion for equitable relief was "unreasonable," "unjustified" or "futile." Therefore, that argument is rejected as lacking any argument in support thereof.

### c. Fees for Settlement Activity

Respondents also argues that Chef Chloe improperly included settlement-related activity in its Supplemental Fee Application. Because Chef Chloe does not provide authority to support the position that settlement discussions can be part of a fee award, and because such a finding could dis-incentivize a party from participating in good faith settlement discussions, the Arbitrator finds that such time entries are not properly included in the Supplemental Fee Application.

The entries that include time for settlement matters are not separately broken out. Accordingly, Chef Chloe shall resubmit the time entries accompanying the Arenz Declaration with the time spent on settlement-related issues removed within two days of the date of this Interim Order; Respondent may file an opposition within two days thereafter, limited solely to amount of the fees resulting from the removal of fees for settlement discussions.

So Ordered,                                               Dated: August 27, 2020

S/Hon. Faith S. Hochberg, Arbitrator

5